# 24-2826

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

TAMENANG CHOH and GRACE KIRK, individually and on behalf of others similarly situated,

*Plaintiffs-Appellants*,

v.

BROWN UNIVERSITY, THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, HARVARD UNIVERSITY, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, PRINCETON UNIVERSITY, YALE UNIVERSITY, and THE IVY LEAGUE COUNCIL OF PRESIDENTS,

*Defendants-Appellees.*

---

*On Appeal from the United States District Court for the District of Connecticut, the Honorable Alvin W. Thompson*
*Civil Action No. 23-305*

---

### APPELLANTS CHOH'S AND KIRK'S OPENING BRIEF

---

Joshua P. Davis
BERGER MONTAGUE PC
505 Montgomery Street, Suite 625
San Francisco, CA 94111
Tel.: (415) 689-9292

F. Paul Bland
Robert E. Litan
BERGER MONTAGUE PC
1001 G Street, Suite 400 East
Washington, DC 20001
Tel.: (202) 809-9136

*Counsel for Plaintiffs-Appellants*
*(additional counsel follow)*

Eric L. Cramer
Alan Cotler*
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3009

*admission pending

Edward Normand
Richard Cipolla
FREEDMAN NORMAND
    FRIEDLAND LLP
10 Grand Central
155 East 44th Street, Suite 915
New York, NY 10017
Tel.: (646) 350-0527

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**PAGE**

Table of Contents ........................................................................... i

Table of Authorities ................................................................... iii

Statement of Jurisdiction............................................................ 1

Statement of the Issues Presented ............................................ 1

Standard of Review .................................................................... 2

Statement of the Case ................................................................ 3

    I.    Nature of the Case and Procedural History ................... 3

    II.   The Parties ...................................................................... 4

    III.  Factual Background ........................................................ 4

Summary of the Argument ........................................................ 6

Argument..................................................................................... 17

    I.    The Antitrust Framework under *Alston*................................ 17

    II.   Plaintiffs Plausibly Allege Anticompetitive
          Effects. ............................................................................ 21

          A.   The District Court Applied the Wrong
               Standards for Assessing Plaintiffs'
               Allegations Defining the Relevant Market................. 21

          B.   Plaintiffs Plausibly Allege Anticompetitive
               Effects Directly............................................................ 25

          C.   Plaintiffs Plausibly Allege Anticompetitive
               Effects Indirectly......................................................... 34

          D.   Direct and Indirect Allegations of Market
               Power Are Cumulative................................................. 45

          E.   Plaintiffs Plead Power in an Alternative
               Market. ......................................................................... 46

i

F.    Plaintiffs Show an Adverse Effect on Overall Competition. .................................... 47

III.    Plaintiff Choh's Claim Is Timely. ........................ 50

A.    Defendants Must Plead and Prove a Claim Is Untimely. ................................................ 50

B.    The Statutory Period Restarts with Each Continuing Violation. .................................... 51

C.    The *US Airways* Exception Does Not Apply Here. ....................................................... 54

Conclusion ........................................................... 60

Certificate of Compliance ...................................... 61

Addendum ........................................................... 62

# TABLE OF AUTHORITIES

## Cases

*1-800 Contacts, Inc. v. Fed. Trade Comm'n*,
1 F.4th 102 (2d Cir. 2021) ...................................................... 10, 33, 48

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) ............................................................ 36

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012) ............................................. 2, 14, 25, 45

*Arizona v. Maricopa Cnty. Med. Soc'y*,
457 U.S. 332 (1982) ........................................................................ 32

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......................................................................... 2

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990) ........................................................................ 48

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979) ............................................. 53, 55, 56, 57

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ................................................................ passim

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
996 F.2d 537 (2d Cir. 1993) ............................................................ 26

*Catalano, Inc. v. Target Sales, Inc.*,
446 U.S. 643 (1980) ......................................................... 28, 29, 31, 32

*Chapman v. New York State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008) ................................................. 21, 22, 44

*Choh v. Brown Univ.*,
2024 WL 4465476 (D. Conn. Oct. 10, 2024) ........................................ 4

*Choh v. Brown Univ.*,
No. 3:23-cv-00305 (D. Conn.) ..................................................... 4, 54

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ......................................................... 14, 25, 47

iii

*DXS, Inc. v. Siemens Med. Sys., Inc.*,
100 F.3d 462 (6th Cir. 1996) ................................................................ 16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) ................................................................. passim

*Eichman v. Fotomat Corp.*,
880 F.2d 149 (9th Cir. 1989) ............................................................... 59

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
129 F.3d 240 (2d Cir. 1993) ......................................................... 22, 49

*Fed. Trade Comm'n v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) ................................................................. passim

*Freeman v. San Diego Ass'n of Realtors*,
322 F.3d 1133 (9th Cir. 2003) ............................................................. 32

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
386 F.3d 485 (2d Cir. 2004) ................................................... 36, 39, 45

*Giordano v. Saks Inc.*,
654 F. Supp. 3d 174 (E.D.N.Y. 2023) ................................................... 59

*Hanover Shoe v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968) ....................................................................... 15, 53

*Henry v. Daytop Vill.*,
42 F.3d 89 (2d Cir. 1994) ..................................................................... 47

*In re Ciprofloxacin Hydrochloride Antitrust Litig.*,
261 F. Supp. 2d 188 (E.D.N.Y. 2003) ................................................... 51

*In re College Athlete NIL Litig.*,
No. 20-cv-03919 (N.D. Cal.) ................................................................ 19

*In re Google Digital Advert. Antitrust Litig.*,
2024 WL 895155 (S.D.N.Y. Mar. 1, 2024) .......................................... 59

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
375 F. Supp. 3d 1058 (N.D. Cal. 2019) ........................................... 8, 32

*In re Pre-Filled Propane Tank Antitrust Litig.*,
860 F.3d 1059 (8th Cir. 2017) .............................................................. 59

iv

*Johnson v. Nat'l Collegiate Athletic Ass'n*,
108 F.4th 163 (3d Cir. 2024) ............................................................. 19

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg., Co.*,
61 F.3d 123 (2d Cir. 1995) ............................................... 15, 26, 33, 49

*Kenmore Mercy Hosp. v. Daines*,
2011 WL 4368564 (W.D.N.Y. Sept. 19, 2011) ................................... 59

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997) ........................................................ 15, 51, 52, 53

*Lalonde v. City of Ogdensburg*,
662 F.Supp.3d 289 (N.D.N.Y. 2023) .................................................. 47

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ........................................................... 14, 25, 45, 47

*McCarthy v. Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007) .............................................................. 20

*Michael Grecco Prods., Inc. v. Radesign, Inc.*,
112 F.4th 144 (2d Cir. 2024) ..................................................... passim

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ......................................................... 33, 48

*Nastasi & Assocs., Inc. v. Bloomberg, L.P.*,
2024 WL 641263 (S.D.N.Y. Feb. 15, 2024) ....................................... 59

*Nat'l Collegiate Athletic Ass'n v. Alston*,
594 U.S. 69 (2021) ...................................................................... passim

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018) .................................................................... passim

*Pavia v. Nat'l Collegiate Athletic Ass'n*,
2024 WL 5159888 (M.D. Tenn. Dec. 18, 2024) .................................. 18

*Regeneron Pharms., Inc. v. Novartis Pharma AG*,
96 F.4th 327 (2d Cir. 2024) ....................................................... passim

*Theophilous v. Bridgeport Mental Health Ctr.*,
2020 WL 4449949 (D. Conn. Aug. 2, 2020) ....................................... 58

*Todd v. Exxon Corp.*,
　　275 F.3d 191 (2d Cir. 2001) ....................................................... passim

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
　　142 F.3d 90 (2d Cir. 1998) .......................................................... passim

*Turner v. McDonald's USA, LLC*,
　　2020 WL 3044086 (N.D. Ill. Apr. 24, 2020) ........................................52

*United States v. Am. Express Co.*,
　　838 F.3d 179 (2d Cir. 2016) .............................................................36

*United States v. Sargent Electric Co.*,
　　785 F.2d 1123 (3d Cir. 1986) .................................................... 14, 31

*United States v. Socony-Vacuum Oil Co.*,
　　310 U.S. 150 (1940)............................................................................32

*US Airways, Inc. v. Sabre Holdings Corp.*,
　　105 F. Supp. 3d 265 (S.D.N.Y. 2015)................................................57

*US Airways, Inc. v. Sabre Holdings Corp.*,
　　2017 WL 1064709 (S.D.N.Y. Mar. 21, 2017) .......................... 56, 57, 58

*US Airways, Inc. v. Sabre Holdings Corp.*,
　　938 F.3d 43 (2d Cir. 2019) .......................................................... passim

*Varner v. Peterson Farms*,
　　371 F.3d 1011 (8th Cir. 2004) ..........................................................59

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
　　627 F.3d 85 (3d Cir. 2010) ...............................................................52

*Walker v. Accenture PLC*,
　　511 F. Supp. 3d 169 (D. Conn. 2020)................................................58

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*,
　　549 U.S. 312 (2007)............................................................................52

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
　　401 U.S. 321 (1971).............................................................. 15, 51, 56

**Statutes**

15 U.S.C. § 1 .........................................................................................3

vi

15 U.S.C. § 1337 ...................................................................... 1

15 U.S.C. § 15 .......................................................................... 1

15 U.S.C. § 26 .......................................................................... 1

28 U.S.C. § 1291 ...................................................................... 1

28 U.S.C. § 1331 ...................................................................... 1

**Rules**

Fed. R. Civ. P. 8 ...................................................................... 47

## STATEMENT OF JURISDICTION

This appeal arises from the District Court's order entered on October 10, 2024, dismissing the case with prejudice. The District Court had jurisdiction under 15 U.S.C. §§ 15(a), 26 and 28 U.S.C. §§ 1331, 1337(a). Plaintiffs-Appellants Tamenang Choh ("Choh") and Grace Kirk ("Kirk") (collectively "Plaintiffs") filed a timely notice of appeal on October 21, 2024. A-277. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED

1. *Relevant Market*. Whether the District Court required Plaintiffs to meet improperly high standards for pleading a relevant market:

(a) *Direct*. Whether the District Court erred by holding—contrary to binding precedent—that a direct showing of anticompetitive effects must meet the same standard for alleging a relevant market as an indirect showing.

(b) *Indirect*. Whether the District Court erred by assessing Plaintiffs' indirect showing of anticompetitive effects—contrary to binding precent—based on *functional* substitutability rather than *economic* substitutability.

2. *Effects on Overall Competition*. Whether the District Court's application of improper standards to define the relevant market also

1

caused it to conclude incorrectly that Plaintiffs did not adequately allege effects on overall competition.

3. *Statute of Limitations*. Whether the District Court erred in concluding that Plaintiff Choh's claims were untimely because:

> (a)    it did not apply the continuing violation doctrine that gives rise to a new statutory period every time a horizontal price-fixing conspiracy adversely affects the price to a plaintiff; and

> (b)    it applied instead an exception to the continuing violation doctrine that is limited to contracts in which the *plaintiff* agrees in advance to pay set prices in a contract that contains anticompetitive terms, whereas Appellant Choh entered no such contract with Brown University ("Brown"), the school he attended.

## STANDARD OF REVIEW

This Court's review of the District Court's dismissal under Rule 12(b)(6) is *de novo*. *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). As a result, this Court should accept Plaintiffs' non-conclusory allegations as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and determine that Plaintiffs have stated a claim if those allegations satisfy its elements directly or if they create a plausible inference that they are satisfied. *Id*. This Court also should limit its analysis to the face of the complaint. *Michael Grecco Prods., Inc. v. Radesign, Inc.*, 112 F.4th 144, 150 (2d Cir. 2024), *petition for cert. filed* (U.S. Jan. 17, 2025) (No. 24-768). Defendants thus can prevail on an

2

affirmative defense, including the statute of limitations, only if Plaintiffs' allegations establish that they did not file their claims in a timely manner. *See id*.

## STATEMENT OF THE CASE

### I.     Nature of the Case and Procedural History

Plaintiffs, former student-athletes at Brown, filed a class action lawsuit against the Ivy League universities (the "Ivies" or "University Defendants") and the Ivy League Council of Presidents ("Ivy League Council," and with the Ivies, "Defendants") alleging that Defendants, Appellees here, violated Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"), through their adherence to an agreement they formed (the "Agreement" or "Ivy Agreement").

The Agreement prohibits the Ivies from awarding athletic scholarships or otherwise paying athletes admitted as students any compensation for the athletic services they provide. A-35; A-37–A-38; A-61–A-62. Instead, Ivy League student-athletes may be awarded financial aid only on the basis of economic need. A-62.

The Ivies compete against each other—albeit in a limited way because of the Agreement—to purchase athletic services from student-athletes. A-37–A-38; A-77; A-77–A-81.

 Plaintiffs filed this action on March 7, 2023. A-32. Defendants moved to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) on May 15, 2023. *Choh v. Brown Univ.*,

3

No. 3:23-cv-00305 (D. Conn.), ECF No. 153. On October 9, 2024, the United States District Court for the District of Connecticut, Honorable Alvin W. Thompson, District Judge (the "District Court") granted Defendants' motion to dismiss with prejudice. *Choh v. Brown Univ.*, 2024 WL 4465476 (D. Conn. Oct. 10, 2024) (the "Order," addended hereto).

## II.  The Parties

Plaintiffs are former students at Brown University, a member of the Ivy League athletic conference and of the National Collegiate Athletic Association (the "NCAA") and its Division I, the highest division of collegiate athletics. A-36; A-42–A-43. Brown recruited both Plaintiffs to play collegiate basketball: Choh from the fall semester, 2017 through the spring semester, 2022, and Kirk from fall semester, 2020 through the spring semester, 2024. A-36; A-42–A-43. Both Plaintiffs received need-based financial aid from Brown that did not cover the total of their tuition, fees, room and board, and incidental expenses. *Id.*

Defendants are the University Defendants and the Ivy League Council. A-43–A-49.

## III.  Factual Background

The Ivy League athletic conference formed in 1954, with each University Defendant signing the Ivy League Agreement. A43. In doing so, each University Defendant agreed that it would not provide athletic scholarships to its students or otherwise compensate student-athletes for the athletic services they provide. A-35; A-37; A-61–A-62.

4

Plaintiffs allege that Defendants conspired through the Agreement to suppress financial aid to student-athletes by barring athletic scholarships. A-35; A-61–A-62. The University Defendants vie with each other for student-athletes to attend their schools and play for their teams—competing against each other to purchase athletic services, or labor, from student-athletes. A-37; A-61; A-63–A-64; A-77; A-79–81. Plaintiffs allege that the University Defendants would compete against each other by offering athletic scholarships but for the Agreement. A-42–A-43; A-78.

Plaintiffs allege that the Agreement fixes prices in violation of federal antitrust law. A-35–A-37; A-60–A-61; A-63–A-65; A-77–A-79.

Plaintiffs allege that Defendants have been able to suppress student-athlete compensation sustainably—and profitably—through the Agreement. A-61–A-62. Plaintiffs allege that Defendants have been able to do so, *inter alia*, because the Ivies are distinctive as purchasers of athletic services from students who are elite both academically and athletically ("Elite Student-Athletes"). A-79–A-81. As a result, the Ivy League constitutes a market for purposes of antitrust analysis. *Id*. In the alternative, the market includes only a few other academically selective schools, notably Stanford University ("Stanford"), the University of Notre Dame ("Notre Dame"), Duke University ("Duke"), and Rice University ("Rice"). *Id*.

By suppressing financial aid and athletic compensation, the Agreement has caused Plaintiffs and the proposed class to suffer antitrust injury. A-40; A-90. The Agreement has had long-lasting, market-wide anticompetitive effects. A-36; A-77–A-78; A-80–A-81. That is because the Ivy League constitutes its own market. A-79–A-82. Under the alternative market definition, the Ivy League dominates the relevant market. A-81; A-83. *See* II.E, *infra*.

The Defendants are members of the NCAA and its Division I. A-35; A-52. Division I members participate at the highest level of athletic competition among the three Divisions. A-35. The Ivy League is the only Division I conference that does not permit athletic scholarships or other payments of compensation to athletes for their athletic services. A-63.

The District Court dismissed the Complaint on the grounds that Plaintiffs do not allege (1) a *per se* antitrust violation, (2) a restraint that violates the rule of reason because they do not allege a properly defined market, and (3) consequently, market-wide anticompetitive effects. Order 10. The District Court also held that the statute of limitations bars Plaintiff Choh's claims but not Plaintiff Kirk's. *Id.* at 10–11.

## SUMMARY OF THE ARGUMENT

The Supreme Court's unanimous decision in *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021), marked a dramatic shift in the application of antitrust law to college sports. No longer should courts assume that universities may agree to deprive student-athletes of

financial compensation. *Id*. at 91–93. The tradition of amateurism in college sports does not provide an exemption from antitrust scrutiny. *Id*.

Indeed, as Justice Kavanaugh noted in concurring, amateurism may not provide a legally cognizable justification at all:

> Nowhere else in America can businesses get away with agreeing not to pay their workers a fair market rate on the theory that their product is defined by not paying their workers a fair market rate. And under ordinary principles of antitrust law, it is not evident why college sports should be any different. The NCAA is not above the law.

*Id*. at 112.

*Alston* held that when colleges conspire to suppress compensation to student-athletes, the facts matter. *Id*. at 93. A searching inquiry is warranted into real-world economic effects: "Whether an antitrust violation exists necessarily depends on a careful analysis of market realities." *Id*. (citing *Ohio v. Am. Express Co.*, 585 U.S. 529 (2018) ("*AmEx*")).

Plaintiffs made detailed allegations that the Ivy League schools agreed to even more severe restrictions on compensation to student-athletes than the ones *Alston* condemned. The NCAA permits schools to offer athletic scholarships. Only the Ivies conspire not to do so. A-63.

Plaintiffs also made detailed allegations about the Ivy League's conspiracy and its effects. A-61–A-63. It decreased the financial aid that the Ivies paid to student-athletes. A-36; A-64; A-78; A-80–A-81.

7

As a result, under *Alston* whether the Ivy League has violated antitrust law "depends on a careful analysis of market realities." *Alston*, 594 U.S. at 93. Assessing those market realities here requires evidence—and hence discovery. Yet the District Court dismissed the complaint without any inquiry into the evidence.

In doing so, the District Court reviewed the Defendants' asserted justification for their price-fixing agreement: "broaden[ing] consumer choice by offering a campus culture and college experience where student-athletes and non-student-athletes" are treated alike for purposes of compensation. Order 17. But that justification—if it is legally cognizable at all—should have been tested through litigation. Plaintiffs should have had the opportunity, for example, to discover whether the Ivies really do treat student-athletes and non-student athletes in the same way when it comes to financial aid. Similarly, they should have had the opportunity to challenge whether the Ivy League conspiracy really does enhance consumer choice, campus cultures, or college experiences, just as the plaintiffs in *Alston* successfully challenged the NCAA's assertion that spectators and television audiences prefer for college athletes to be deprived of compensation. *Alston*, 594 U.S. at 83 (citing *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1076 (N.D. Cal. 2019) ("*Grant-in-Aid*")).

Instead, the District Court's order in effect improperly placed the Ivy League "above the law." *Id.* at 112 (Kavanaugh, J., concurring). In so

ruling, it misapplied, first, antitrust law on anticompetitive effects and power in a relevant market and, second, statute of limitations doctrine.

*Market Power and Adverse Effects on Overall Competition*. Courts adopt a range of standards in assessing potentially anticompetitive conduct. *Alston*, 594 U.S. at 88–89. The most stringent is the *per se* rule—which condemns some conduct categorically—and the most lenient is the rule of reason—which entails an inquiry into the anticompetitive and procompetitive effects of challenged conduct. *Id.*; *AmEx*, 585 U.S. at 540–41. The District Court here applied the rule of reason.

The rule of reason for Section 1 antitrust claims involves a three-step, burden-shifting process. *Alston*, 594 U.S. at 96 (citing *AmEx*, 585 U.S. 541). Plaintiffs first must show anticompetitive effects, such as adverse effects on price. *Id.*; *AmEx*, 585 U.S. 541–42. If they do, defendants then must show procompetitive effects. *Alston*, 594 U.S. at 96; *AmEx*, 585 U.S. at 541. If they do, then plaintiffs must show the defendants could have achieved the procompetitive effects by means that were less harmful to competition. *Alston*, 594 U.S. at 96–97; *AmEx*, 585 U.S. at 542.

At the pleading stage, ordinarily only the first step is relevant. Plaintiffs need not address procompetitive effects. Nonetheless, here they have denied them. A-84–A-86. As the District Court recognized, the relevant issue for present purposes is whether Plaintiffs have adequately alleged that the Ivy Agreement caused anticompetitive effects. Order 20,

9

23. Any procompetitive effects that Defendants may assert were not properly before the District Court and are not properly before this Court on appeal.

Plaintiffs meet their burden under step one of the rule of reason if they make non-conclusory allegations that plausibly establish Defendants could and did cause anticompetitive effects, such as artificially deflating compensation to student-athletes. *Alston*, 594 U.S. at 97–98. Plaintiffs may establish those effects and power in a relevant market using either of two, independent methods. *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 96 (2d Cir. 1998). First, they can do so directly. *AmEx*, 585 U.S. at 542; *Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460–61 (1986); *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 118 (2d Cir. 2021); *Tops Mkts.*, 142 F.3d at 96. Showing that defendants artificially and sustainably caused an adverse effect on price, output, or quality is direct. *AmEx*, 585 U.S. at 542; *1-800 Contacts*, 1 F.4th at 118. Each is enough for an anticompetitive harm. *AmEx*, 585 U.S. at 542; *1-800 Contacts*, 1 F.4th at 118. If Defendants caused any one of those harms, by definition they have power in a relevant market. *Alston*, 594 U.S. at 97–98; *AmEx*, 585 U.S. at 542; *Ind. Fed'n*, 476 U.S. at 460–61.

Second, Plaintiffs may establish anticompetitive effects indirectly. *AmEx*, 585 U.S. at 542; *Tops Mkts.*, 142 F.3d at 96. That requires pleading circumstances giving rise to an inference of market power, such

10

as control of a large percentage of a relevant market, and harmful use of that market power. *Tops Mkts.*, 142 F.3d at 96–97.

*Direct Allegations*. The District Court erred in part because it conflated the two means of demonstrating anticompetitive effects: direct and indirect. Contrary to decades of precedent, it required Plaintiffs to meet the same standard for defining a relevant market when they establish anticompetitive effects *directly* as when they do so *indirectly*. Order 28–31. That is incorrect.

The point of the direct approach is that only defendants with power in a relevant market can cause anticompetitive harm. If defendants *do* cause anticompetitive harm, they necessarily *can* do so and, by definition, have power in a relevant market. That is why the Supreme Court and this Court have held: "Market power is but a surrogate for detrimental effects." *Tops Mkts.*, 142 F.3d at 96 (cleaned up). And it is why direct and indirect demonstrations are "two *independent* means by which to satisfy the adverse-effect requirement." *Id.* (emphasis added). It follows that non-conclusory allegations of anticompetitive effects necessarily establish power in a relevant market.

Plaintiffs allege that the Ivies on an ongoing basis provided significantly less financial aid to student-athletes than they would have absent their conspiracy. A-35–A-36; A-77; A-82. They allege that the Ivy League formed the Agreement with the purpose of withholding financial aid from student-athletes based on their athletic performance. A-78.

11

They further allege that in the absence of that agreement, they would have offered athletic scholarships, as virtually all colleges do, including the ones most like the Ivies. A-43–A-43; A-78. So Plaintiffs' non-conclusory allegations give rise to a plausible inference of anticompetitive price effects in a market consisting of the Ivies.

The District Court did *not* reject Plaintiffs' argument that they made proper direct allegations of anticompetitive price effects. Nonetheless, it ruled for Defendants on the issue of power in a relevant market. That was incorrect.

The premise of the District Court's ruling was that Plaintiffs' *direct* allegations of anticompetitive effects—and power in a relevant market—cannot suffice unless Plaintiffs define a relevant market with the same precision that is required for *indirect* allegations of anticompetitive effects. Order 27–31. As explained above, that conflicts with a long line of Supreme Court and Second Circuit precedent. *See, e.g.*, *AmEx*, 585 U.S. at 542; *Ind. Fed'n*, 476 U.S. at 460–61; *Tops Mkts.*, 142 F.3d at 96. That provides reason enough for reversal.

*Indirect Allegations*. The District Court also drew improper inferences in rejecting Plaintiffs' allegations establishing anticompetitive effects *indirectly*.

One way to show anticompetitive effects indirectly is through Defendants' share of a relevant market. *Tops Mkts*, 142 F.3d at 96–97. A market consists of the group of products or services that antitrust

12

defendants need to control to cause anticompetitive harm. *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024). If a single market actor with control over a set of products or services can profitably and significantly alter prices (or output or quality), then that set constitutes a market. *Id*.

Again, that is because of the purpose of defining a market. It is not an end in itself. It is instrumental. The goal of defining a relevant market—and assessing market power—is to answer the ultimate question: whether Defendants can cause anticompetitive harm. *Id*. If they control a set of goods or services sufficient to cause such harm, then they can do so. *Id*.

It follows that the Ivies constitute a distinct market if they are sufficiently unlike other schools that a price-fixing agreement limited to them can artificially and sustainably suppress compensation to student-athletes. That is what Plaintiffs plausibly allege.

Plaintiffs' non-conclusory allegations support a plausible inference that the Ivy League schools are distinctive—that they offer special opportunities to Elite Student-Athletes. *See* A-52–A-56. It is plausible that the Ivies are sufficiently unlike other schools that many Elite Student-Athletes would choose to attend them *without* athletic scholarships over non-Ivy League schools *with* athletic scholarships. It is further plausible that the Ivies are distinct enough that, as a group, they could and did sustainably agree to deprive Elite Student-Athletes of

13

financial aid they otherwise would have received. Those allegations suffice to establish the Ivy League as a market.

*Allegations as a Whole*. Plaintiffs' direct and indirect allegations of anticompetitive effects and market power are mutually reinforcing. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011) (considering allegations in complaint "as a whole" in assessing motion to dismiss); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698–99 (1962) (anticompetitive conduct in antitrust cases should be assessed as a whole); *Anderson News*, 680 F.3d at 190 (complaint must be "read as a whole, rather than piecemeal"). The Ivy League Agreement to bar athletic scholarships implies that the Ivies both perceived the need for an agreement and expected one to work. *United States v. Sargent Electric Co.*, 785 F.2d 1123, 1127 (3d Cir. 1986). The Agreement's longevity shows that the Ivies were right on both counts. Otherwise, why enter and continue a price-fixing agreement among competitors? *Id.*

As *Sargent* observed, "To some extent, of course, a horizontal agreement tends to define the relevant market, for it tends to show that the parties to it are at least potential competitors. If they were not, there would be no point to such an agreement. Thus its very existence supports an inference that it would have an effect in a relevant market." *Id.* at 1127.

*Effects on Overall Competition*. The District Court's conclusion that Plaintiffs failed to allege adverse effects on overall competition was

14

derivative of its improper conclusions about anticompetitive effects and power in a relevant market. Order 27–31. Plaintiffs' allegations show that the Defendants' conduct affected pricing generally, not just for a few Elite Student-Athletes. That effect on overall competition suffices to state an antitrust violation. *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg., Co.*, 61 F.3d 123, 128 (2d Cir. 1995) ("The overarching standard is whether defendants' actions 'diminish overall competition, and hence consumer welfare.'") (citation omitted).

*Statute of Limitations*. The District Court also concluded that the claims of one of the two named Plaintiffs—Choh—were untimely. Brown University, where he attended, initially undercompensated him more than four years—the statutory period—before Plaintiffs filed suit. Brown did so again during the statutory period.

That gave rise to a timely claim under the continuing violation doctrine, particularly as applied in price-fixing cases. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 67 (2d Cir. 2019) (citing *Klehr*, 521 U.S. at 189). That doctrine holds that a new statute of limitations begins to run each time the price to a plaintiff is adversely affected by an antitrust conspiracy, especially a horizontal price-fixing conspiracy. *Klehr*, 521 U.S. at 189 (citation omitted); *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15 (1968); *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467

15

(6th Cir. 1996)). As noted, Plaintiff Choh received artificially deflated financial aid during the statutory period. A-42–A-43. That makes his claims timely.

The District Court acknowledged the continuing violation doctrine and its potential to render Plaintiff Choh's claims timely. Order 32–33. It nonetheless concluded he filed his claims too late. *Id*. at 33–35. The basis for its decision was a misreading of a limited exception to the continuing violation doctrine based on this Court's decision in *US Airways*.

*US Airways* held that a contract formed before the statutory period creates an exception to the continuing violation doctrine if: (1) it is between the plaintiff and the defendant; (2) it sets future prices for transactions between the plaintiff and defendant; and (3) it contains the key anticompetitive terms that make the defendant's conduct unlawful. *Id*. at 68-69

There, the plaintiff and defendant entered a contract containing terms that were allegedly anticompetitive and that specified the prices the plaintiff would later pay the defendant. *Id.* at 51. This Court held that payment of the prices to which the plaintiff agreed in advance was not a new overt act by the defendant in furtherance of an antitrust violation. *Id.* at 68–69. Instead, it was "the performance of a contract as a manifestation of the [earlier] 'overt act,' the decision to enter the contract." *Id.* at 69.

16

Defendants do not satisfy *US Airways* here. The statute of limitations is an affirmative defense. *Michael Grecco*, 112 F.4th at 149–50. The burden is on Defendants to plead and prove it. *Id*. That generally means they cannot prevail on the defense under Rule 12. *Id*. Only if Plaintiffs made affirmative allegations demonstrating that *US Airways* applied would dismissal of Plaintiff Choh's claims be proper. *See id*. They did not.

No allegations in the Complaint establish that Plaintiff Choh formed a contract with Brown at the outset of his education that set his financial aid for his full time in school. Nor do any allegations establish that any such contract contained the key conduct Plaintiffs challenge. Rather the conduct Plaintiffs challenge—Defendants' agreement to fix prices for athletic scholarships at zero—is contained in the Ivy Agreement. That agreement is between *Defendants*; Choh is not a party to it. Nor do Plaintiffs allege that Choh's financial aid for his career at Brown was set in the Ivy Agreement. *US Airways* does not apply.

## ARGUMENT

### I. The Antitrust Framework under *Alston*.

*Alston* ushered in a new era for antitrust and college sports. The Supreme Court affirmed an injunction limiting the NCAA's ability to restrict compensation to student-athletes. *Alston*, 594 U.S. at 107. The Court held that tradition is not enough to justify a practice. *Id*. at 92–93. Market realities must support a claim that suppressing compensation to

17

student-athletes has procompetitive effects. *Id*. *Alston* found no such support for the challenged NCAA restrictions on the ability of schools to provide education-related compensation or benefits. *Id*. at 84–85, 107.

*Alston* opened treatment of student-athletes to additional antitrust scrutiny. *See., e.g.*, *Pavia v. Nat'l Collegiate Athletic Ass'n*, 2024 WL 5159888, at \*1 (M.D. Tenn. Dec. 18, 2024) (appeal pending) (*Alston* "drastically changed the landscape of collegiate athletics"). Plaintiffs did not contest the trial court's order in the Supreme Court. *Alston*, 594 U.S. at 86. For example, they did not seek reversal of the trial court's decision that the NCAA could limit school compensation to student-athletes that is not related to education. *Id*. at 84–85, 107. As a result, the Supreme Court did not approve the restrictions that the lower courts left in place. *Id*. at 86; *id*. at 87 ("we express no views" on issues not raised by the parties); *id*. at 86 ("[T]he student-athletes do not renew their across-the-board challenge to the NCAA's compensation restrictions. Accordingly, we do not pass on the rules that remain in place or the district court's judgment upholding them. Our review is confined to those restrictions now enjoined."); *id*. at 108 (Kavanaugh, J., concurring) ("[T]his case involves only a narrow subset of the NCAA's compensation rules.").

To the contrary, *Alston* cast doubt on agreements to suppress student-athlete compensation. *Id*. at 108–12 (Kavanaugh, J., concurring) (noting "serious questions" about the legality of the restrictions on compensation to student-athletes after *Alston*). As Justice Kavanaugh

18

proclaimed in his concurrence, "Price-fixing of labor is price-fixing of labor." *Id*. at 110. *Alston* does not prevent student-athletes from challenging horizontal price-fixing agreements that the Supreme Court did not address, including the Ivy League Agreement. *Id*. at 86, 108.

Indeed, student-athletes have pursued antitrust claims not addressed by *Alston*. For example, plaintiffs initiated class actions to challenge restrictions on compensation student-athletes may receive in exchange for the rights to use their names, images, or likenesses ("NIL Rights"). *See In re College Athlete NIL Litig.*, No. 20-cv-03919 (N.D. Cal.). A trial court recently granted preliminary approval to a settlement of those class actions that would transform the market for compensating student-athletes. *Id*. at ECF No. 544 (Oct. 7, 2024). Not only would the athletes be entitled to nearly $2.8 billion in payments for past under-compensation, but it could lead to them benefiting from extensive revenue sharing with college athletic departments. *Id*. at ECF No. 450, 7–10; *see also Johnson v. Nat'l Collegiate Athletic Ass'n*, 108 F.4th 163, 172–73, 182 (3d Cir. 2024) (holding that student-athletes may be employees under the Fair Labor Standards Act, notwithstanding the "tradition of amateurism" in NCAA Division 1 athletics).

Moreover, under *Alston*, the Ivy League Agreement is particularly suspect. The NCAA has long permitted athletic scholarships. Nonetheless, *Alston* restricted the NCAA's ability to limit the compensation or benefits schools provide to student-athletes if they

19

relate to education. *Alston*, 594 U.S. at 84–85, 107. Yet the Ivies go further. They conspire to deprive student-athletes of *any* athletic scholarships, even to pay tuition and other educational costs. Those costs relate *directly* to education. Under *Alston*, whether the Ivy Agreement is legal depends on the *evidence*.

*Alston* held that restrictions on student-athlete compensation are unlawful if they violate the ordinary rule of reason. *Id.* at 87–96. The rule of reason involves a three-step, burden-shifting framework:

> **Step One**. *Plaintiffs—Anticompetitive Effect*. Plaintiffs must first establish "the challenged restraint has a substantial anticompetitive effect," *id.* at 96 (quoting *AmEx*, 585 U.S. at 541);

> **Step Two**. *Defendants—Procompetitive Effect*. If plaintiffs do, defendants must respond by showing "a procompetitive rationale for the restraint," *id.* (quoting *AmEx*, 585 U.S. at 541–42); and

> **Step Three**. *Plaintiffs—Less Restrictive Alternative*. If defendants do, plaintiffs must respond by demonstrating that the procompetitive efficiencies defendants presented "could reasonably be achieved through less anticompetitive means." *Id.* at 97 (quoting *AmEx*, 585 U.S. at 542).

Here, the only issue under the rule of reason properly before this Court is whether Plaintiffs adequately alleged substantial anticompetitive effects. For Defendants to be able to raise arguments under Steps Two or Three—relating to potential procompetitive effects—Plaintiffs would have had to allege that there were some. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (at motion-to-dismiss stage, court's review is generally limited "to the facts as asserted

within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference"). They did not and, instead, denied that Defendants' conduct had any procompetitive effects. A-79; A-84–A-86.

## II. Plaintiffs Plausibly Allege Anticompetitive Effects.

To state a Section 1 antitrust claim under the rule of reason, Plaintiffs must allege anticompetitive effects. *Alston*, 594 U.S. at 96. They can do so in two ways: directly or indirectly. *AmEx*, 585 U.S. at 542. A showing of adverse effects on price, output, or quality is direct and suffices. *Id*. Alternatively, they can make the showing indirectly by alleging power in a relevant market—such as through a high market share. *Id*. Plaintiffs here carried their initial burden in both ways and with the two combined—each warranting reversal.

### A. The District Court Applied the Wrong Standards for Assessing Plaintiffs' Allegations Defining the Relevant Market.

Courts are reluctant to grant a motion to dismiss based on market definition. *Regeneron*, 96 F.4th at 339 (quoting *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (courts "'hesitate to grant motions to dismiss for failure to plead a relevant product market'"). The relevant analysis depends on "commercial realities," *id*. (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482 (1992), and requires "'a deeply fact-intensive inquiry.'" *Id*. (quoting *Chapman*,

21

546 F.3d at 238). As a result, courts generally permit discovery before assessing a plaintiff's market definition. *Id.*

As explained above, plaintiffs may plead anticompetitive effects directly or indirectly. *AmEx*, 585 U.S. at 542. The standard for pleading a relevant market is lower for the *direct* than the *indirect* approach, particularly if plaintiffs challenge a horizontal agreement rather than a vertical one. *Id.* at 543 n.7.

The reason is that plaintiffs' direct allegations establish the anticompetitive harm that is the ultimate concern of antitrust law. *Ind. Fed'n*, 476 U.S. at 460–61; *Eastman Kodak*, 504 U.S. at 477. Indirect allegations, in contrast, require an inference to establish the ultimate issue—anticompetitive harm—an inference that is based on market definition, market share, and the like. *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001). Plaintiffs' burden is lighter yet if they plead anticompetitive effects based on a horizontal agreement, as opposed to a vertical agreement. *AmEx*, 585 U.S. at 543 n.7. And plaintiffs have the lightest burden of all if they allege a horizontal price-fixing conspiracy, as Plaintiffs allege here. *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 244 (2d Cir. 1993).

Even when plaintiffs allege anticompetitive effects indirectly, they still need merely satisfy "a relatively permissive pleading standard" for pleading a relevant market. *Regeneron*, 96 F.4th at 339. The goal of the inquiry is to define a relevant market limited to those goods or services

22

that are close enough substitutes for one another that any small but significant artificial alteration in price would cause too big a loss of transactions for it to be sustainable. *Id.* Too many buyers or sellers would switch to other goods or services to make anticompetitive conduct viable. *Id.* In economics, the goods or services that belong in the same market are called "reasonably interchangeable," *id.* (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), and are described as having a high "cross-elasticity of demand." *Id.* (quoting *Todd*, 275 F.3d at 201–02) (cleaned up).

The District Court erred here because it did not apply the proper legal standards in assessing Plaintiffs' market definition. That is most striking for its analysis of Plaintiffs' direct allegations of anticompetitive effects. For this purpose, the District Court relied on its analysis of Plaintiffs' allegations showing anticompetitive effects *indirectly*. Order 23–25. That approach conflicts with the Supreme Court's holding in *AmEx* that in cases involving horizontal restraints—as opposed to vertical restraints—a relevant market need not be precisely defined. *AmEx*, 585 U.S. at 543 n.7. Instead, the District Court should have evaluated the Plaintiffs' direct allegations of anticompetitive effects for the kind of error that occurred in *AmEx*—an error of market definition that caused Plaintiffs to address the wrong price. *AmEx*, 585 U.S. at 547–48. So the District Court did not apply the right standard to Plaintiffs' *direct* allegations of anticompetitive effects.

23

The same is true for Plaintiffs' *indirect* allegations of anticompetitive effects. Plaintiffs plausibly defined a relevant market based on the perception of Elite Student-Athletes that the Ivies are distinctive. Plaintiffs supported that market definition with non-conclusory allegations that addressed reasonable interchangeability and cross-elasticity of demand. It is an empirical issue—one that depends on the *evidence*—whether any other schools are so like the Ivies in the eyes of Elite Student-Athletes that they belong in the same market. *Regeneron*, 96 F.4th at 339–40. So the Court should have concluded that Plaintiffs stated an antitrust claim.

However, the District Court applied the wrong standard to Plaintiffs' non-conclusory allegations—improperly assessing substitutability *functionally* rather than *economically*. *Id*. It rejected Plaintiffs' market definition because schools other than the Ivies "offer educational services" to Elite Student-Athletes, and because the Ivies "are not the only schools to which" Elite Student-Athletes "sell their athletic services." Order 24. But the right issue is not whether students could receive an education from, or play sports for, another school. It is whether so many students would choose to attend non-Ivies instead of Ivies in response to a small but significant decrease in scholarships below competitive levels that Defendants' price-fixing conspiracy would be unsustainable. *Regeneron*, 96 F.4th at 339–40. That is the correct way to frame the relevant issue—in terms of *economic* substitutability. *Id*.

24

Plaintiffs plausibly allege that no schools are *economic* substitutes for the Ivies for Elite Student-Athletes. That means they plausibly allege that the Ivies constitute a relevant market.

Finally, the District Court erred by not considering Plaintiffs' allegations as a whole. *Matrixx*, 563 U.S. at 47; *see also Cont'l Ore*, 370 U.S. at 698–99; *Anderson News*, 680 F.3d at 190. It addressed only Plaintiffs' indirect allegations of defining a relevant market. Order 23–25. It then subjected Plaintiffs' direct allegations to the same standard. *Id.* 28–31. But it did not combine the two in assessing whether Plaintiffs had defined a plausible market. That too supports reversal.

### B. Plaintiffs Plausibly Allege Anticompetitive Effects Directly.

Plaintiffs made non-conclusory allegations directly establishing the Agreement suppressed student-athlete compensation. Plaintiffs allege that: the Ivies entered an Agreement—unlike any other Division I athletic conference—that prohibits them from providing athletic scholarships to their students, A-35; A-61–A-63; they have been able to maintain the Agreement for decades, *id.*; without the Agreement they would have competed for Elite Student-Athletes by offering athletic scholarships, A-40; A-42–A-43; A-78; and the effect of the Agreement was to suppress student-athlete compensation at the Ivies significantly below competitive levels. A-77–A-78.

25

Plaintiffs thus establish that the Agreement enabled the Ivies to provide their student-athletes less compensation than they otherwise would have. That is enough to carry Plaintiffs' initial burden under the rule of reason. *Alston*, 594 U.S. at 96 (citing *AmEx*, 585 U.S. at 541). Plaintiffs need not also make *indirect* allegations—such as independently showing market power by defining a relevant market and that defendants possess a high share of the market. *AmEx*, 585 U.S. at 542 (citing *Ind. Fed'n*, 476 U.S. at 460).

That has long been the law. As *K.M.B. Warehouse* explained, "[i]f a plaintiff can show an actual adverse effect on competition," courts "do not require a further showing of market power." 61 F.3d at 129 (citing *Ind. Fed'n*, 476 U.S. at 460–61l; *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 546 (2d Cir. 1993)); *see also Todd*, 275 F.3d at 206–07 (same).

That makes sense. Market power is the ability to cause anticompetitive effects, including by causing a small but significant non-transitory effect on price. *Regeneron*, 96 F.4th at 339. If defendants *did* cause an anticompetitive effect on price, they *could* do so. Defendants *can* do what they *have done*. *See Eastman Kodak*, 504 U.S. at 477 ("It is clearly reasonable to infer that Kodak has market power to raise prices and drive out competition in the aftermarkets, since respondents offer direct evidence that Kodak did so.").

An appropriate analogy is to direct and indirect (or circumstantial) evidence of whether a criminal defendant committed murder. A prosecutor may have to prove that the defendant left his office at 5 p.m., drove to the victim's residence, arrived by 6 p.m., and killed the victim. Given the distance and traffic conditions, it might be unclear whether the defendant could have arrived in time to commit the crime.

The prosecution could prove its case on this point with direct or indirect evidence. Direct evidence might include a videotape of the defendant killing the victim and a confession from the defendant that he did so. Indirect evidence, in contrast, might involve a traffic expert testifying about the likelihood that the defendant could have arrived in time.

The prosecutor's direct evidence should suffice. If it establishes that the defendant *did* arrive in time, it follows that he *could have*. The prosecutor need not also call a traffic expert to testify that the defendant could do what he did. Such indirect evidence is unnecessary.

The same reasoning applies to market definition. To be sure, anticompetitive effects occur in a relevant market. Here, that market comprises the Ivies. As noted above, a market is the group of products or services that Defendants need to control to suppress prices profitably by a small but significant amount. *Regeneron*, 96 F.4th at 339. Plaintiffs' non-conclusory allegations establish directly that the Agreement among the Ivies significantly suppressed compensation to Elite Student-

Athletes. Those allegations thus also show that the Ivies form a market of purchasers of Elite Student-Athletes' services. If they did not, the Ivy Agreement would not have worked.

A direct showing obviates the need for an indirect showing. That is true for a relevant market. *Ind. Fed'n*, 476 U.S. at 460–61 ("[P]roof of actual detrimental effects . . . can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.") (citation omitted); *Tops Mkts.*, 142 F.3d at 96 ("Market power is but a surrogate for detrimental effects.") (cleaned up). It is also true for the murder example. The direct evidence—the video and confession—establish that traffic would not have prevented the defendant from arriving at the scene of the crime by 6 p.m. without the need for indirect evidence—a traffic expert. So too does a showing that the Ivy Agreement caused anticompetitive price effects establish that the Ivies control a relevant market without any additional searching analysis of that market. *AmEx*, 585 U.S. at 543 n.7. That is why the Supreme Court recognizes in cases involving horizontal agreements—between competitors—that no precise definition of a market is necessary to show anticompetitive effects directly. *Id.* ("Given that horizontal restraints involve agreements between competitors not to compete in some way, this Court concluded that it did not need to precisely define the relevant market to conclude these agreements were anticompetitive.") (citing *Ind. Fed'n*, 476 U.S. at 460–61; *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648–69 (1980)).

28

This case involves not only an agreement between competitors—a horizontal agreement—but also one that fixes prices. A-35; A-37–A-38; A-61–A-63. No conduct is more likely to have anticompetitive effects. *Catalano*, 446 U.S. at 646–47. As a result, Plaintiffs' non-conclusory allegations plausibly establish that Defendants suppressed compensation in a market defined by the Ivy League.

*AmEx* confirmed that a direct showing suffices for anticompetitive effects (and thus market power). *AmEx*, 585 U.S. at 542 ("The Plaintiffs can make [the showing of anticompetitive effects] directly or indirectly. Direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition.") (cleaned up). It further held that adverse effects on price suffice to establish anticompetitive effects directly. *Id.*

That said, in *AmEx* a more searching analysis of the market was required—but only because of two circumstances that are not present here: (1) the plaintiffs there addressed the wrong price and (2) the defendants were not horizontal competitors.

As to the first point, the plaintiffs had challenged vertical agreements as part of a credit-card network. *Id.* at 544. Credit-card networks are anomalous. *Id.* at 533–37. They create a rare kind of two-sided market. *Id.* The networks enter into price agreements for simultaneous transactions with two sets of market actors—merchants and cardholders. *Id.* That gave rise to two questions relevant to showing

29

anticompetitive effects directly: what is the relevant market and, relatedly, what is the relevant price? Plaintiffs assumed that the relevant market was for services to merchants, and hence the relevant price was the one merchants paid. *Id*. at 547. The Supreme Court disagreed. *Id*.

*AmEx* held that the relevant price should reflect both sides of the simultaneous transactions: the merchant and the cardholder. *Id*. at 547–48. The plaintiffs, however, had attempted to establish price effects only on merchants. They ignored cardholders. *Id*. As a result, they offered no evidence about the prices for credit-card transactions as a whole, as was necessary. *Id*. In short, their showing addressed the wrong market and the wrong price. *Id*. The right market was for entire credit-card transactions. *Id*. The right price combined both sides of those transactions. *Id*.

Another aspect of *AmEx*—also not present here—complicated the analysis. The agreements there were vertical, not horizontal. *Id*. at 540–41. They involved firms at different levels of the chain of distribution of the services at issue. *Id*. American Express did not form agreements with other credit-card networks—its direct, horizonal competitors. *Id*. It formed agreements with merchants and consumers—to whom it sold services. *Id*. As the Court recognized, a more robust analysis of market definition is appropriate in cases involving vertical restraints than horizontal restraints. *Id*. at 543 n.7. Horizontal agreements between

30

competitors not to compete are the most likely to cause anticompetitive effects and so do *not* require a precise market definition. *Id*.

No similar issues arise here. First, the relevant price is compensation to Ivy League student-athletes. *Alston* held that, in college sports, schools cause anticompetitive effects if they exercise their power by suppressing student-athlete compensation. 594 U.S. at 97–98 ("the student-athletes had shown the NCAA enjoys the power to set wages in the market for student-athletes' labor—and that the NCAA has exercised that power in ways that have produced significant anticompetitive effects"). The District Court did not suggest otherwise. Neither have the Defendants.

Second, the Ivies are horizontal competitors. A-37–A-38; A-61; A-63–A-64; A-77; A-79–A-81. They vie with one another for the services of Elite Student-Athletes. *Id*. And they fixed prices. A-35–A-36; A-77; A-82. Their Agreement not to offer sports scholarships—to fix the relevant compensation at zero—is a standard horizontal price-fixing agreement. *Catalano*, 446 U.S. at 646–47. Without it, according to Plaintiffs' market definition, they would have competed among themselves and could not have sustainably suppressed Elite-Student Athlete compensation, as they did. A-42–A-43; A-78. *See Sargent*, 785 F.2d at 1127 (conspiracies imply a relevant market, revealing which market actors the conspirators believe suffice to achieve anticompetitive effects).

31

Such horizontal price-fixing agreements are the bane of antitrust law. As the Ninth Circuit observed, "No antitrust violation is more abominated than the agreement to fix prices." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1144 (9th Cir. 2003). They tend to have anticompetitive effects without offering offsetting procompetitive efficiencies. *Catalano*, 446 U.S. at 646–47; *see also Freeman*, 322 F.3d at 1144 (citing *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 345 (1982); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940)).

*Alston* assumed—without deciding—that the NCAA is a joint venture and its restrictions on athlete compensation might have "procompetitive benefits." 594 U.S. at 88. But that did not mean that they were unlikely to cause anticompetitive effects. Indeed, the NCAA "did not meaningfully dispute" that they did. *Id.* at 97–98 (quoting *Grant-in-Aid*, 375 F. Supp. 3d at 1067). As with most horizontal price-fixing conspiracies, the agreement among schools to suppress compensation to student-athletes was effective. *Grant-in-Aid*, 375 F. Supp. 3d at 1068–70.

Here, the District Court did *not* suggest that Plaintiffs' direct allegations were conclusory or that they did not plausibly establish anticompetitive effects. Instead, it required Plaintiffs to undertake the sort of analysis for defining a relevant market and for establishing power in that market that is appropriate only for an *indirect* showing of anticompetitive effects. Order 27–31. That was error.

32

To be sure, the District Court opinion quoted at length the holding of *Indiana Federation of Dentists*:

> Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects.

Order 29–30 (quoting *Ind. Fed'n*, 476 U.S. at 460–61). Yet the District Court did not apply that holding. *Id.* 29.

*Indiana Federation of Dentists* was clear. A direct showing of anticompetitive effects "can obviate the need" to assess market power by other means, such as defining a relevant market and determining defendants' share of it. 476 U.S. at 460–61; *Todd*, 275 F.3d at 206–07; *K.M.B. Warehouse*, 61 F.3d at 129; *see also Tops Mkts.*, 142 F.3d at 96 ("Market power is but a surrogate for detrimental effects.") (cleaned up). A direct showing of anticompetitive effects thus suffices. *AmEx*, 585 U.S. at 542; *Eastman Kodak*, 504 U.S. at 477; *Ind. Fed'n*, 476 U.S. at 460–61; *1-800 Contacts*, 1 F.4th at 118; *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018); *Tops Mkts.*, 142 F.3d at 96.

The District Court's rewriting of antitrust doctrine would cause the distinction between direct and indirect showings of market power to collapse. That warrants reversal.

33

### C. Plaintiffs Plausibly Allege Anticompetitive Effects Indirectly.

Plaintiffs may show anticompetitive effects indirectly. *AmEx*, 585 U.S. at 542. They can do so by establishing Defendants have sufficient market power and used it to harm competition. *Id.* ("Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition.") (citations omitted). Plaintiffs in turn may demonstrate market power by defining a relevant market and showing that Defendants control a large share of that market and that there are high barriers to entry. *Todd*, 275 F.3d at 199 ("One traditional way to demonstrate market power is by defining the relevant product market and showing defendants' percentage share of that market.").

As with a direct analysis, the purpose—and guiding star—for an indirect analysis is to assess whether defendants have the power to cause anticompetitive effects, including adverse effects on price. *Regeneron*, 96 F.4th at 339; *Ind. Fed'n*, 476 U.S. 460–61 ("[M]arket power . . . is but a surrogate for detrimental effects.") (citations omitted). The goal is thus to identify the group of products or services that defendants must control to cause anticompetitive harm. *Regeneron*, 96 F.4th at 339–40. That group is the relevant market.

The courts have identified various considerations to guide this inquiry. *Id*. They confirm that the Ivy League constitutes an appropriate market for purposes of this case. They include "the reasonable interchangeability of use or the cross-elasticity of demand" between

34

products or services and potential substitutes for them. *Id.* at 339 (citing *Brown Shoe*, 370 U.S. at 325). Products or services are "reasonably interchangeable" where consumers would respond to a slight change in the price of one by switching to the other, *i.e.*, where there is "sufficient cross-elasticity of demand." *Id.* (citing *Todd*, 275 F.3d at 201–02).

In this case, the anticompetitive harm is suppressing Elite Student-Athlete compensation below competitive levels. So the relevant market consists of the group of products or services—here, universities—that Defendants must control to suppress Elite Student-Athlete compensation below competitive levels. In other words, the relevant market consists of the universities that Elite Student-Athletes find "reasonably interchangeable" and that have sufficient cross-elasticity of demand.

There are two relevant possibilities. On one hand, if enough Elite Student-Athletes consider the Ivies distinctive that the Ivy Agreement could profitably (and thus sustainably) deflate financial aid to Ivy League athletes by a small but significant amount, then the Ivies form a relevant market. *Id.* On the other hand, if too many Elite Student-Athletes would opt for other schools, forcing the Ivies to abandon the Agreement, then those other schools are also part of the relevant market. *Id.*

At the pleading stage, to allege a plausible relevant market, a plaintiff need merely make non-conclusory allegations that address the right economic framework, laid out above. *Id.* at 338; *Todd*, 275 F.3d at 200, 203. *See also Regeneron*, 96 F.4th at 339 ("This is a relatively

35

permissive pleading standard."). As a result, courts generally will not dismiss an antitrust claim based on market definition unless it suffers from one of two flaws. *Id*. The first is that plaintiffs' allegations do not address "reasonable interchangeability and cross-elasticity of demand." *Id*. The second is that the definition excludes goods or services that are "clearly" interchangeable with those included in the market. *Id*.

Courts focus on these flaws because the key issue is whether the relevant market includes all goods or services that market participants perceive as so similar that anticompetitive effects—such as a small but significant change in price—would cause large numbers of them to abandon the antitrust defendants for their rivals. *Id*. at 337–39. Unless so many would switch that the anticompetitive conduct would prove unsustainable—only "transitory"—then the market definition is proper. *Id*.; *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc*., 386 F.3d 485, 496 (2d Cir. 2004) (describing the "goal" of defining a relevant market as "identify[ing] the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output"). Other products or services belong in the relevant market *only* if they "substantially constrain" the defendants' ability to impose a small but significant price change. *United States v. Am. Express Co*., 838 F.3d 179, 198–99 (2d Cir. 2016) (citing *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999)). Accordingly, a relevant market definition satisfies the so-called "rule of reasonable interchangeability"

36

when the goods or services it contains have a sufficiently high "cross-elasticity of demand" to matter and the ones it excludes do not. *Regeneron*, 96 F.4th at 339.

What follows from the above framework is that the relevant issue is not *functional* substitutability, but rather *economic* substitutability. *Id.* at 339–40. Different products or services may perform the same essential functions—as do a Rolls Royce Phantom and a Toyota Corolla—but that does not mean they are *economic* substitutes. *Id.* What matters for defining a market is whether so many market participants will substitute one good or service for another based on a small but significant change in price that the price change is not sustainable. *Id.* That is why the Second Circuit recently reversed dismissal for failure to state a claim, warning against rejection of a market definition "simply because a court believes the plaintiff is unintuitively separating products that might have real-world functional similarities into different markets." *Id.* Goods or services may function similarly, but many market participants may perceive them as materially different. *Id.* A small but significant overcharge on Phantoms would not result in sufficient buyers switching to Corollas to render artificial price inflation unsustainable.

Plaintiffs here satisfy the standard for pleading anticompetitive effects and a relevant market indirectly. Plaintiffs' non-conclusory allegations address the right economic framework, establishing that the Ivy League includes all schools that Elite Student-Athletes perceive as

37

reasonably interchangeable and that have a sufficiently high cross-elasticity of demand. Their non-conclusory allegations establish that the Ivies by themselves could sustainably deprive Elite Student-Athletes of athletic scholarships and thus deflate their compensation by a small but significant amount—as the Ivy Agreement in fact did. That means non-Ivy schools are not *economic* substitutes for the Ivies.

Plaintiffs allege that Elite Student-Athletes see the Ivies as distinctive because of the "high-level Division I athletics programs and the rigorous academic programs that the University Defendants offer." A-79. They also allege that "the overwhelming portion" of Elite Student-Athletes "would not consider a college or university outside the Ivy League to be an adequate substitute because they do not provide the same opportunities." *Id*. Accordingly, if the Ivies "reduced the compensation to" Elite Student-Athletes below competitive levels by "a small but significant degree for a substantial period of time," it "would not cause sufficient numbers" of Elite Student-Athletes "to switch to other colleges or universities to make such compensation suppression unprofitable." A-82. (Indeed, under the Agreement, the University Defendants "have already imposed substantial price increases for their educational services provided to [Elite Student-Athletes], relative to other Division I universities and colleges . . . and have not suffered sufficient defections of such students to make those price increases unprofitable." A-80–A-82.)

38

These allegations provide a "plausible explanation" as to why the relevant market should be limited to the University Defendants. *Todd*, 275 F.3d at 200. And they show that the District Court was incorrect that Plaintiffs failed to define the proposed relevant market in terms of the rule of reasonable interchangeability and cross-elasticity of demand. Order 24–25. Plaintiffs' non-conclusory allegations establish that non-Ivies are not reasonably interchangeable with the Ivies and that the cross-elasticity of demand between them is not high enough to force the Ivies to offer athletic scholarships. So the Ivies form a relevant market.

Plaintiffs' allegations regarding the economic realities in the market for Elite Student-Athletes' labor confirm this definition. To assess those realities, courts use the so-called *Brown Shoe* factors. *Regeneron*, 96 F.4th at 339. They are "practical indicia" within the market such as "industry or public recognition of the" proposed market "as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* (citing *Brown Shoe*, 370 U.S. at 325). The factors clarify "whether two products are in fact 'reasonable' substitutes and are therefore part of the same market." *Geneva Pharms.*, 386 F.3d at 496. In other words, the *Brown Shoe* factors ground the analysis in reality: "The emphasis always is on the actual dynamics of the market rather than rote application of any formula." *Id.*

Plaintiffs allege that industry participants—including student-athletes and the Ivies themselves—recognize the Ivy League as constituting its own market—a "separate economic entity" from other universities and colleges. *Brown Shoe*, 370 U.S. at 325. Industry recognition is significant because courts assume that "economic actors usually have accurate perceptions of economic realities." *Todd*, 275 F.3d at 205 (citation omitted).

Plaintiffs allege that the Agreement reflects what "the University Defendants have themselves long understood, they compete in a distinct market . . . for [students'] athletic services." A-37; *see Todd*, 275 F.3d at 205 (crediting plaintiff's allegations about "defendants' own conduct and apparent perceptions" as probative of the relevant market definition).

The role of the Ivy Council supports this market definition. Its work reveals the Ivies' view of themselves as a separate economic entity. A-49. Plaintiffs allege that the Council "focuses on efforts to strengthen the model of the Ivy League as a nationally regarded, premier collegiate athletic conference that is unique and distinct from any other Division I conference." *Id.* (internal quotations omitted). As part of those efforts, the Council negotiates television rights, including with ESPN. A-48. The Ivy League even has its own network—The Ivy League Network—in partnership with ESPN. *Id.* Plaintiffs allege that, before the ESPN deal, the Ivy Council—on behalf of the Ivy League—"formed league-wide television agreements with other national broadcasting networks." *Id.*

40

The Ivy Council recognizes the Ivy League as distinct in generating and distributing revenues. It "negotiates on behalf of the University Defendants for revenues generated by Ivy League athletic competitions and distributes the proceeds due to the University Defendants." A-49. The Ivy Council acts on behalf of the Ivies as a distinct, "separate economic entity." *Brown Shoe*, 370 U.S. at 325.

Plaintiffs also allege that other "[i]ndustry participants recognize" the Ivies as "unique and distinct." A-56. For example, Japan's National Football Association ("JNFA") views the Ivy League brand as "distinct." A-54. The JNFA partnered with the League to participate in the "Japan-U.S. Dream Bowl," held in Japan in January 2023. *Id.* "The Ivy League team, with a 52-person roster, comprised athletes from all of the University Defendants." *Id.* Similarly, the country's largest college athletic recruiting network, Next College Student Athlete, acknowledged that the Ivy League is distinctive in providing an "ultra-high level of competition in both athletics and academics." A-56.

Plaintiffs make additional allegations to support an Ivy-only market. Plaintiffs allege that the term "Ivy League" itself speaks to the distinctive quality of the Ivies. It conjures an exclusive group of some of the oldest universities in the country, located in the Northeast, with top athletic and academic credentials. A-55–A-56. Plaintiffs allege that that perception is not an accident; Defendants—both the Universities and the

41

Ivy Council—invest significant time and money to maintain the "Ivy League" as a unique brand. A-53–A-56.

Plaintiffs allege that each of the Defendants uses the "brand value" of the "Ivy League" "in marketing efforts, including efforts to attract students and faculty and to sell tickets and media rights to athletic competitions." *Id*. Defendants recognize this value. *Id*. Their rules "*require* prominent display of the 'Ivy League' logo at events and in promotional materials." *Id*. (emphasis added). They also control it. "There are detailed rules governing the logo and how it is to be displayed." *Id*. For example, the Ivy rules prohibit broadcast arrangements or packages from using "the Ivy League® name or logo without specific approval from the Ivy Office." *Id*.

These allegations show that Ivies see themselves as different from other schools. Indeed, the District Court recognized that Plaintiffs' non-conclusory allegations plausibly established that the Ivies have a "'unique brand.'" Order 31 (quoting A-53). It further recognized that "the University Defendants define themselves as . . . an athletic conference, with a 'unique brand,'" and that they "are viewed [that way] by industry participants." *Id*. No more is required for Plaintiffs to establish that non-Ivy schools are not *economic* substitutes for Ivies—that they are not reasonably interchangeable from the perspective of Elite Student-Athletes. *Regeneron*, 96 F.4th at 338–39.

The District Court erred because it did not apply the proper *economic* test for substitutability, but rather an improper *functional* test. *Id*. at 339–40. It noted that other schools "compete to offer educational services" to Elite Student-Athletes, and "that the University Defendants are not the only schools to which" Elite Student-Athletes "sell their athletic services." Order 24. In sum, it concluded that some schools are *functional* substitutes for Elite Student-Athletes—that *some* Elite Student-Athletes apply to or attend non-Ivies. The District Court did not conclude that allegations in the Complaint establish that Elite Student-Athletes would attend non-Ivies in such large numbers that the Ivy Agreement would not be sustainable. The District Court thus applied the wrong standard in assessing Plaintiffs' allegations. *See Regeneron*, 96 F.4th at 337–40.

The relevant standard is economic substitutability, not functional substitutability. *Id*. at 339–40. Products or services that perform the same *function* are not necessarily part of the same antitrust market. *Id*. Antitrust law is concerned with *economic* substitutability. The relevant issue is not whether *some* market actors *could* use another product or service in the face of a small but significant price change—functional substitutability—but whether *enough of them would do so to make the price change unsustainable*—economic substitutability. *Id*.

That issue "can be determined only after a factual inquiry into the commercial realities faced by" Elite Student-Athletes. *Id*. (quoting

43

*Eastman Kodak*, 504 U.S. at 482). It is "a deeply fact-intensive inquiry." *Id*. (quoting *Chapman*, 546 F.3d at 238). As a result, courts generally accept allegations defining a relevant market unless plaintiffs (1) fail even to address "reasonable interchangeability and cross-elasticity of demand"—here, Plaintiffs addressed both; or (2) they allege "a proposed relevant market that clearly does not encompass all interchangeable substitute" schools—Plaintiffs here avoided this pitfall as well. *Id*. (quoting *Chapman*, 546 F.3d at 238).

Instead, the District Court rejected Plaintiffs' market definition because it believed Plaintiffs were "unintuitively separating products that might have real-world functional similarities into different relevant markets." *Id*. That is precisely what *Regeneron* proscribes—it is improper to reject a market definition because it excludes products that "appear to be functionally similar." *Id*. at 340.

Crediting Plaintiffs' market definition here—which the District Court should have done—means Defendants control 100% of the relevant market. That is more than sufficient to establish market power. *Todd*, 275 F.3d at 208 (describing 80-90% as "an extremely high market share by any measure"); *Tops Mkts.*, 142 F.3d at 99 ("a market share of over 70 percent is usually strong evidence of *monopoly* power") (emphasis added) (cleaned up). Plaintiffs alleged as much. *See* A-83 ("The University Defendants, at all relevant times, have collectively had . . . monopsony

44

power."); *id.* ("The University Defendants are the dominant . . . purchasers of" Elite Student-Athletes' services).

Similarly, the Ivies' ability to sustainably depress Elite Student-Athlete compensation is not constrained by "actual or potential competitors capable of providing new competition quickly with little sunk costs." *Geneva Pharms.*, 386 F.3d at 499. Plaintiffs allege that the Ivies are distinctive, *inter alia*, because of their history, alumni network, and legacy. A-55; A-67; A-74. These distinguishing characteristics developed over the centuries during which the University Defendants have operated. A-44–47; A-49; A-55. The Ivies also have multi-billion-dollar endowments that allow them to hire the best faculties and coaching staffs and build state-of-the art facilities. A-67–A-68. These characteristics cannot be duplicated "quickly" or "with little sunk costs" and raise high barriers to potential competitors entering the market.

### D. Direct and Indirect Allegations of Market Power Are Cumulative.

The District Court should have assessed Plaintiffs' allegations as a whole. *Matrixx*, 563 U.S. at 47 (considering allegations in complaint "as a whole"); *Anderson News*, 680 F.3d at 190 (same). It did not. It considered Plaintiffs' indirect allegations of power in a relevant market, concluded they were insufficient, and held that Plaintiffs' direct allegations of anticompetitive effects were thus also insufficient on their own. Order 27–31. That was improper.

45

Plaintiffs' indirect and direct allegations of adverse price effects combine to show that the Ivy League Agreement could and did artificially suppress compensation. An additional reason for reversal is that Plaintiffs' non-conclusory allegations are mutually reinforcing.

### E. Plaintiffs Plead Power in an Alternative Market.

The District Court rejected Plaintiffs' assertion, in the alternative, that if any other schools are part of the same relevant market as the Ivy League, they are too few and too flawed as substitutes to discipline the compensation that the Ivies pay Elite Student-Athletes. Order 25–27.

As noted above, the District Court rejected Plaintiffs' market definition because it observed that some schools outside of the Ivies "compete to offer educational services" to Elite Student-Athletes and because "the University Defendants are not the only schools to which [Elite Student-Athletes] sell their athletic services." Order 24. It focused on Plaintiffs' allegations that Stanford University can maintain academic excellence while also offering athletic scholarships (although Plaintiffs did *not* allege that Elite Student-Athletes perceive Stanford as so similar to the Ivies as to fall within the same market). *Id*. As also noted above, that reasoning improperly relies on *functional* substitutability rather than *economic* substitutability. *Regeneron*, 96 F.4th at 339–40.

But there is another reason Plaintiffs' alternative market definition is proper. Even if Stanford is part of the relevant market, that would not prevent the Ivies from causing anticompetitive effects. That is what

46

Plaintiffs allege in the alternative. A-83–A-84. Their non-conclusory direct and indirect allegations suffice to establish power in a relevant market, even if it includes a small number of other schools. Their direct allegations of anticompetitive effects are sufficient, *AmEx*, 585 U.S. at 542, as are their allegations of control over a very high share of the alternative market, *id.*, and those allegations should be assessed together. *Matrixx*, 563 U.S. at 47; *Cont'l Ore*, 370 U.S. at 698–99.

Further, the District Court should not have applied Plaintiffs' allegations in the alternative in assessing whether the Ivy League is an appropriate market. Fed. R. Civ. P. 8(d). Rule 8 authorizes pleading in the alternative, even for theories that contradict each other. *Id.*; *Lalonde v. City of Ogdensburg*, 662 F. Supp. 3d 289, 312–13 (N.D.N.Y. 2023) (citing, *e.g.*, *Henry v. Daytop Vill.*, 42 F.3d 89, 95 (2d Cir. 1994)). If one set of alternative allegations states a claim, a motion to dismiss should be denied. Fed. R. Civ. P. 8(d)(2) ("If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."). Here, the District Court treated Plaintiffs' allegations of an alternative market definition as contradicting their allegations of the Ivy League market. Order 24–27. That too was reversible error.

### F. Plaintiffs Show an Adverse Effect on Overall Competition.

To state an antitrust claim, Plaintiffs must allege that Defendants' conduct did not just have an adverse effect on individual market actors,

but rather on overall competition. *See K.M.B. Warehouse*, 61 F.3d at 128 ("The overarching standard is whether defendants' actions diminish overall competition, and hence consumer welfare.") (cleaned up). The concern of the antitrust laws is not for individual market participants, but for competition in the market. As the Supreme Court observed, the antitrust laws are designed for "the protection of *competition*, not *competitors*." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) (quoting *Brown Shoe*, 370 U.S. at 320).

The District Court concluded that Plaintiffs' allegations establish anticompetitive harm at most "to just some market participants," not to competition generally. Order 28. It then cites to a series of cases that are unlike this one.

The District Court relied, for example, on *1-800 Contacts*. *Id.* But that decision recognized the longstanding rule that a direct showing of anticompetitive effects suffices. 1 F.4th at 118 (citing *AmEx*, 585 U.S. 541–42; *N. Am. Soccer*, 883 F.3d at 42). An administrative law judge had found for the Federal Trade Commission after a trial. *Id.* at 111–12. The problem for the government in *1-800 Contacts* was that it did not offer empirical evidence at an evidentiary trial, and instead based its case on theory and anecdotes. *Id.* at 118. Here, in contrast, Plaintiffs have not yet passed the pleading stage, and they have made non-conclusory allegations that the Ivy Agreement artificially suppressed Elite Student-Athlete compensation. After discovery, Plaintiffs intend to prove those

48

effects with evidence. Under governing law, they should have the opportunity to do so.

A similar analysis applies to *Elecs. Comm'ns Corp.*, 129 F.3d at 245 (cited by Order 28). There, the plaintiff was a distributor of cell phones. *Id.* at 241. It based an antitrust claim on one defendant, a distributor, coercing the other defendant, a rival cell phone manufacturer, to cease distributing through the plaintiff. *Id.* This Court rejected the claim for lack of an explanation of how the challenged conduct could have harmed competition, as opposed to just the plaintiff. *Id.* at 245. As this Court recognized, that problem is much more likely to arise in vertical agreements—where defendants do not compete with each other—than in horizontal agreements—where they do. *Id.* at 243–44. This Court also distinguished the agreement at issue there from price fixing, which it acknowledged generally causes anticompetitive harm. *Id.* Here, in contrast, the agreement is horizontal, not vertical, and it involves price fixing.

Plaintiffs do not allege suppression of compensation to just a few Elite Student-Athletes, but to "overall competition" for their services. *K.M.B. Warehouse*, 61 F.3d at 128. The direct and indirect showings of anticompetitive effects thus sufficed to meet the relevant standard. The District Court's error in reaching the contrary conclusion was derivative of its improper approach to anticompetitive effects more generally. As explained above, it made a legal error by concluding that a *direct* showing

49

cannot suffice to establish anticompetitive effects without the kinds of allegations about the relevant market that are required only for an *indirect* showing. Order 27–31. That was its basis for concluding Plaintiffs had not alleged anticompetitive effects in the overall market. *Id*. The District Court also erred in evaluating Plaintiffs' indirect showing of anticompetitive effects, and their combined direct and indirect showing. Each of these errors provides reason enough to reverse on harm to overall competition.

## III. Plaintiff Choh's Claim Is Timely.

In addition to stating a claim under the rule of reason, Plaintiffs allege the Ivy Agreement caused Plaintiff Choh to receive lower compensation than he otherwise would have in the four years before this action was filed. So Plaintiff Choh's claim is timely.

### A. Defendants Must Plead and Prove a Claim Is Untimely.

In contrast, Defendants have failed to carry their burden of pleading that the statute of limitations bars Choh's claim. Because it is an affirmative defense, defendants have the burden of pleading untimeliness. *Michael Grecco*, 112 F.4th at 149–50. A defendant may not raise the statute of limitations in a Rule 12 motion unless "the defense appears on the face of the complaint." *Id.* (quotation marks omitted). As a result, if the complaint does not address facts relevant to application of the statute of limitations, the issue should be resolved after discovery. *Id.*

50

("Of course, affirmative defenses, like the statute of limitations, often require consideration of facts outside of the complaint and thus are inappropriate to resolve on a motion to dismiss.") (cleaned up). As with dismissal under Rule 12(b)(6) in general, "application of a statute of limitations presents a legal issue and is also reviewed *de novo.*" *Id.* (quotations omitted).

### B. The Statutory Period Restarts with Each Continuing Violation.

The applicable statute of limitations is four years. *Zenith*, 401 U.S. at 338 ("The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefor is commenced within four years after the cause of action accrued.") (cleaned up). An antitrust cause of action accrues, and the limitations period begins to run, "when a defendant commits an act that causes injury to the plaintiff." *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 218 (E.D.N.Y. 2003).

Anticompetitive conduct constitutes a "continuing violation," and restarts the statute of limitations, each time a defendant takes an action that causes a new injury—provided that the challenged conduct "inflict[s] continuing and accumulating harm" on a plaintiff. *Hanover Shoe*, 392 U.S. at 502 n.15. Imposing an anticompetitive price on a plaintiff constitutes an "overt act" that imposes a new injury and causes the statutory period to run anew. *Klehr*, 521 U.S. at 188–91; *US Airways*, 938 F.3d at 68.

51

In *Klehr*, the Supreme Court explained that, in "a price-fixing conspiracy that brings about a series of unlawfully high-priced sales over a period of years . . . each sale to the plaintiff [is an overt act that] starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." 521 U.S. at 189 (cleaned up).

*Klehr* applies to antitrust actions involving payment of suppressed compensation to a seller of services. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 106 (3d Cir. 2010) ("refus[als] to increase [plaintiff's] reimbursement rates" were "injurious acts in furtherance of the conspiracy within the limitations period"); *Turner v. McDonald's USA, LLC*, 2020 WL 3044086, at *4 (N.D. Ill. Apr. 24, 2020) ("each time plaintiff was paid a depressed wage for her labor, she was injured and the four-year statute of limitations for that injury began"); *see also Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 321–22 (2007) (buyer and seller claims are symmetric). Accordingly, the continuing violations doctrine applies here—where the Defendants engaged in the ongoing Agreement that suppressed financial aid to the Plaintiffs.

Citing *Klehr*, this Court recognized that:

> antitrust law provides that, in the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff,

> *e.g.*, each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.

*US Airways*, 938 F.3d at 67–68 (cleaned up). This holding tracks *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), in which this Court reasoned that because at the time an antitrust defendant "commits anticompetitive conduct it is entirely speculative how much damage that action will cause" in the future, it makes sense to apply a rule where "a purchaser suing a monopolist for overcharges paid within the previous four years" may base its claim on "anticompetitive actions taken before the limitations period." *Id.* at 295–96.

Here, the District Court ruled that Plaintiff Choh's claims are time-barred because he enrolled at Brown more than four years before Plaintiffs filed this action. Order 32–35. Because he "first felt the adverse impact of the Ivy League Agreement no later than when he enrolled at Brown," *id.* at 34, and because that Agreement resulted in his additional injuries, the District Court concluded his claim is untimely. *Id.* at 35.

The District Court seemed to recognize that this result would be improper under the continuing violation doctrine. *Id.* at 32. As discussed above, under that doctrine, each time a defendant imposes a price that causes the relevant form of injury to a plaintiff, the statutory period begins anew. *Hanover Shoe*, 392 U.S. at 502 n.15; *Klehr*, 521 U.S. at 188–91. The persistence of an anticompetitive agreement does not render claims based on newly imposed injuries untimely. *Id.* And, as the District

53

Court acknowledged, Brown declined to award Plaintiff Choh an athletic scholarship every year he attended school, and so each year Brown committed a new act that newly harmed him. Order 32–33 (quoting Pls.' Opp'n to Mot. to Dismiss, *Choh v. Brown Univ.*, ECF No. 160, 49–50 (citing A-42–A-43)). As a result, under the continuing violation doctrine, his claims are timely.

### C.    The *US Airways* Exception Does Not Apply Here.

In nonetheless dismissing Plaintiff Choh's claims, the District Court relied on an exception to the continuing violation doctrine this Court articulated in *US Airways*. But that exception does not apply here.

The *US Airways* exception arises when a plaintiff enters into a contract with an antitrust defendant, the contract sets prices in advance, and the contract itself contains the key anticompetitive terms. 938 F.3d at 68–69. Under those circumstances, new transactions subject to the pre-set prices do not involve new overt anticompetitive acts. *Id*. Each transaction is merely a "manifestation of the prior overt act of entering into" the agreement between the plaintiff and defendant. *Id*. at 69.

That approach follows from the reasoning of *US Airways*. It framed the relevant issue as "whether a defendant commits an 'overt act' each time a plaintiff pays a defendant a supracompetitive price *pursuant to a contract that violates the Sherman Act*." 938 F.3d at 68 (emphasis added). Three points about this framing are crucial: (1) the contract at issue was between the plaintiff and the defendant; (2) it set future prices so that

the anticompetitive price paid was "pursuant to a contract" that pre-dated the statutory period; and (3) the contract between the plaintiff and defendant contained the anticompetitive provisions that violated federal antitrust law. *Id.* Because the plaintiff and defendant entered a contract that met these criteria, payment of an anticompetitive price was "but a manifestation of the prior overt act of entering into" the contract, not a new overt act. *Id.* at 69. That is not true here.

No allegation in the Complaint establishes that Plaintiff Choh entered a contract with Brown fixing in advance his financial aid, so that his annual tuition was just a "manifestation" of an earlier agreement to which he was a party. Instead, each year Brown committed a new overt act in furtherance of the Ivy Agreement that harmed Choh—offering less financial aid than it otherwise would have because it did not offer an athletic scholarship.

That the Ivies had a longstanding agreement *among themselves* does not change that analysis. If it did, the *US Airways* exception would swallow the continuing violation doctrine. Defendants could enter a protracted unlawful agreement—even one involving horizonal price fixing—and thereby insulate themselves from liability. *Berkey Photo* warned against this risk: "Untoward consequences would follow were we to hold that the anticompetitive conduct itself triggered the running of the limitations period." 603 F.2d at 295. This Court held that an antitrust

55

"cause of action, therefore, accrues only on the date damages are 'suffered.'" *Id.* at 295–96 (quoting *Zenith*, 401 U.S. at 340).

*US Airways* did not purport to overrule *Berkey Photo* or this longstanding doctrine. To the contrary, it recognized the vitality of the continuing violation doctrine. 938 F.3d at 67–68. It confirmed the rule that even if a plaintiff is aware of anticompetitive conduct, each time an antitrust defendant imposes an anticompetitive price, it triggers a new statutory period. *Id.* at 67 ("each sale to the plaintiff starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.") (cleaned up).

That rule is consistent with the *US Airways* exception—what matters is when the plaintiff and defendant commit to a price in an anticompetitive contract, not when the transaction occurs implementing the price. *Id.* at 68. That is what *US Airways* said: the statutory period does not renew for payment of a price "*pursuant to*" *a contract* between the plaintiff and defendant because it is "not an overt act of its own, but a manifestation of the prior overt act of entering into" an earlier contract. *Id.* at 69 (emphasis added).

Indeed, in *US Airways*, the defendant had argued that it initiated its anticompetitive practice—embodied in its contracts with the plaintiff—more than four years before the plaintiff filed suit. *US Airways, Inc. v. Sabre Holdings Corp.*, 2017 WL 1064709, at *17 n.11 (S.D.N.Y. Mar. 21, 2017). So, the defendant contended, *none* of the plaintiff's claims

56

were timely. *Id.* The trial court rejected that position because the relevant issue is not when the anticompetitive conduct began, but when the plaintiff entered the agreement setting its prices. *Id.*; *US Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 278 (S.D.N.Y. 2015) (applying *Berkey Photo*, 603 F.2d at 295).

As the trial court explained, an exception to the continuing violation doctrine is appropriate "when the purchaser was a counterparty to an allegedly illegal contract, who knew when the contract was executed the allegedly inflated price it was required to pay and the allegedly anticompetitive effects of the contract." *US Airways*, 105 F. Supp. 3d at 278. The trial court concluded that the timeliness of the plaintiffs' claims depended on when the plaintiff entered an anticompetitive contract with the defendant that fixed prices between the two. *Id.* at 278–79; *US Airways*, 2017 WL 1064709, at *17 n.11. The plaintiff had entered one contract fixing prices *more* than four years before filing suit—so the prices it paid pursuant to that contract were *not* timely—and another contract *less* than four years before filing suit—so claims based on those prices were *timely*. *US Airways*, 105 F. Supp. 3d at 279. This Court affirmed that ruling—holding that claims based on the first contract were barred by the statute of limitations, but claims based on the second contract were not. 938 F.3d at 68–69.

Here, the Complaint does not allege that student-athlete Choh was a party to the Ivy Agreement. Nor did the District Court so conclude. Order 31–35. So the Ivy Agreement could not render his claims untimely.

Nor have the Defendants presented evidence that student-athlete Choh entered a contract in his first year at Brown that fixed his financial aid for his entire time as a student. Nothing in the record suggests he did so. Further, it would have been premature at this point for the Defendants to present evidence to support their affirmative defense. *Michael Grecco*, 112 F.4th at 149–50; *see also Walker v. Accenture PLC*, 511 F. Supp. 3d 169, 191–92 (D. Conn. 2020) (explaining that whether plaintiff's allegations of a series of events "constitute a continuing pattern of discrimination triggering the continuing violation doctrine or, instead, are discrete events is a question better addressed on a summary judgment motion after discovery"); *accord Theophilous v. Bridgeport Mental Health Ctr.*, 2020 WL 4449949, at *9 (D. Conn. Aug. 2, 2020).

Moreover, the contract between the plaintiff and defendant in *US Airways* contained the anticompetitive terms at issue. *US Airways*, 938 F.3d at 68 (applying exception to continuing violation contract where plaintiff was subject to anticompetitive "price pursuant to a contract that *violate[d] the Sherman Act*") (emphasis added); *US Airways*, 2017 WL 1064709, at *5. Here, Plaintiffs did not allege that Brown's financial aid agreement with Plaintiff Choh was the conduct that enabled the Defendants to cause anticompetitive harm. The key anticompetitive

58

agreement was among the Ivies. Nothing in the record suggests Plaintiff Choh was a party to that agreement and, again, Defendants have not—and at this stage could not—present evidence on that point. *Michael Grecco*, 112 F.4th at 149–50.[1]

In sum, for numerous reasons the statute of limitations does not bar Plaintiff Choh's claim: (1) he was not a party to the contract that the District Court held rendered his claims untimely; (2) he did not allege that he entered a contract that fixed his tuition throughout his time at Brown; and (3) his contract with Brown did not contain the horizontal price-fixing agreement that gives rise to his claims. Accordingly, the District Court erred as a matter of law in dismissing his claims as untimely.

---

[1] Other courts have recognized that price-fixing agreements are subject to the continuing violations doctrine, particularly where plaintiffs did not participate in the agreement that formed the core of the antitrust violation. *See, e.g.*, *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1067 (8th Cir. 2017) (*en banc*) (distinguishing *Varner v. Peterson Farms*, 371 F.3d 1011, 1019–20 (8th Cir. 2004)); *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) (plaintiff entered anticompetitive agreement); *Giordano v. Saks Inc.*, 654 F. Supp. 3d 174, 192 (E.D.N.Y. 2023). The other cases the District Court cited do not involve the sort of horizontal price fixing at issue in this case. *See In re Google Digital Advert. Antitrust Litig.*, 2024 WL 895155, at *30 (S.D.N.Y. Mar. 1, 2024); *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, 2024 WL 641263, at *4 (S.D.N.Y. Feb. 15, 2024); *Kenmore Mercy Hosp. v. Daines*, 2011 WL 4368564, at *4 (W.D.N.Y. Sept. 19, 2011).

59

## CONCLUSION

For the foregoing reasons, reversal is appropriate. The District Court should be reversed.

January 27, 2025                    Respectfully submitted,

                                   s/Joshua P. Davis
                                   Joshua P. Davis
                                   BERGER MONTAGUE PC
                                   505 Montgomery Street, Suite 625
                                   San Francisco, CA 94111
                                   Tel.: (415) 689-9292

                                   F. Paul Bland
                                   Robert E. Litan
                                   BERGER MONTAGUE PC
                                   1001 G Street, Suite 400 East
                                   Washington, DC 20001
                                   Tel.: (202) 809-9136

                                   Eric L. Cramer
                                   Alan Cotler
                                   BERGER MONTAGUE PC
                                   1818 Market Street, Suite 3600
                                   Philadelphia, PA 19103
                                   Tel.: (215) 875-3009

                                   Edward Normand
                                   Richard Cipolla
                                   FREEDMAN NORMAND
                                       FRIEDLAND LLP
                                   10 Grand Central
                                   155 East 44th Street, Suite 915
                                   New York, NY 10017
                                   Tel.: (646) 350-0527

## CERTIFICATE OF COMPLIANCE

### WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1. This document complies with the type-volume limit of Local Rule 32.1(a)(4) because, excluding parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,880 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft® Word for Microsoft 365 MSO (Version 2408 Build 16.0.17928.20336) 64-bit in 14-point Century Schoolbook.

s/Joshua P. Davis
Joshua P. Davis

# ADDENDUM

Ruling on Defs.' Mot. to Dismiss
*Choh v. Brown Univ.*, 2024 WL 4465476 (D. Conn. Oct. 10, 2024)

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
------------------------------ x
                               :
TAMENANG CHOH and GRACE KIRK,  :
individually and on behalf of  :
others similarly situated,     :
                               :
                               :  Civil No. 3:23-cv-00305(AWT)
          Plaintiffs,          :
                               :
v.                             :
                               :
BROWN UNIVERSITY, THE TRUSTEES  :
OF COLUMBIA UNIVERSITY IN THE  :
CITY OF NEW YORK, CORNELL      :
UNIVERSITY, TRUSTEES OF        :
DARTMOUTH COLLEGE, HARVARD     :
UNIVERSITY, THE TRUSTEES OF THE :
UNIVERSITY OF PENNSYLVANIA,     :
PRINCETON UNIVERSITY, YALE     :
UNIVERSITY, and THE IVY LEAGUE :
COUNCIL OF PRESIDENTS,         :
                               :
          Defendants.          :
------------------------------ x
```

<u>**RULING ON MOTION TO DISMISS**</u>

The plaintiffs, Tamenang Choh and Grace Kirk, individually and on behalf of all others similarly situated, bring this proposed class action, claiming a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The Class Action Complaint (ECF No. 1) (the "Complaint") names as defendants Brown University ("Brown"), The Trustees of Columbia University in the City of New York ("Columbia"), Cornell University ("Cornell"), Trustees of Dartmouth College ("Dartmouth"), Harvard University ("Harvard"), The Trustees of the University of Pennsylvania

("Penn"), Princeton University ("Princeton"), Yale University ("Yale") (collectively, the "University Defendants"), and The Ivy League Council of Presidents (the "Council," and with the University Defendants, the "Ivy League").

The defendants have moved to dismiss the Complaint. For the reasons set forth below, their motion to dismiss is being granted.

## I.  FACTUAL ALLEGATIONS

This action arises out of an agreement among the defendants (the "Ivy League Agreement") "not to provide athletic scholarships to their Division I athletes ("Ivy League Athletes") and not to pay Ivy League Athletes any compensation (or reimbursement of education-related expenses) . . . ." Compl. ¶ 1. "The original Ivy League Agreement, from 1954, states in relevant part: 'The members of the Group reaffirm their prohibition of athletic scholarships. Athletes shall be admitted as students and shall be awarded financial aid only on the basis of economic need.'" Id. ¶ 131 (quoting Ivy Manual (2017-2018), at 39 (quoting the 1954 Ivy League Agreement)). The plaintiffs

> bring suit on behalf of a proposed Class of all Ivy League Athletes recruited to play a sport by one or more University Defendants, and who, within the period of March 7, 2019, to the date the conduct challenged as illegal in this Complaint ceases (the "Class Period"), attended one of the University's undergraduate programs while playing a sport for that school.

Id. ¶ 2.

"Plaintiff Tamenang Choh, a resident of Lowell, Massachusetts, attended Brown University from September 2017 until May 2022, when he graduated." Id. ¶ 23. "Choh was recruited to play basketball by multiple Division I colleges and received a full athletic scholarship from at least three of them." Id. "Brown recruited, accepted, and enrolled Choh, providing him need-based financial aid, which did not cover the full cost of his tuition, room, and board, and incidental expenses." Id.

"Plaintiff Grace Kirk, a resident of Duluth, Minnesota, is attending Brown." Id. ¶ 24. "Kirk was recruited to play women's basketball by multiple Division I colleges and was offered a full athletic scholarship from one of them." Id. "Brown recruited, accepted, and enrolled Kirk, providing her need-based financial aid, which did not cover the full cost of her tuition, room, and board, and incidental expenses." Id.

"The University Defendants are institutions of higher education that have belonged to the Ivy League athletic conference since its formation in 1954." Id. ¶ 25. "The Ivy League Council of Presidents (also known as the Council of Ivy Group Presidents) is the body that effectuates and enforces the Ivy League Agreement on behalf of the University Defendants." Id. ¶ 26.

-3-

"The Council, through its executive director and administrative staff, coordinates the athletic activities of the Ivy League schools, including the negotiation of television rights for Ivy League athletic competitions . . . ." Id. ¶ 77. "The Council also organizes meetings of the Ivy League schools, which representatives of the University Defendants attend." Id. ¶ 80. "The Council also negotiates on behalf of the University Defendants for revenues generated by Ivy League athletic competitions and distributes the proceeds due to the University Defendants." Id. ¶ 81. "The 'Ivy League' is an athletic conference." Id. ¶ 96. "The Ivy League competes on a national level in all Division I sports . . . ." Id. ¶ 97. "The Ivy League's mission has long included recruiting students with the highest academic qualifications with nationally ranked athletic skills." Id.

"The Ivy League maintains an extensive body of rules and regulations that govern its intercollegiate sports activities." Id. ¶ 98. "Under the latest edition of the 'Ivy Manual' (2017-18), these rules and regulations govern, for example, the eligibility of Ivy League students for intercollegiate sports competitions, multiple aspects of competitions themselves and when they are held, and dates for the 'seasons' for individual sports." Id.

-4-

"The Ivy League operates through multiple standing committees, principally the Council, but also the Policy Committee, the Committee on Administration, the Committee on Admissions, and the Committee on Financial Aid." Id. ¶ 99.

> The Ivy League's Executive Director is responsible for implementing the rules set forth in the Ivy League Manual and the relevant national rules pertaining to intercollegiate athletics, and for imposing "penalties as may be appropriate and the implementation of such procedures for exceptions to Ivy rules as may be established by the Committee with authority in such areas."

Id. ¶ 100 (quoting Ivy Manual at 18). "The name 'Ivy League' has brand value, which each of the Defendants use in marketing efforts, including efforts to attract students and faculty and to sell tickets and media rights to athletic competitions." Id. ¶ 101. "The Ivy League rules require prominent display of the 'Ivy League' logo—evidencing the value of the 'Ivy League' brand—at events and in promotional materials." Id. "The Ivy League has rules that promote its unique brand on television broadcasts." Id. ¶ 103. "The rules state in that regard: 'League-wide programming should emphasize the distinguishing characteristics of Ivy League athletics and institutions: in particular, wide participation in a variety of sports, equal opportunity for women and equal emphasis upon women's athletics, and the comprehensive excellence of each of the eight Ivy League institutions.'" Id. (quoting Ivy Manual at 133). "In addition,

television exposure 'should involve outlets and times that have the basis for securing a good audience and for portraying Ivy League athletics as an activity worth watching in its own right, not simply as another collegiate athletic broadcast.'" Id. ¶ 104 (quoting Ivy Manual at 134).

> The Ivy League promotes [and] markets itself through its website to students, athletes, and the nation as the only league that, top to bottom, "stands at the pinnacle of higher education and Division I athletics, rooted in the longstanding, defining principle that intercollegiate athletics competition should be kept in harmony with the essential educational purposes of the institution."

Id. ¶ 109 (quoting About the Ivy League, https://ivyleague.com/ sports/2017/8/13/HISTORY_0813173057.aspx).

> Defendants further proclaim, on the website, the uniqueness of the Ivy League conference, with a brand that is "[u]nrivaled in its legacy," and that "the Ivy League provides the true test of academic and co-curricular rigor – fostering an enduring culture that celebrates a storied-tradition, thrives on shared values and holds paramount the academic and personal growth of students."

Id.

The Ivy League is a member of the National Collegiate Athletic Association (the "NCAA"). "The NCAA has three athletic Divisions." Id. ¶ 1 n.1. "Division I contains approximately 350 colleges and universities and reflects the highest level of athletic competition among the three Divisions." Id. "According to the NCAA: Division I schools provide unmatched academic and athletic opportunities and support. This support includes full

-6-

scholarships, cost-of-attendance stipends, degree completion programs and academic revenue distribution from the NCAA for schools that meet certain criteria. . . ." Id. (alteration in original) (quoting Our Division I Story, http://www.ncaa.org/sports/2021/2/16/our-division-i-story.aspx). "Division II schools generally offer only partial athletic scholarships [citing Division II Partial-Scholarship Model, https://www.ncaa.org/sports/2014/9/25/divisionii-partial-scholarship-model.aspx], while those in Division III cannot offer athletic scholarships [citing Our Division III Story, https://www.ncaa.org/sports/2021/2/16/our-division-iiistory.aspx]." Mem. of Law in Supp. of Defs.' Mot. to Dismiss (ECF No. 153-1) ("Defs.' Mem.") at 12.[1]

The plaintiffs claim that "[t]he misconduct at issue occurs in two related markets." Compl. ¶ 7. The first is "the market for educational services for athletically and academically high-achieving ("AAHA") students who seek to graduate from college and play Division [I] sports in the National Collegiate Athletic Association . . . ." Id. The plaintiffs define this market as the AAHA Educational Services Market. The second is "the market for the athletic services of the AAHA students who seek to play

---

[1] The page numbers cited to in this ruling for documents that have been electronically filed refer to the page numbers in the header of the documents and not to the page numbers in the original documents, if any.

for the University Defendants." Id. The plaintiffs define this as the AAHA Athletic Services Market.

"In the AAHA Educational Services Market, the University Defendants compete with each other, albeit in ways restricted by the Ivy League Agreement, to attract AAHA students' purchase of educational services." Id. ¶ 142. "In the AAHA Athletic Services Market, the University Defendants compete with each other, albeit in ways restricted by the Ivy League Agreement, to attract AAHA students to provide their athletic services to the University Defendants." Id.

## II.  LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")). "Nor does a

-8-

complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (alteration in original) (quoting Twombly, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (internal citations and quotations omitted). However, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." Id. at 547. "A claim has facial plausibility when the [claimant] pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" Mytych v. May Dep't Store Co., 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting Ryder Energy Distribution v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984)). "The issue [on a motion to dismiss] is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." United States v. Yale New Haven Hosp., 727 F. Supp. 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 236).

In its review of a motion to dismiss for failure to state a

claim, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local 504, 992 F.2d 12, 15 (2d Cir. 1993). "[I]n some cases, a document not expressly incorporated by reference in the complaint is nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a motion to dismiss. A document is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).

## III. DISCUSSION

The Complaint does not allege a per se antitrust violation, nor does it allege a restraint that violates the rule of reason. The Complaint fails to allege a restraint that violates the rule of reason because it does not allege any properly defined market, and consequently, it also fails to allege market-wide anticompetitive effects. In light of this fact, the court does not reach the defendants' additional argument as to why the plaintiffs have failed to state a claim under the rule of reason and does not reach their argument with respect to failure to allege an antitrust injury-in-fact. The court reaches the

defendant's argument that the statute of limitations bars plaintiff Choh's claim and concludes that it does.

### A. **The Complaint Does Not Allege a Per Se Violation**

"Only unreasonable restraints on competition violate § 1 of the Sherman Act." N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 41 (2d Cir. 2018). "[A] restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be 'per se' unreasonable, or because it violates what has come to be known as the 'Rule of Reason.'" Id. (alteration in original) (quoting FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 458 (1986)). The court agrees with the defendants that "[w]ell-established precedent requires that Plaintiffs' claim be assessed under the rule of reason." Defs.' Mem. at 19.

"Regulation of league sports is a textbook example of when the rule of reason applies." N. Am. Soccer League, 883 F.3d at 41 (citing NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 101, 104 (1984)).

In NCAA v. Alston, 594 U.S. 69 (2021), the Supreme Court applied the rule of reason to NCAA-wide rules limiting compensation for student-athletes. As part of its analysis, the Court gave an overview of the evolution of rules relating to such compensation. That overview included the following:

> In 1948, the NCAA . . . adopted the "Sanity

-11-

Code." The code reiterated the NCAA's opposition to "promised pay in any form." . . .

. . . In 1956, the NCAA expanded the scope of allowable payments to include room, board, books, fees, and "cash for incidental expenses such as laundry." . . . In 1974, the NCAA began permitting paid professionals in one sport to compete on an amateur basis in another. . . . In 2014, the NCAA "announced it would allow athletic conferences to authorize their member schools to increase scholarships up to the full cost of attendance." . . .

In recent years, changes have continued. The NCAA has created the "Student Assistance Fund" and the "Academic Enhancement Fund" to "assist student-athletes in meeting financial needs," "improve their welfare or academic support," or "recognize academic achievement." These funds have supplied money to student-athletes for "postgraduate scholarships" and "school supplies," as well as "benefits that are not related to education," such as "loss-of-value insurance premiums," "travel expenses," "clothing," and "magazine subscriptions." . . .

The NCAA has also allowed payments "'incidental to athletics participation,'" including awards for "participation or achievement in athletics" (like "qualifying for a bowl game") and certain "payments from outside entities" (such as for "performance in the Olympics"). The NCAA permits its member schools to award up to (but no more than) two annual "Senior Scholar Awards" of $10,000 for students to attend graduate school after their athletic eligibility expires. Finally, the NCAA allows schools to fund travel for student-athletes' family members to attend "certain events."

Id. at 77-79 (internal citations omitted).

It was against this backdrop that the Court stated: "Determining whether a restraint is undue for purposes of the Sherman Act 'presumptively' calls for what we have described as a 'rule of reason analysis.'" Id. at 81 (citations omitted).

-12-

Upholding the scope of the permanent injunction issued by the district court, the Court stated: "The [district] court enjoined only restraints on education-related benefits—such as those limiting scholarships for graduate school, payments for tutoring, and the like." Id. at 103. The Court added: "And the [district] court emphasized that its injunction applies only to the NCAA and multiconference agreements; individual conferences remain free to reimpose every single enjoined restraint tomorrow—or more restrictive ones still." Id.; see also id. at 104-05 ("Accordingly, the NCAA may seek whatever limits on paid internships it thinks appropriate. And, again, the court stressed that individual conferences may restrict internships however they wish.").

The Supreme Court had previously applied the rule of reason to the NCAA in Board of Regents. In 1984, during an era prior to the NCAA's recent expansions of the scope of allowable payments to athletes, the Court explained the nature of the NCAA as follows:

> [Some] activities can only be carried out jointly. Perhaps the leading example is league sports. . . . What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed. A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed,

-13-

all must be agreed upon, and all restrain the manner
in which institutions compete. Moreover, the NCAA
seeks to market a particular brand of football—college
football. The identification of this "product" with an
academic tradition differentiates college football
from and makes it more popular than professional
sports to which it might otherwise be comparable, such
as, for example, minor league baseball. In order to
preserve the character and quality of the "product,"
athletes must not be paid, must be required to attend
class, and the like. And the integrity of the
"product" cannot be preserved except by mutual
agreement; if an institution adopted such restrictions
unilaterally, its effectiveness as a competitor on the
playing field might soon be destroyed. Thus, the NCAA
plays a vital role in enabling college football to
preserve its character, and as a result enables a
product to be marketed which might otherwise be
unavailable. In performing this role, its actions
widen consumer choice—not only the choices available
to sports fans but also those available to athletes—
and hence can be viewed as procompetitive.

Bd. of Regents, 468 U.S. at 101–02 (quotation marks and internal

citations omitted); see also McCormack v. NCAA, 845 F.2d 1338

(5th Cir. 1998) (applying rule of reason to NCAA rules limiting

compensation for collegiate football players to scholarships

with limited financial benefits); Rock v. NCAA, 928 F. Supp. 2d

1010 (S.D. Ind. 2013) (applying rule of reason to NCAA bylaws

prohibiting multi-year athletics-based scholarships and capping

the total amount of athletics-based scholarships member

institutions could grant to student-athletes in a given sport);

O'Bannon v. NCAA, 802 F.3d 1049, 1069 (9th Cir. 2015) (applying

rule of reason to NCAA rules prohibiting student-athletes from

receiving compensation for their names, images, and likenesses).

A review of the factual allegations in the Complaint and the contents of the Ivy Manual, which is quoted in the Complaint and attached as an appendix to the defendants' memorandum of law, shows that assessing the plaintiffs' claim under the rule of reason is consistent with this well-established precedent. The Complaint alleges that "[t]he 'Ivy League' is an athletic conference," Compl. ¶ 96, and "[t]he University Defendants are institutions of higher education that have belonged to the Ivy League athletic conference since its formation in 1954," id. ¶ 25. The Complaint also alleges that the Ivy League promotes itself "as the only league that, top to bottom, 'stands at the pinnacle of higher education and Division I athletics, rooted in the longstanding, defining principle that intercollegiate athletics competition should be kept in harmony with the essential educational purposes of the institution,'" and "provides the true test of academic and co-curricular rigor – fostering an enduring culture that celebrates a storied-tradition, thrives on shared values and holds paramount the academic and personal growth of students." Id. ¶ 109. The Complaint alleges that the defendants affirmed in 2017 that "[a]ll the Ivy League institutions follow the common policy that any financial aid for student-athletes will be awarded and renewed on the sole basis of economic need with no differentiation in amount or in kind (e.g. packaging) based on

athletic ability or participation." Compl. ¶ 134 (quoting 1977 Ivy Manual at 149).

The Ivy League Agreement, which is Appendix A to the Ivy Manual, begins with the following statement: "In November, 1945, the undersigned institutions entered into an agreement regarding football, with the purpose of maintaining the values of the game in the service of higher education." Ivy Manual at 151. Section 3A of the Ivy League Agreement states:

> The Group affirm their conviction that under proper conditions intercollegiate competition in organized athletics offers desirable development and recreation for players and a healthy focus of collegiate loyalty. These conditions require that the players shall be truly representative of the student body and not composed of a group of specially recruited athletes. They further require that undue strain upon players and coaches be eliminated and that they be permitted to enjoy the game as participants in a form of recreational competition rather than as professional performers in public spectacles. In the total life of the campus, emphasis upon intercollegiate competition must be kept in harmony with the essential educational purposes of the institution.

Id. Section 3B states: "The Group conclude that these conditions and requirements can best be fulfilled by denying to the fullest possible extent external pressures for competitive extremes." Id.

The Ivy Manual also states:

> The principle of need as the basis for financial aid for student-athletes is a cornerstone of Ivy belief. The Ivy Group has consistently adopted positions with the objective of requiring need as the basis for all such aid, while arguing against any related

-16-

> limitations on the number of scholarships awarded to
> athletes or any special admissions restrictions for
> athletes i.e., letters-of-intent.

Id. at 5. The Ivy Manual was last revised in August 2017. See
id. at 3.

These factual allegations and provisions in the Ivy Manual
support the defendants' position that "[t]he challenged rule
helps broaden consumer choice by offering a campus culture and
college experience where student-athletes and non-student-
athletes are treated equally and financial assistance provided
to student-athletes is not conditioned on their continued
participation in varsity sports, while preserving a measure of
competitive balance within the athletic conference and still
allowing student-athletes the opportunity to play competitive
Division I sports." Defs.' Mem. at 21.

The plaintiffs contend that the Ivy League Agreement is per
se illegal because "[t]he University Defendants are horizontal
competitors in the commercial activities in the Relevant Service
Markets. . . . [H]orizontal agreements on price restraints with
respect to commercial activities [are] per se illegal under the
Sherman Act." Compl. ¶ 141. However, as the defendants point
out, "[h]orizontal price fixing and output limitation [that] are
ordinarily condemned as a matter of law under an 'illegal per
se' approach" were at issue in Board of Regents yet the Court
concluded "that it would be inappropriate to apply a per se rule

-17-

. . . .″ <u>Board of Regents</u>, 468 U.S. at 100.

The plaintiffs also contend that "the Ivy League Agreement satisfies the criteria for application of the <u>per se</u> standard under <u>United States v. Brown University [in Providence in the State of Rhode Island]</u>, 5 F.3d [658], [6]72 (3d Cir. 1992) (declining to apply the <u>per se</u> standard to the 'Ivy Overlap' agreement because of defendant MIT's alleged pure altruistic motive and alleged absence of a revenue-maximizing purpose)." Compl. ¶ 145. The Complaint alleges that "[t]he Ivy League Agreement meets the <u>Brown</u> standard because the University Defendants' athletic operations are commercial enterprises and are not purely altruistic." <u>Id.</u> ¶ 146. In <u>Brown</u>, the Antitrust Division of the United States Department of Justice claimed that Massachusetts Institute of Technology ("MIT") had "violated section one et seq. of the Sherman Anti-Trust Act, 15 U.S.C. § 1 et seq., by agreeing with the Ivy League schools to distribute financial aid exclusively on the basis of need and to collectively determine the amount of financial assistance commonly admitted students would be awarded." 5 F.3d at 661. "The district court found that the Ivy Overlap Group members, which are horizontal competitors, agreed upon the price which aid applicants and their families would have to pay to attend a member institution to which that student had been accepted." <u>Id.</u> at 670 (internal quotation marks and citation omitted). "Based

-18-

on this finding, the [Antitrust] Division argue[d] that MIT's conduct was <u>per se</u> unlawful price fixing." <u>Id.</u> The court of appeals agreed "with the district court that [the agreement] must be judged under the rule of reason." <u>Id.</u> at 672. In reaching this decision, the court reasoned that the "alleged pure altruistic motive and alleged absence of a revenue maximizing purpose contribute to our uncertainty with regard to [the agreement's] anti-competitiveness, and thus prompts us to give careful scrutiny to the nature of [the agreement], and to refrain from declaring [the agreement] <u>per se</u> unreasonable." <u>Id.</u> The plaintiffs maintain that:

> In this case, in contrast, Plaintiffs allege in detail that Defendants operate, both generally and in their athletic programs, without altruistic motives; and that they do in fact maximize revenues, defined to include both revenue from operations and donations. <u>See, e.g.</u>, Compl. ¶¶ 145-46, 148-84. Under <u>Brown</u>'s rationales, these facts warrant <u>per se</u> treatment.

Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss (ECF No. 160) ("Pls.' Opp'n") at 28.

However, the rationale in <u>Brown</u> does not support a conclusion that where plaintiffs allege that defendants do not have purely altruistic motives and have a revenue maximizing purpose, i.e. the defendant is operating a commercial enterprise, the conduct of the defendants should not be judged under the rule of reason. As the defendants note, correctly:

> [T]he NCAA has repeatedly been called "commercial,"

-19-

> yet the Supreme Court and lower courts consistently
> apply the rule of reason to evaluate its rules. See,
> e.g., Alston, [594 U.S. at 76] (noting long history of
> "commercialism" and "profitab[ility]" in college
> sports); O'Bannon, 802 F.3d at 1065 (similar); Board
> of Regents, 468 U.S. at 100-101 n.22 (similar).

Defs.' Mem. at 24 (second alteration in original). Moreover, the

above-quoted language from the Ivy Manual directly contradicts

the plaintiffs' contention that the Ivy League operates without

altruistic motives.

Therefore, the court concludes that the plaintiffs have not

plausibly alleged a per se antitrust violation.

## B. **The Rule of Reason**

"To determine whether a restraint violates the rule of

reason . . . a three-step, burden-shifting framework applies."

Ohio v. Am. Express Co., 585 U.S. 529, 541 (2018). "Under this

framework, the plaintiff has the initial burden to prove that

the challenged restraint has a substantial anticompetitive

effect that harms consumers in the relevant market." Id. The

rule of reason analysis "generally requires a court to 'conduct

a fact-specific assessment of market power and market structure'

to assess a challenged restraint's 'actual effect on

competition.'" Alston, 594 U.S. at 70 (quoting Am. Express Co.,

585 U.S. at 541). "Always, '[t]he goal is to distinguish between

restraints with anticompetitive effect that are harmful to the

consumer and restraints stimulating competition that are in the

-20-

consumer's best interest.'" Id. (alteration in original) (quoting Am. Express Co., 585 U.S. at 541).

Plaintiffs can meet their initial burden "directly or indirectly." Am. Express Co., 585 U.S. at 542. "Direct evidence of anticompetitive effects would be proof of actual detrimental effects [on competition], such as reduced output, increased prices, or decreased quality in the relevant market. Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." Id. (alteration in original) (internal citations and quotation marks omitted).

"[A] plaintiff initially must show that the challenged action had an actual adverse effect on competition as a whole in the relevant market . . . ." Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 96 (2d Cir. 1998) (internal citation and quotation marks omitted). "The Sherman Act protects competition as a whole in the relevant market, not the individual competitors within that market, so that a plaintiff may succeed only when the loss he asserts derives from activities that have a 'competition-reducing' effect." Id. (quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342–44 (1990)).

"To state a claim under . . . [§ 1] of the Sherman Act . . . a plaintiff must allege a plausible relevant market in which competition will be impaired." City of New York v. Grp.

Health Inc., 649 F.3d 151, 155 (2d Cir. 2011). "The relevant

market must be defined 'as all products "reasonably

interchangeable by consumers for the same purposes," because the

ability of consumers to switch to a substitute restrains a

firm's ability to raise prices above the competitive level.'"

Id. (quoting Geneva Pharm. Tech. Corp. v. Barr Labs. Inc., 386

F.3d 485, 496 (2d Cir. 2004) (quoting United States v. E. I. du

Pont de Nemours & Co., 351 U.S. 377, 395 (1956))).

> Though market definition is a deeply fact-intensive
> inquiry [and] courts [therefore] hesitate to grant
> motions to dismiss for failure to plead a relevant
> product market, [w]here the plaintiff fails to define
> its proposed relevant market with reference to the
> rule of reasonable interchangeability and cross-
> elasticity of demand, or alleges a proposed relevant
> market that clearly does not encompass all
> interchangeable substitute products even when all
> factual inferences are granted in plaintiff's favor,
> the relevant market is legally insufficient and a
> motion to dismiss may be granted.

Chapman v. N.Y. State Div. for Youth, 546 F.3d 230, 238 (2d Cir.

2008) (alterations in original) (internal citation and quotation

marks omitted). "Interchangeability implies that one product is

roughly equivalent to another for the use to which it is put

. . . ." Id. (alteration in original) (quoting Queen City Pizza

v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997)).

"Cross-elasticity of demand [means] consumers would respond to a

slight increase in the price of one product by switching to

another product." Todd v. Exxon Corp., 275 F.3d 191, 201-02 (2d

Cir. 2001) (quoting AD/SAT, Div. of Skylight, Inc. v. Associated Press, 181 F.3d 216, 227 (2d Cir. 1999)).

### 1. Failure to Allege Any Properly Defined Market

#### a. The Alleged Primary Markets

As discussed above, a plaintiff must initially show that the challenged action had an actual adverse impact "on competition as a whole in the relevant market," Tops Markets, 142 F.3d at 96, and "define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand," City of New York, 649 F.3d at 155 (quoting Chapman, 546 F.3d at 238). Here the plaintiff defines the relevant markets as the AAHA Educational Services Market and the AAHA Athletic Services Market. The sellers or buyers, respectively, in these markets are limited to the University Defendants. The Complaint alleges that "AAHA students highly and uniquely value both the high-level Division I athletics programs and the rigorous academic programs that the University Defendants offer." Compl. ¶ 202. It also alleges that "AAHA students are a distinct and unique group of college applicants and, later, students. . . . AAHA students are exceptionally high-achieving in both academics and athletics." Id. ¶ 213.

In addition though, the Complaint alleges that "[o]ther academically selective universities—such as Stanford University, Duke University, the University of Notre Dame, and Rice

-23-

University—award athletic scholarships and compensate/reimburse
their athletes . . . . These schools are not part of the Ivy
League, but they demonstrate they can maintain stellar academic
standards while competing for excellent athletes . . . ." Id.
¶ 11. The Complaint further alleges that "[a] handful of other
academically selective institutions offer athletic scholarships
along with need-based aid for all other students, without
sacrificing their academic standing." Id. ¶ 231. With respect to
Stanford University, the Complaint alleges: "Through the 2018-19
academic year, for example, Stanford University had won the
IMF/Learfield Director's Cup for the overall most successful
intercollegiate athletic department in the nation for 25
consecutive years. Simultaneously, Stanford ranks among the most
academically prestigious universities in the country." Id.
(footnote omitted).

Thus the Complaint alleges facts which show that schools
other than the University Defendants compete to offer
educational services to AAHA students, and that the University
Defendants are not the only schools to which AAHA students sell
their athletic services.[2] But Stanford, Notre Dame, Duke and Rice
are not included for purposes of the definition of the relevant

---

[2] The defendants assert that "scores of other schools . . . offer 'high-level
Division I athletics programs' and 'rigorous academic programs,'" identifying
specifically UVA, Michigan, Berkeley, UNC Chapel Hill, Georgetown, and
Vanderbilt. Defs.' Mem. at 27. These schools are not named in the Complaint.

-24-

market with respect to either the AAHA Educational Services Market or the AAHA Athletic Services Market. Consequently, the Complaint does not satisfy, with respect to the alleged primary markets, the requirements for defining a plausible relevant market, i.e., defining the proposed relevant markets with reference to the rule of reasonable interchangeability and cross-elasticity of demand, and the alleged primary relevant markets are legally insufficient.

### b. The Alternative Alleged Markets

With respect to the AAHA Educational Services Market, the Complaint alleges that "[i]n the alternative, the AAHA Educational Services Market comprises both the Defendant Universities and a few other schools, including Stanford, Notre Dame, Duke, and Rice." Compl. ¶ 210 (emphasis added). With respect to the AAHA Athletic Services Market, the Complaint alleges that "[i]n the alternative, the AAHA Athletic Services Market comprises AAHA students who sell their athletic services to the University Defendants and a small number of other academically selective universities (those in the alternative AAHA Educational Services Market)." Id. ¶ 218. Thus the Complaint alleges that the sellers or buyers, respectively, in each of these alternative markets are the University Defendants plus a small number of other schools, some of which are identified and some of which are not identified.

The court agrees with the defendants that "these proposed market definitions fail for the simple reason that Plaintiffs do not actually propose the contours of a relevant market." Defs.' Mem. at 29. "The Supreme Court requires plaintiffs to identify the relevant product and geographic markets so the district court can assess 'what the area of competition is, and whether the alleged unlawful acts have anticompetitive effects in that market.' . . . Without an explanation of the [competitors] involved, and their products and services, the court cannot determine the boundaries of the relevant product market . . . ." Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield, 552 F.3d 430, 437 (6th Cir. 2008) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 324 (1962)); see also Laboratoires Majorelle SAS v. Apricus Bioscis., Inc., No. 17 Civ. 6625 (AT), 2018 WL 11222863, at *5 (S.D.N.Y. Sept. 21, 2018) (a well-pled antitrust claim must "allow the Court to perform an 'analysis of the interchangeability of use or the cross-elasticity of demand for potential substitute products'" (citation omitted)); Vital Pharms., Inc. v. Berlin Packaging LLC, 632 F. Supp. 3d 780, 786 (N.D. Ill. 2022) (antitrust plaintiff did not "allege a cognizable market in which [defendant] ha[d] market power" when the plaintiff "never clearly identifie[d] the product market); Prescient Med. Holdings, LLC v. Lab'y Corp. of Am. Holdings, C.A. No. 18-600-

MN, 2019 WL 635405, at *6 (D. Del. Feb. 14, 2019) (a failure to "identify which . . . services are a part of the relevant product market" is a failure "to adequately define the relevant product market").

The court also agrees with the defendants that "the absence of any meaningful market definition makes it impossible to evaluate whether Plaintiffs have plausibly alleged that Defendants have the market power necessary to withhold athletic scholarships and other athletics-based aid without losing athletically and academically high-achieving student-athletes to other excellent schools in these alternative markets." Defs.' Mem. at 29–30. As in Cupp v. Alberto-Culver USA, Inc., the court requires a "a more specific definition and accounting of the [schools] in the relevant market[s]" to "determine the boundaries of the market[s]." 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004).

### 2. Failure to Allege Market-Wide Anticompetitive Effects

As discussed above, the plaintiffs have failed to define a legally sufficient relevant market with respect to the AAHA Educational Services Market because they do not include other colleges and universities that compete with the University Defendants to offer educational services to AAHA students, and with respect to the AAHA Athletic Services Market, because they do not include other colleges and universities to which AAHA

-27-

students sell their athletic services. As a consequence, the facts alleged by the plaintiffs are legally insufficient to show an adverse effect on competition as a whole in a relevant market. At best, the plaintiffs' allegations of anticompetitive effects relate to just some market participants, not effects in the market as a whole. See 1-800 Contacts, Inc. v. FTC, 1 F.4th 102, 118 n.11 (2d Cir. 2021) (per curiam) ("[S]howing that a price for certain [products] dropped is not direct evidence of the effect on the market as a whole."); Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 245 (2d Cir. 1997) ("Without any allegation as to how market-wide competition will be affected, the complaint fails to allege a claim on which relief may be granted."); Pennsylvania v. NCAA, 948 F. Supp. 2d 416, 431 (M.D. Pa. 2013) (holding that, lacking any more precise market definition, a university did not adequately allege an "anticompetitive effect . . . in the nationwide market for" athletes and "the nationwide market for post-secondary education").

The plaintiffs contend that "where, as alleged here, there is direct evidence of anticompetitive effects, there is no need for proof of market power or relevant market." Pls.' Opp'n at 33. The plaintiffs quote FTC v. Indiana Federation of Dentists for the proposition that "[s]ince the purpose of the inquiries into market definition and market power is to determine whether

-28-

an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." 476 U.S. 447, 460-61 (1986) (internal quotation marks and citations omitted).

As an initial matter, this dicta in Indiana Federation of Dentists predates the explanation in American Express Co. of what a court is required to do in conducting a rule of reason analysis. Moreover, while the plaintiffs accurately quote from Indiana Federation of Dentists, the context in which the quoted language appears makes it clear that the Court is not purporting to articulate an alternative standard for pleading a claim that a restraint violates the rule of reason. The quoted language appears as part of a discussion by the Court of reasons it rejects the arguments advanced by the Indiana Federation of Dentists. The Court explained that "the Federation suggests that in the absence of specific findings by the Commission concerning the definition of the market in which the Federation allegedly restrained trade and the power of the Federation's members in that market, the conclusion that the Federation unreasonably restrained trade is erroneous as a matter of law." Id. at 460. In rejecting the Federation's argument the Court stated:

> [T]he Commission's failure to engage in detailed
> market analysis is not fatal to its finding of a
> violation of the Rule of Reason. The Commission found
> that in two localities in the State of Indiana (the
> Anderson and Lafayette areas), Federation dentists
> constituted heavy majorities of the practicing
> dentists and that as a result of the efforts of the
> Federation, insurers in those areas were, over a
> period of years, actually unable to obtain compliance
> with their requests for submission of x rays. Since
> the purpose of the inquiries into market definition
> and market power is to determine whether an
> arrangement has the potential for genuine adverse
> effects on competition, "proof of actual detrimental
> effects, such as a reduction of output," can obviate
> the need for an inquiry into market power, which is
> but a "surrogate for detrimental effects." 7 P.
> Areeda, Antitrust Law ¶ 1511, p. 429 (1986). In this
> case, we conclude that the finding of actual,
> sustained adverse effects on competition in those
> areas where IFD dentists predominated, viewed in light
> of the reality that markets for dental services tend
> to be relatively localized, is legally sufficient to
> support a finding that the challenged restraint was
> unreasonable even in the absence of elaborate market
> analysis.

Id. at 460-61 (footnote omitted).

In support of this contention the plaintiffs also quote

United States v. Sargent Electric Co. for the proposition that

"[t]o some extent, of course, a horizontal agreement tends to

define the relevant market, for it tends to show that the

parties to it are at least potential competitors. If they were

not, there would be no point to such an agreement. Thus its very

existence supports an inference that it would have an effect in

a relevant market." 785 F.2d 1123, 1127 (3d Cir. 1986). However

this language in Sargent makes it clear that defining a relevant

market is a predicate for drawing the inference the plaintiffs argue should be drawn here, and the plaintiffs have failed to define a legally sufficient relevant market.

The plaintiffs also argue that they "allege in detail how the University Defendants themselves define the Ivy League as a distinct market through the particular combination of the academic and athletic excellence of their collegiate athletes, and how industry participants view the Ivy League as singular. See, e.g., Compl. ¶¶ 96–113." Pls.' Opp'n at 35. The court agrees with the defendants that "[t]hose allegations show no such thing." Defs.' Reply in Supp. of Mot. to Dismiss (ECF No. 164) ("Defs.' Reply") at 11. These allegations merely show that the University Defendants define themselves as, and are viewed by industry participants as, an athletic conference, with a "unique brand." Compl. ¶ 103.

## C. <u>The Statute of Limitations -- Plaintiff Choh</u>

"[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." <u>Zenith Radio Corp. v. Hazeltine Rsch., Inc.</u>, 401 U.S. 321, 339 (1971). The statute of limitations for a federal antitrust claim expires "four years

after the cause of action accrued." Id. (quoting 15 U.S.C. § 15b).

The defendants contend that plaintiff Choh's claim is time-barred because he alleges that "[b]ut for the Ivy League Agreement, Brown would have awarded Choh a full athletic scholarship and compensated/reimbursed him for the athletic services he provided to Brown," Compl. ¶ 23, but Choh enrolled at Brown more than four years before this action was filed on March 7, 2023. See id. ("Choh . . . attended Brown University from September 2017 until May 2022, when he graduated.").

Choh does not dispute that he enrolled at Brown more than four years before this action was filed. Rather he maintains that his claim is timely under the continuing violation doctrine. "[I]n the case of a 'continuing violation,' . . . 'each overt act that is part of the violation and that injures the plaintiff,' e.g., each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.'" US Airways, Inc. v. Sabre Holdings Corp., 938 F.3d 43, 68–69 (2d Cir. 2019) (quoting Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997)). Choh argues that his claim satisfies the requirements of the continuing violation doctrine "because the University Defendants decline, every year, to award athletic scholarships or compensation for athletic services for the year; and every

-32-

year in which Defendants continued the Agreement, during Choh's tenure at Brown, inflicted new and accumulating injury on him." Pls.' Opp'n at 49–50 (citing Compl. ¶ 23). But Choh does not satisfy the requirements for pleading a claim under the continuing violation doctrine.

In US Airways the court adopted the rule that had been adopted by the Sixth, Eighth, and Ninth Circuits for determining whether the continuing violation doctrine applies. The court stated:

> The Sixth Circuit has concluded that "[a]n overt act that restarts the statute of limitations is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." [DXS, Inc. v. Siemens Med. Sys., Inc., 100 F.3d 462, 467 (6th Cir. 1996)] (internal quotation marks omitted); see also Grand Rapids Plastics, Inc. v. Lakian, 188 F.3d 401, 406 (6th Cir. 1999) ("[E]ven if the payment agreement constituted a continuing violation ... the individual payments ... were only a manifestation of the previous agreement. The individual payments therefore do not constitute a 'new and independent act,' as required to restart the statute of limitations."); Varner v. Peterson Farms, 371 F.3d 1011, 1019-20 (8th Cir. 2004) ("Performance of the alleged anticompetitive contracts during the limitations period is not sufficient to restart the period." (citations omitted)); Eichman v. Fotomat Corp., 880 F.2d 149, 160 (9th Cir. 1989) ("[T]he passive receipt of profits from an illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations."). We agree. A contract is a vehicle for determining at the time of contracting what should happen at some time thereafter. So, like the Sixth, Eighth, and Ninth Circuits, we think of the performance of a contract as a manifestation of the

-33-

> "overt act," the decision to enter the contract,
> rather than an independent overt act of its own.

US Airways, 938 F.3d at 68-69; see also In re Google Digital
Advertising Antitrust Litigation, No. 21-CV-3446 (PKC), 2024 WL
895155, at *30 (S.D.N.Y. Mar. 1, 2024) ("[The] Complaint
describe[d] a repeated manifestation of the same overt act –
enforcement o[f] a limit on the number of line items permitted
in header bidding – and not new and independent acts. The claim
directed to line-item caps does not describe a continuing
violation."); Nastasi & Associates, Inc. v. Bloomberg, L.P., No.
20-CV-5428 (JMF), 2024 WL 641263, at *4 (S.D.N.Y. Feb. 15, 2024)
(holding that a scheme to manipulate the price of contractors'
bids did not reset the statute of limitations for prior injuries
each time a new bid was entered); Giordano v. Saks Inc., 654 F.
Supp. 3d 174, 192 (E.D.N.Y. 2023) ("[A]rtificially suppressed
wages paid by Defendants as a result of the no-hire agreement do
not" "make their otherwise untimely claims timely."); Kenmore
Mercy Hosp. v. Daines, No. 09-CV-162S, 2011 WL 4368564, at *4
(W.D.N.Y. Sept. 19, 2011) (holding that new instances of
applying an established policy do not reset the limitations
period for old instances).

Applying the standard articulated in US Airways to this
case, Choh first felt the adverse impact of the Ivy League
Agreement no later than when he enrolled at Brown University in

-34-

September 2017. His claim accrued by then and the statute of limitations began running. The failure of Brown to award him an athletic scholarship or compensation for athletic services during the remainder of his time at Brown was simply a manifestation of the overt act, namely Brown's decision to enter into the most recent version of the Ivy League Agreement. That version of the Ivy League Agreement was simply "a vehicle for determining at the time of contracting what should happen at some time thereafter," namely at the time when Choh enrolled at Brown University. US Airways, 938 F.3d at 69.

Therefore plaintiff Choh's claim must also be dismissed because it is barred by the applicable statute of limitations.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss (ECF No. 153) is hereby GRANTED, and the Complaint is dismissed.

The deficiencies in the Complaint that are the basis for granting the motion to dismiss are substantive in nature, and nothing in the plaintiff's papers suggests that they could amend the Complaint to overcome these substantive deficiencies. (Compare Pls.' Opp'n at 40 n.30). Consequently, the court is not dismissing the Complaint with leave to amend, and any motion for leave to amend the Complaint must be filed within 30 days and comply with Local Rule 7(f). See Long Island Anesths. PLLC v.

-35-

United Healthcare Ins. Co. of N.Y. Inc., No. 22-CV-04040 (HG), 2023 WL 8096909, at *8 (E.D.N.Y. Nov. 21, 2023). If a motion to amend is not timely filed, this case will be closed.

It is so ordered.

Dated this 9th day of October 2024, at Hartford, Connecticut.

/s/AWT
_____
Alvin W. Thompson
United States District Judge
