# 24-2826

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

TAMENANG CHOH and GRACE KIRK, individually and on behalf of others similarly situated,

*Plaintiffs-Appellants*,

*v.*

BROWN UNIVERSITY, TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK, CORNELL UNIVERSITY, TRUSTEES OF DARTMOUTH COLLEGE, HARVARD UNIVERSITY, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, PRINCETON UNIVERSITY, YALE UNIVERSITY, and THE IVY LEAGUE COUNCIL OF PRESIDENTS,

*Defendants-Appellees*.

On Appeal from the United States District Court for the District of Connecticut, No. 3:23-cv-00305, Before the Honorable Alvin W. Thompson, U.S. District Judge

## BRIEF FOR DEFENDANTS-APPELLEES

DAVID GRINGER
ALAN SCHOENFELD
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

April 2, 2025

SETH P. WAXMAN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000

*Counsel for Defendant-Appellee The
Trustees of the University of Pennsylvania*

**ADDITIONAL COUNSEL ON SIGNATURE PAGE**

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellees certify the following:

Defendants-Appellees Brown University, Trustees of Columbia University in the City of New York, Cornell University, Trustees of Dartmouth College, President and Fellows of Harvard College (named in this proceeding as "Harvard University"), The Trustees of the University of Pennsylvania, The Trustees of Princeton University (named in this proceeding as "Princeton University"), and Yale University are each non-profit corporations with no parent corporation, and no publicly held company owns 10% or more of any defendant-appellee's stock.

Defendant-Appellee Council of Ivy Group Presidents (named in this proceeding as "The Ivy League Council of Presidents") is an unincorporated association with no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENTS ..................................................... i

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ..................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................ 4

STATEMENT OF THE ISSUES .................................................................. 4

STATEMENT OF THE CASE ..................................................................... 4

    A.    Factual Background ................................................................ 4

    B.    This Lawsuit ......................................................................... 7

    C.    The District Court's Decision .................................................. 9

SUMMARY OF ARGUMENT ................................................................... 11

STANDARD OF REVIEW ....................................................................... 13

ARGUMENT ........................................................................................ 14

I.    THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT THE IVY
    LEAGUE AGREEMENT VIOLATES THE SHERMAN ACT .......................... 14

    A.    Plaintiffs' Alleged Markets Are Implausible ............................ 16

        1.    The complaint's primary alleged markets are
            implausible ............................................................... 16

            a.    Plaintiffs' allegations confirm their primary
                markets are implausibly underinclusive ................. 17

            b.    Common sense independently confirms
                plaintiffs' concession that their primary
                alleged markets are implausibly narrow ................. 24

2.  Plaintiffs' alternative markets are insufficiently defined and forfeited ............................................ 28

3.  The complaint's generic "all sports" markets are implausible ....................................................... 32

4.  Plaintiffs' failure to allege a plausible market definition means they cannot indirectly allege anticompetitive effects ............................................ 37

B.  Plaintiffs Have Not Plausibly Alleged Market-Wide Anticompetitive Effects ............................................ 38

C.  Plaintiffs' Bootstrapping Theory Is Unavailing ................................. 48

II.  CHOH'S CLAIM IS UNTIMELY ............................................ 49

A.  Choh Has Not Alleged Any New, Independent Overt Act ................. 50

B.  Choh's Counterarguments Are Unavailing ........................................ 54

CONCLUSION .................................................................................. 58

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*1-800 Contacts, Inc. v. FTC*, 1 F.4th 102 (2d Cir. 2021) ...............38, 39, 41, 42, 47

*AD/SAT, Division of Skylight, Inc. v. Associated Press*, 181 F.3d 216
　　(2d Cir. 1999)....................................................................................28, 48

*Adia v. Grandeur Management, Inc.*, 933 F.3d 89 (2d Cir. 2019) ..........................14

*Apple, Inc. v. Psystar Corp.*, 586 F.Supp.2d 1190 (N.D. Cal. 2008) ......................27

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................13

*Belfiore v. New York Times Co.*, 826 F.2d 177 (2d Cir. 1987)...............................20

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)............................................48

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.
　　1979) ................................................................................................57

*Brooklyn Downtown Hotel LLC v. New York Hotel & Motel Trades
　　Council, AFL-CIO*, 2017 WL 1192179 (S.D.N.Y. Mar. 29,
　　2017) ...............................................................................................35

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) .........................................28

*California Dental Ass'n v. FTC*, 526 U.S. 756 (1999) ............................................48

*Cendella v. Metropolitan Museum of Art*, 348 F.Supp.3d 346
　　(S.D.N.Y. 2018)................................................................................43

*Chapman v. New York State Division for Youth*, 546 F.3d 230
　　(2d Cir. 2008)................................................................ 17, 18, 19, 20, 24, 33

*City of New York v. Group Health Inc.*, 649 F.3d 151 (2d Cir. 2011).........16, 17, 20

*Concord Associates, L.P. v. Entertainment Properties Trust*,
　　817 F.3d 46 (2d Cir. 2016) ...............................................................37

*CSX Transportation, Inc. v. Norfolk Southern Railway Co.*,
　　114 F.4th 280 (4th Cir. 2024) ...........................................................51

- iv -

*Darby v. Greenman*, 14 F.4th 124 (2d Cir. 2021) .................................................26

*Doe v. Trump Corp.*, 6 F.4th 400 (2d Cir. 2021) ...................................................31

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145
    (2d Cir. 2014)..................................................................................................14

*DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462 (6th Cir.
    1996) ..........................................................................................................56, 57

*Electronics Communications Corp. v. Toshiba America Consumer
    Products, Inc.*, 129 F.3d 240 (2d Cir. 1997)...........................................38, 39

*Emigra Group LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*,
    612 F.Supp.2d 330 (S.D.N.Y 2009) ................................................................35

*FTC v. RAG-Stiftung*, 436 F.Supp.3d 278 (D.D.C. 2020) ...................................30

*FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986)..........................44, 45

*FTC v. Staples, Inc.*, 190 F.Supp.3d 100 (D.D.C. 2016) .......................................36

*Gazzola v. Hochul*, 88 F.4th 186 (2d Cir. 2023)...................................................24

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories,
    Inc.*, 386 F.3d 485 (2d Cir. 2004) ....................................................................29

*Gilead Community Services, Inc. v. Town of Cromwell*, 112 F.4th 93
    (2d Cir. 2024)..................................................................................................44

*Giordano v. Saks & Co. LLC*, 2025 WL 799270 (2d Cir.
    Mar. 13, 2025) ................................................................................................42

*Giordano v. Saks Inc.*, 654 F.Supp.3d 174 (E.D.N.Y. 2023) ...........................51, 55

*Green Country Food Market, Inc. v. Bottling Group, LLC*,
    371 F.3d 1275 (10th Cir. 2004) ......................................................................35

*Griffin v. Carnes*, 72 F.4th 16 (2d Cir. 2023) .......................................................53

*Hack v. President & Fellows of Yale College*, 237 F.3d 81 (2d Cir.
    2000) ....................................................................................................19, 20, 25

*In re German Automotive Manufacturers Antitrust Litigation*,
 612 F.Supp.3d 967 (N.D. Cal. 2020)....................................................27

*In re Google Digital Advertising Antitrust Litigation*,
 627 F.Supp.3d 346 (S.D.N.Y. 2022) ...................................................42

*In re Google Digital Advertising Antitrust Litigation*,
 721 F.Supp.3d 230 (S.D.N.Y. 2024) ...................................................52

*In re NCAA Grant-in-Aid Cap Antitrust Litigation*,
 375 F.Supp.3d 1058 (N.D. Cal. 2019)............................................24, 25

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997) ...............................54, 55

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*,
 275 F.3d 762 (9th Cir. 2001) .............................................................35

*Madison 92nd Street Associates, LLC v. Courtyard Management
 Corp.*, 624 F.App'x 23 (2d Cir. 2015)................................................21

*Madison Square Garden, L.P. v. NHL*, 2008 WL 4547518 (S.D.N.Y.
 Oct. 10, 2008) .................................................................................52

*Mandala v. NTT Data, Inc.*, 975 F.3d 202 (2d Cir. 2020) ...............13, 14

*NASL, LLC v. USSF, Inc.*, 883 F.3d 32 (2d Cir. 2018)....................15, 37

*NCAA v. Alston*, 594 U.S. 69 (2021) ................... 4, 15, 16, 24, 25, 27, 36

*NCAA v. Board of Regents of University of Oklahoma*, 468 U.S. 85
 (1984)..............................................................................................48

*Ohio v. American Express Co.*, 585 U.S. 529 (2018)...........38, 39, 46, 47

*Pearson v. Gesner*, 125 F.4th 400 (2d Cir. 2025)....................................13

*Regeneron Pharmaceuticals, Inc. v. Novartis Pharma AG*,
 96 F.4th 327 (2d Cir. 2024) ...........................................................21, 22

*Rock v. NCAA*, 928 F.Supp.2d 1010 (S.D. Ind. 2013)......................33, 37

*Sierra Club v. Con-Strux, LLC*, 911 F.3d 85 (2d Cir. 2018) ..................14

*SL-x IP S.a.r.l. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
2023 WL 2620041 (2d Cir. Mar. 24, 2023) .................................50

*Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch
Management Co.*, 414 F.App'x 372 (2d Cir. 2011) ...............18, 21

*Skyline Travel, Inc. (NJ) v. Emirates*, 476 F.App'x 480 (2d Cir. 2012)...............32

*Spinelli v. NFL*, 903 F.3d 185 (2d Cir. 2018) .........................................40

*Tam Travel, Inc. v. Delta Airlines, Inc.*, 583 F.3d 896 (6th Cir. 2009)...................51

*Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) ............................................26

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue
Shield*, 552 F.3d 430 (6th Cir. 2008) ...........................................29

*Turner v. McDonald's USA, LLC*, 2020 WL 3044086 (N.D. Ill.
Apr. 24, 2020)....................................................................55

*US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43
(2d Cir. 2019)...................................................... 11, 49, 50, 51, 53, 56

*United States v. Sargent Electric Co.*, 785 F.2d 1123 (3d Cir. 1986) ..............43, 44

*Vengalattore v. Cornell University*, 36 F.4th 87 (2d Cir. 2022)............................14

*Wellnx Life Sciences Inc. v. Iovate Health Sciences Research Inc.*,
516 F.Supp.2d 270 (S.D.N.Y. 2007) ...........................................43

*West Penn Allegheny Health System v. UPMC*, 627 F.3d 85 (3d Cir.
2010) ...............................................................................55

*Windward Bora LLC v. Sotomayor*, 113 F.4th 236 (2d Cir. 2024) ........................31

*Yerdon v. Poitras*, 120 F.4th 1150 (2d Cir. 2024) .....................................33

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971) ..................49

## DOCKETED CASES

*1-800 Contacts v. FTC*, No. 18-3848 (2d Cir.).........................................39

## STATUTES AND RULES

15 U.S.C.
§1 ................................................................................................7
§15b .....................................................................................10, 49

Fed. R. Evid. 201 ......................................................................14

## OTHER AUTHORITIES

Big East Conference, *2024-25 Men's Basketball Standings*,
    https://tinyurl.com/bdzfw2sh (accessed Apr. 2, 2025)...................36

Big Ten Conference, *Men's Lacrosse Standings*,
    https://tinyurl.com/33yct8ue (accessed Apr. 2, 2025)...................36

EISA, *Schools*, https://tinyurl.com/2af2bs72 (accessed Apr. 2, 2025)....................36

Ivy League, *Home Page*, ivyleague.com (accessed April 2, 2025)........................33

NACDA, *Learfield Directors' Cup Division I Fall Standings* (Dec.
    22, 2024), https://tinyurl.com/y4kvu38v .......................................25

NCAA, *Division I 2024-25 Manual* (Aug. 9, 2024),
    https://tinyurl.com/44drb8vz ..........................................................6

NCAA, *NCAA Directory: Division I Institutions*,
    https://tinyurl.com/2vrk6uvj (accessed Apr. 2, 2025)....................5

Whitford, Emma & Janet Novack, *America's Top Colleges*, Forbes
    https://tinyurl.com/3pnkmc5r (accessed Apr. 2, 2025) ................25

## INTRODUCTION

For decades, the Ivy League and its member institutions have offered student-athletes an opportunity to compete at the highest level of intercollegiate athletics while attending universities that make athletics just one component of the overall student experience.  To help achieve this educational goal, the schools comprising the Ivy League—one of dozens of Division I athletic conferences, and one that contains only eight of the over 350 Division I schools—have chosen not to offer scholarships based on athletic achievement or participation and instead to offer significant financial aid to all students who need it based exclusively on economic need.

As the district court recognized, this longstanding policy creates a particular balance of athletics and academics and provides student-athletes with greater options when choosing a school from among the many colleges and universities that compete with the Ivy League, including schools the complaint concedes are viable substitutes.  This is exactly the choice that these plaintiffs made when they turned down athletic scholarships at non-Ivy schools to attend and play basketball at Brown University knowing the Ivy League's policy.

Plaintiffs seek to eliminate this option by trying to misuse the antitrust laws to force the Ivy League to change the policies that help define the broader undergraduate experiences available at the Ivy League's member institutions (and

1

to recover a windfall in after-the-fact payments for former student-athletes). The antitrust laws should not be used to *reduce* consumer choice by denying prospective students the same range of options these plaintiffs had when making their college selections—indeed, to deny future students the choice that *these plaintiffs knowingly made*. In a comprehensive opinion, the district court correctly held as much, dismissing plaintiffs' complaint for failure to state a claim. That decision is compelled by controlling precedent and should be affirmed for the following reasons.

To start, dismissal was appropriate because plaintiffs failed to satisfy a threshold requirement for their antitrust claim: plausibly pleading a relevant market. Plaintiffs primarily allege that the market of schools considered by student-athletes with elite academic and athletic credentials consists exclusively of the eight Ivy League schools. The district court recognized that this putative market is implausibly narrow because it excludes the many other academically selective schools that offer the chance to compete in Division I athletics. This was an appropriate ruling on a motion to dismiss because the complaint *admits* that the alleged markets exclude these reasonable substitute schools for the Ivy League schools. Plaintiffs also allege an alternative market definition that encompasses the Ivy League and an undefined, unknown number of other schools. The district court rightly deemed this definition much too vague. And both the primary and

alternative markets suffer from yet another independent and fatal defect: they group together all Ivy League schools and all sports, even though the schools offer different sports that are not reasonable substitutes for each other (for example, a lacrosse player cannot substitute a school with a lacrosse program for a school without one).

Unable to overcome these fundamental flaws, plaintiffs contend that they need not satisfy the market-definition requirement because they purportedly have directly alleged anticompetitive effects. That too is wrong. Among other things, the antitrust laws are concerned with *market-wide* anticompetitive effects, and whether effects are market-wide cannot be determined without an understanding of the proper market.

The district court correctly reasoned that plaintiffs' failure to plausibly allege a properly defined relevant market necessarily means that plaintiffs failed to plausibly allege market-wide anticompetitive effects within such a relevant market, as they must do to state an antitrust claim. Plaintiffs resist this conclusion, but their effort at doing so erroneously assumes the validity of their alleged markets or otherwise misunderstands governing precedent.

Lastly, plaintiff Tamenang Choh's claim independently fails because it is time-barred. The complaint establishes that his claim accrued when he matriculated at Brown University in Fall 2017, knowing that he would not get an

3

athletic scholarship while attending Brown. His enrollment in 2017 was outside the four-year limitations period. And as the district court properly concluded, no tolling doctrine excuses his belated claim.

In sum, this Court should affirm because plaintiffs' allegations, when taken alone or in combination with materials cognizable on a motion to dismiss, fail as a matter of law to plead a plausible antitrust claim.

## JURISDICTIONAL STATEMENT

Defendants agree with plaintiffs' jurisdictional statement.

## STATEMENT OF THE ISSUES

1. Did the district court correctly hold that plaintiffs' proposed relevant product markets were implausible, thus precluding an inference that the challenged conduct harmed competition?

2. Did the district court correctly hold that plaintiffs failed to adequately plead market-wide harm to competition?

3. Did the district court correctly hold that Choh's claim was untimely?

## STATEMENT OF THE CASE

### A.    Factual Background

For nearly 120 years, intercollegiate athletics in the United States have been overseen by the National Collegiate Athletic Association. *See NCAA v. Alston*, 594 U.S. 69, 75-76 (2021). The NCAA has three different athletic Divisions—I,

4

II, and III.  A35 n.1.  "Division I contains approximately 350 colleges and universities and reflects the highest level of athletic competition among the three Divisions."  *Id.*  These schools may offer full-tuition scholarships to student-athletes.  *Id.*  Most Division I schools are members of one of dozens of athletic conferences.  *See* NCAA, *NCAA Directory: Division I Institutions*, https://tinyurl.com/2vrk6uvj.  In each sport, schools compete primarily against other members of their conference during the regular season, and then exclusively with the other schools in their conference for a postseason conference championship.  *See* A51; A95-98.

Defendants Brown University, Trustees of Columbia University in the City of New York, Cornell University, Trustees of Dartmouth College, Harvard University, The Trustees of the University of Pennsylvania, Princeton University, and Yale University (collectively, the "University Defendants") are the eight Division I institutions who are members of an athletic conference known as the Ivy League.  A35; A43.  Defendant The Ivy League Council of Presidents (the "Ivy Council") is "the governing body of the Ivy League."  A36.  The University Defendants compete against each other and opponents from other conferences in dozens of sports ranging from football to fencing to rowing.  A95-98.  Distinct NCAA and Ivy League rules governing eligibility, recruiting, training, travel,

5

competition, and scheduling apply to different sports. NCAA, *Division I 2024-25 Manual*, art. 17 (Aug. 9, 2024), https://tinyurl.com/44drb8vz; A214-238.

In 1954, the University Defendants named themselves "The Ivy Group" and "reaffirm[ed] the principle[s] that in each institution the academic authorities should control athletics," and, accordingly, that "[a]thletes shall be admitted as students and awarded financial aid only on the basis of the same academic standards and economic need as are applied to all other students." A264-265.

Today, Ivy League schools continue to share substantially the same understanding of the role athletics should play in campus life at the member institutions. "All the Ivy League institutions follow the common policy that any financial aid for student-athletes will be awarded and renewed on the sole basis of economic need with no differentiation in amount or in kind *(e.g.*, packaging) based on athletic ability or participation, provided that each school shall apply its own standard of economic need." A262; *accord* A118 ("[N]eed as the basis for financial aid for student-athletes is a cornerstone of Ivy belief."). Students are not required to continue playing varsity sports to maintain financial aid awarded based on economic need. This policy, which plaintiffs call the "Ivy League Agreement," A35, ensures that student-athletes and non-athletes alike have the same opportunities at Ivy League schools, and that student-athletes are not obligated to continue playing sports to pursue that experience.

6

**B.** **This Lawsuit**

Plaintiffs Tamenang Choh and Grace Kirk are former Brown University students.  A36; Br.4.  Choh was a member of Brown's men's basketball team between 2017 and 2022.  A36.  Kirk was a member of Brown's women's basketball team between 2020 and 2024.  *Id.*; Br.4.  Both plaintiffs were recruited to play basketball by Brown and other Division I schools outside the Ivy League, and both allege that they received full-tuition athletic scholarship offers from other (unspecified) Division I schools.  A42-43.  Both plaintiffs rejected those scholarship offers and instead chose to enroll at Brown, where each received need-based financial aid.  *Id.*

Plaintiffs commenced this putative class action in March 2023.  A1.  The putative class was composed of "all Ivy League Athletes recruited to play a sport by one or more University Defendants, and who, within the period of March 7, 2019, to the date the conduct challenged as illegal in this Complaint ceases … attended one of the University's undergraduate programs while playing a sport for that school."  A35-36.  The complaint alleges the existence of a "horizontal agreement among competitors" that violates Section 1 of the Sherman Act, 15 U.S.C. §1.  A89.  Plaintiffs claim that "[b]ut for the Ivy League Agreement," the University Defendants would have paid "compensation or reimbursement for

7

education-related expenses from the University Defendants for the athletic services [student-athletes] have provided to the universities." A78.

The complaint alleges that the Ivy League Agreement generates anticompetitive effects in two product markets involving students that plaintiffs call "athletically and academically high-achieving," which they refer to as "AAHA." A37. The first alleged market is "the AAHA Educational Services Market," and the second is the "AAHA Athletic Services Market." A79. The former "comprises the University Defendants, which all compete to offer educational services to AAHA students." *Id.* The latter "comprises AAHA students who sell their athletic services to the University Defendants." A81. The complaint does not reference any previous usage or recognition of either market.

As plaintiffs' definitions make clear, both alleged markets include only the University Defendants—the eight Ivy League schools. As an alternative to their Ivy-only definitions, plaintiffs alleged fallback AAHA Educational and Athletic Services Markets encompassing "both the Defendant Universities and a few other schools, including Stanford, Notre Dame, Duke, and Rice." A81-82. The complaint alleged no additional facts about these "alternative" markets.

### C.    The District Court's Decision

The district court granted defendants' motion to dismiss the complaint on multiple grounds.  Order.2.[1]

The court first concluded that the Ivy League Agreement was not *per se* unlawful, and therefore needed to be assessed under the "rule of reason" standard applicable to most antitrust claims.  Order.11.  In reaching this conclusion, the court relied on several prior cases, including Supreme Court precedent, applying the rule of reason to analyze horizontal restraints involving intercollegiate athletics.  Order.11-14.  The court also deemed *per se* treatment improper because, in its view, plaintiffs' "factual allegations and provisions in the Ivy Manual support the defendants' position that '[t]he challenged rule helps broaden consumer choice.'"  Order.17.  Plaintiffs did not renew their *per se* argument on appeal and now concede (Br.20) that the rule of reason applies.

Next, the court determined that plaintiffs had not plausibly pleaded a defined relevant market.  The court found plaintiffs' primary markets implausible because although "the Complaint alleges facts which show that schools other than the University Defendants compete to offer educational services to AAHA students, and that the University Defendants are not the only schools to which AAHA students sell their athletic services," these other, non-Ivy League schools "are not

---

[1] The district court's opinion is at the addendum to the opening brief.

9

included for purposes of the definition of the relevant market[s]." Order.24-25. As for the alternative markets, the court concluded that those failed because plaintiffs' identification of four additional schools being some, but not all, of the non-Ivy League schools included did not "actually propose the contours of a relevant market." Order.26.

The court next turned to whether plaintiffs adequately alleged anticompetitive effects. "As a consequence" of plaintiffs' failure to plead relevant markets, the court held plaintiffs' allegations "legally insufficient to show an adverse effect on competition as a whole in a relevant market." Order.28. "At best," the court continued, "the plaintiffs' allegations … relate to just some market participants, not effects in the market as a whole." *Id.*

Finally, the district court held that Choh's claim was untimely. Order.35. The court reasoned that antitrust claims have a four-year limitations period, *see* 15 U.S.C. §15b, and Choh's claim accrued when he enrolled at Brown in September 2017, which was more than four years before the complaint was filed. Order.34-35. Choh sought to invoke the so-called "continuing violations doctrine," arguing that Brown violated the Sherman Act every year it relied on the Ivy League Agreement in not awarding him an athletic scholarship, and some of these years fell within the four years before the complaint was filed. *See* Order.32. But the court deemed the decision not "to award [Choh] an athletic scholarship or

10

compensation for athletic services during the remainder of his time at Brown …
simply a manifestation of the overt act, namely Brown's decision to enter into the
most recent version of the Ivy League Agreement." Order.35. Relying on this
Court's decision in *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43 (2d Cir.
2019), the district court therefore concluded that the continuing violations doctrine
was inapplicable. Order.35. Though given the opportunity to seek leave to amend,
*id.*, plaintiffs chose to immediately appeal the district court's ruling.

## SUMMARY OF ARGUMENT

I.     The district court correctly held that plaintiffs failed to plausibly
allege a violation of the Sherman Act. As plaintiffs now concede, their claim is
governed by the rule of reason. To state a claim under the rule of reason, a
complaint must contain facts that plausibly describe harm to competition. There
are two ways a plaintiff may do so. A plaintiff may do so "indirectly," by showing
that defendants have a significant share in a well-defined relevant market, plus
some other ground for believing that the challenged conduct harmed competition in
the relevant market. Alternatively, a plaintiff can proceed "directly," by plausibly
alleging facts that market-wide competition has been harmed. In either case,
plaintiffs must plead a plausible relevant market within which to assess the
competitive effects of the challenged conduct.

11

The district court correctly held that plaintiffs' complaint fails this threshold requirement to plead a plausible relevant market. Their two primary markets are facially implausible because those markets exclude economic substitutes from outside the Ivy League. Plaintiffs' alternative markets fail because the complaint does not plead facts identifying the contours of those markets at all, rendering it impossible to determine market power or if the challenged conduct has caused market-wide anticompetitive effects, and because plaintiffs forfeited reliance on those markets by not invoking them in opposition to defendants' motion to dismiss. And both sets of markets fail for the independent reason that they encompass all intercollegiate sports played in the Ivy League, even though such a generic "all-sports" market is inconsistent with the requirements of reasonable interchangeability and cross-elasticity of demand.

Plaintiffs fare no better with their attempt to avoid the market-definition requirement in attempting to proceed directly. The Sherman Act is focused on market-wide harm to competition. A necessary predicate to determining if any effects are market-wide is defining at least the rough contours of a plausible market in which those purported anticompetitive effects took place. The district court correctly held that plaintiffs' failure to allege even the rough contours of a plausible market meant they could not plausibly allege market-wide anticompetitive effects.

12

II.     The district court correctly held that Choh's claim is time-barred.

Choh alleges that he enrolled at Brown knowing that pursuant to Ivy League rules, he would not receive an athletic scholarship for his entire time at Brown. He would have therefore suffered a purported injury in 2017, when he first matriculated at Brown and, pursuant to the Ivy League Agreement, did not receive an athletic scholarship. That matriculation, which occurred more than five years before the complaint was filed, fell outside the limitations period. Although Choh received renewed need-based financial-aid packages within the limitations period, the absence of any athletic scholarship in those packages merely reflected a continuation of the challenged conduct. The district court therefore properly concluded that, on the facts alleged, Choh could not invoke the continuing violations doctrine to excuse his dilatory filing.

## STANDARD OF REVIEW

This Court "review[s] *de novo* a district court's grant of a motion to dismiss for failure to state a claim." *Pearson v. Gesner*, 125 F.4th 400, 406 (2d Cir. 2025). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]his plausibility pleading standard … is not toothless." *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 207 (2d Cir. 2020). For instance, "allegations that are 'merely consistent with' liability [are not]

13

enough to defeat a motion to dismiss." *Id.* Moreover, "general allegations that are contradicted 'by more specific allegations in the Complaint'" need not be taken as true. *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151-152 (2d Cir. 2014). And courts are encouraged "to draw on [their] judicial experience and common sense" when "[d]etermining whether a claim is plausible." *Adia v. Grandeur Mgmt., Inc.*, 933 F.3d 89, 92 (2d Cir. 2019).

For purposes of resolving a motion to dismiss, the court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018). The Court may also consider materials subject to judicial notice, *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 102 (2d Cir. 2022), *i.e.*, facts that are "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b).

## ARGUMENT

### I. THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT THE IVY LEAGUE AGREEMENT VIOLATES THE SHERMAN ACT

The district court correctly held that plaintiffs failed to plausibly allege a violation of the Sherman Act.

14

Plaintiffs acknowledge (Br.20) that under *NCAA v. Alston*, 594 U.S. 69 (2021), "restrictions on student-athlete compensation are unlawful if they violate the ordinary rule of reason," and they have not challenged the district court's correct conclusion that the challenged agreement is not plausibly *per se* anticompetitive, *supra* p.9. Under the rule of reason, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect" that harms consumers "in the relevant market." *Alston*, 594 U.S. at 96-97. Plaintiffs can carry this burden either "directly" or "indirectly." *NASL, LLC v. USSF, Inc.*, 883 F.3d 32, 42 (2d Cir. 2018). To proceed indirectly, plaintiffs must plausibly allege facts "showing that the defendant[s] ha[ve] sufficient market power to cause an adverse effect on competition[,]" along with some "'other grounds' for believing that the challenged restraint harms competition." *Id.* To proceed directly, plaintiffs must allege facts "showing an 'actual adverse effect on competition as a whole in the relevant market.'" *Id.* Examples of such adverse effects include "higher prices or reduced output." *Id.*

After correctly holding that plaintiffs failed to plausibly allege a well-defined market, the district court correctly held that plaintiffs necessarily failed to state a claim under the rule of reason.

15

### A.    Plaintiffs' Alleged Markets Are Implausible

Regardless of whether a plaintiff seeks to demonstrate anticompetitive effects directly or indirectly, step one of the rule of reason inquiry requires plausible allegations establishing the relevant market. *Alston*, 594 U.S. at 96; *City of N.Y. v. Group Health Inc.*, 649 F.3d 151, 155 (2d Cir. 2011) ("To state a claim under … §1 of the Sherman Act, a Plaintiff must allege a plausible relevant market in which competition will be impaired."). Plaintiffs' complaint fails at this first, fundamental step. The Ivy-only markets fail because they are underinclusive, excluding other athletically and academically rigorous schools that plaintiffs' own allegations confirm are reasonable substitutes. Plaintiffs' alternative markets comprised of the Ivy League "and a few other schools, including Stanford, Notre Dame, Duke, and Rice," A81-82, are implausible because they are impermissibly vague, and in any event have been forfeited. Both sets of markets also independently fail because a single market consisting of dozens of different sports that are not reasonably interchangeable is implausible.

#### 1.    The complaint's primary alleged markets are implausible

Plaintiffs' primary proposed markets include only the eight university members of the Ivy League. *Supra* p.8. Both plaintiffs' own allegations and common sense confirm that these markets are implausibly underinclusive.

16

The relevant market must be defined "as all products 'reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level." *City of N.Y.*, 649 F.3d at 155. As plaintiffs acknowledge (Br.36), when a plaintiff "alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted," *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008).

### a.    *Plaintiffs' allegations confirm their primary markets are implausibly underinclusive*

i.     Plaintiffs allege that the eight schools in the Ivy League make up their own market because of "both the high-level Division I athletics programs and the rigorous academic programs" they offer. A79. But plaintiffs *also* allege that there are *non*-Ivy League schools that "maintain stellar academic standards while competing for excellent athletes." A38. Indeed, they identify by name what are concededly just *some* of those schools: "Other academically selective universities—such as Stanford University, Duke University, the University of Notre Dame, and Rice University—award athletic scholarships and compensate/reimburse their athletes up to the limits the Supreme Court and the NCAA have allowed." *Id.*; *see also* A84-85 (alleging that "[a] handful of other

17

academically selective institutions offer athletic scholarships along with need-based aid for all other students, without sacrificing their academic standing").

Relevant markets are determined by their "unifying characteristic[s]." *Chapman*, 546 F.3d at 238. If, as plaintiffs contend, the relevant market here is defined by offering "high-level Division I athletics programs" and "rigorous academic programs," A79, then the other schools that plaintiffs allege also "maintain stellar academic standards while competing for excellent athletes," A38, must be included. *See Smugglers Notch Homeowners' Ass'n v. Smugglers' Notch Mgmt. Co.*, 414 F.App'x 372, 376 (2d Cir. 2011) (alleged vacation-properties market defined by "the 'unique geographic qualities of ski areas'" was implausibly narrow when it only included properties near a particular ski resort). As the district court correctly put it, "the Complaint alleges facts which show that schools other than the University Defendants compete to offer educational services to AAHA students, and that the University Defendants are not the only schools to which AAHA students sell their athletic services." Order.24. Indeed, both named plaintiffs, who are allegedly representative of the AAHA students in the putative class, A89, applied to non-Ivy League schools that offered them athletic scholarships, but ultimately chose to attend Brown knowing they would receive only need-based financial aid. A42-43.

18

Under a long line of precedent holding that markets excluding reasonable substitutes are too narrowly defined, plaintiffs' alleged markets do not satisfy "the requirements for defining a plausible relevant market, i.e., defining the proposed relevant markets with reference to the rule of reasonable interchangeability and cross-elasticity of demand, and the alleged primary relevant markets are legally insufficient." Order.25. This alone suffices to affirm the district court's rejection of plaintiffs' claims.

This Court routinely finds alleged markets insufficient as a matter of law when the "definition is too narrow." *Chapman*, 546 F.3d at 238. *Hack v. President & Fellows of Yale College*, 237 F.3d 81 (2d Cir. 2000), is particularly instructive. There, this Court affirmed dismissal of an alleged product market "confined to a Yale education," holding that it was "obvious" that "there are many institutions of higher learning providing superb educational opportunities." *Id.* at 86. Prospective students dissatisfied with the Yale policy in question, the Court explained, "could matriculate elsewhere." *Id.* at 86-87.

The same principle applies here: plaintiffs' market definition is too narrow because academically high-achieving student-athletes dissatisfied with the option provided by the Ivy League schools "could matriculate elsewhere," *Hack*, 237 F.3d at 86-87, especially at elite academic schools that also award athletic scholarships. And to the extent plaintiffs argue (as they did below, Dkt.160 at 26) that *Hack* is

19

solely a market-power case, that assertion is mistaken. This Court in *Hack* expressly considered both "market definition and market power," and held "that the market alleged here is not" "plausible." 237 F.3d at 86.

Outside the higher education context, this Court has held markets inadequate as a matter of law on the basis that the market was too narrow. In *City of New York*, for instance, this Court held that an alleged market consisting of health insurance plans that New York City selected to make available to municipal employees was "legally insufficient" absent a plausible alleged "reason why other similar insurance plans are unsuitable." 649 F.3d at 156. Similarly, a proposed market for "restraint training services to private child-care providers" was "too narrow" as opposed to "the larger market for restraint training services to other businesses, agencies, and organizations." *Chapman*, 546 F.3d at 238. In *Belfiore v. New York Times Co.*, 826 F.2d 177 (2d Cir. 1987), this Court held that an alleged market limited to "general interest daily newspapers directed primarily to upscale readers" was "implausible as a theoretical matter" because it failed to include "alternative sources of and substitutes for defendants' products," *id.* at 180. And, in an unpublished opinion, this Court held implausible an alleged market for "[l]abor services provided by nonmanagerial Hotel employees working or seeking work in Marriott-managed hotels … in New York City[,]" because it was "beyond doubt" that Marriott hotels would have to increase their wages to retain their

20

employees if "other, non-Marriott-managed hotels in New York City suddenly doubled the wages they paid to their employees." *Madison 92nd St. Assocs., LLC v. Courtyard Mgmt. Corp.*, 624 F.App'x 23, 29 (2d Cir. 2015); *see also Smugglers Notch Homeowners' Ass'n*, 414 F.App'x at 376 (proposed market of vacation homes near a particular ski resort implausible as "there are undoubtedly many other vacation properties located within or in close proximity to ski areas").

ii.     Plaintiffs offer two arguments—one substantive and one procedural—for overlooking their failure to include conceded viable substitutes in their alleged primary markets.  Neither has merit.

Substantively, plaintiffs rely on *Regeneron Pharmaceuticals, Inc. v. Novartis Pharma AG*, 96 F.4th 327 (2d Cir. 2024), to argue (Br.24, 43-44) that the district court erred by applying a functional test of substitutability rather than an economic test.  There was no error.  To start, *Regeneron* expressly recognizes that "functional interchangeability is a *prima facie* indication that two products may be in the same antitrust market."  96 F.4th at 340.  But even beyond that, the district court held that plaintiffs' primary markets were implausible because plaintiffs had "allege[d] facts which show that schools other than the University Defendants compete to offer educational services to AAHA students, and that the University Defendants are not the only schools to which AAHA students sell their athletic

21

services." Order.24. This is clearly an economic test of substitutability and is consistent with *Regeneron*'s framework.

*Regeneron* involved medications that treated the same disorder packaged in (a) vials and (b) pre-filled syringes ("PFSs"). 96 F.4th at 332. Although they contained the same medicine, the syringes allegedly "enable[d] physicians to administer the required dose more precisely and with a lower risk of foreign particles entering the eye." *Id.* at 334. In fact, "physicians … converted between 80 and 100 percent of their patients from vials to PFSs once PFS versions of the drugs became available." *Id.* The plaintiffs in that case thus plausibly alleged that the syringes were so superior that they "compete[d] in a wholly separate market from vials." *Id.* at 341. Here, by contrast, the complaint alleges *both* economic substitutability and functional substitutability among Ivy and non-Ivy schools. Plaintiffs' own allegations concede that schools beyond those in the Ivy League "maintain stellar academic standards *while competing for excellent athletes*." A38 (emphasis added). This is a straightforward concession that "athletically and academically high-achieving … students who seek to graduate from college and play Division 1 sports," A37, consider more schools than just the eight included within the alleged Ivy-only markets. Moreover, plaintiffs' complaint, unlike the one in *Regeneron*, alleged no facts to suggest that the Ivy League schools are so superior from the other "stellar" schools as to comprise their own market.

22

Plaintiffs' procedural argument fares no better. Plaintiffs contend (Br.47) that their allegations undercutting the Ivy-only markets were intended only to support their alternative market, and they claim that the district court contravened Federal Rule of Civil Procedure 8's endorsement of pleading in the alternative by relying on those allegations to reject their primary alleged markets. One need only skim the complaint to see that is not correct. The district court found that the key factual allegations were contained in paragraphs 11 and 231. Order.24. The complaint shows that plaintiffs did not make these allegations in support of their alternative market definitions, but rather to support the proposition that "[t]he Ivy League Agreement is not necessary … to preserve the unique nature of Ivy League athletics, where academic excellence is paramount," A38, or "to maintain or enhance the academic excellence of the University Defendants," A84-85. The relevant allegations were not addressed or expressly limited to the alternate-market definition and thus pleaded plaintiffs out of court.

In any event, plaintiffs have forfeited this argument. Defendants relied on these allegations in their opening brief to the district court, Dkt.153-1 at 19-20, and plaintiffs' opposition nowhere suggested that it would be improper for the court to rely on these allegations in assessing the viability of their primary markets, *see generally* Dkt.160. They cannot raise the argument for the first time on appeal.

23

*Gazzola v. Hochul*, 88 F.4th 186, 194 n.5 (2d Cir. 2023), *cert. denied*, 144 S.Ct. 2659 (2024).

> **b.      *Common sense independently confirms plaintiffs' concession that their primary alleged markets are implausibly narrow***

i.      Even if plaintiffs' own allegations had not conceded the point, common sense, *supra* p.14, confirms that the "proposed relevant market[s] … clearly do[] not encompass all interchangeable substitute products," *Chapman*, 546 F.3d at 238.  As plaintiffs' allegations establish, discovery is not necessary to know that high-achieving student-athletes considering an Ivy League school might instead choose a full athletic scholarship from one of the many other schools that offer "high-level Division I athletics programs" and "rigorous academic programs," A79.

The Supreme Court's reasoning in *Alston* also supports this conclusion.  The district court in *Alston* found that allowing "[i]ndividual conferences … to set or maintain limits on education-related benefits" was a less restrictive means of achieving the same procompetitive benefits as the challenged NCAA-wide rules precisely because "no individual conference dominates nearly the entire market, like the NCAA does."  *In re NCAA Grant-in-Aid Cap Antitrust Litig.*, 375 F.Supp.3d 1058, 1088 (N.D. Cal. 2019), *aff'd sub nom. NCAA v. Alston*, 594 U.S. 69 (2021).  Because no conference is itself a standalone antitrust market, and

24

therefore no individual conference has market power, restrictions at the individual conference level "would not have an anticompetitive effect." *Id.* The Supreme Court adopted that straightforward reasoning, explaining that "individual conferences remain free to reimpose every single enjoined restraint tomorrow—or more restrictive ones still," 594 U.S. at 103; *accord id.* at 104-105.

Facts cognizable on a motion to dismiss reinforce the implausible narrowness of plaintiffs' alleged markets. For example, as an indicator of athletic rigor, plaintiffs point to the IMF/Learfield Director's Cup, which determines the "most successful intercollegiate athletic department." *See* A84-85. For Fall 2024, out of all Division I schools, only two Ivy League schools were in the top 25. *See* NACDA, *Learfield Directors' Cup Division I Fall Standings* (Dec. 22, 2024), https://tinyurl.com/y4kvu38v. Meanwhile, non-Ivy League schools in the top 25 include Stanford, Georgetown University, Notre Dame, the University of North Carolina, the University of Virginia, Duke University, and UCLA, all of which offer rigorous academic programs and are considered "Top Colleges" on various measures. *See* Whitford & Novack, *America's Top Colleges*, Forbes https://tinyurl.com/3pnkmc5r. Thus, if prospective student-athletes do not like the Ivy League's scholarship policies, "they could matriculate elsewhere," *Hack*, 237 F.3d at 86-87, and receive a similarly rigorous athletic and academic experience.

25

ii.     Plaintiffs cannot circumvent this common-sense conclusion.  The vast majority of their argument on this topic (Br.34-40) simply recites the governing legal standards or offers the sort of "conclusory allegation[s]" that courts "are not required to credit" on a motion to dismiss, *Darby v. Greenman*, 14 F.4th 124, 131 n.7 (2d Cir. 2021).  And the few facts plaintiffs allege are insufficient as a matter of law.  While plaintiffs assert (Br.40) that their allegations suggest "that industry participants … recognize the Ivy League as constituting its own market—a 'separate economic entity' from other universities and colleges," the district court correctly recognized that plaintiffs' "allegations show no such thing," Order.31. To the contrary, the few facts plaintiffs point to confirm that the alleged markets are implausibly small.

*First*, plaintiffs rely on allegations establishing only that the Ivy League is a joint venture between the eight member schools.  But not all or even most joint ventures are their own market.  *See, e.g.*, *Texaco Inc. v. Dagher*, 547 U.S. 1, 5-6 (2006) (observing that joint venture competed with other firms in relevant market). Plaintiffs point (Br.40-42) to efforts the Ivy Council takes on behalf of the whole Ivy League (including negotiating television rights and revenue distributions), to a football contest held between the Ivy League and Japan's National Football Association, and to use of the Ivy League name and logo at Ivy League events. These allegations say nothing about reasonable substitutability or cross-elasticity

of demand between the Ivies and non-Ivy League schools outside the proposed market. They merely suggest that the Ivy League is a typical athletic conference that engages in the normal and necessary activities of any athletic conference. With the array of athletic conferences in Division I, the Ivy League by itself is plainly not its own market. *Cf. Alston*, 594 U.S. at 103-105.

*Second*, plaintiffs reference (Br.40-42) efforts by the Ivy Council and its members to strengthen and leverage the Ivy League brand to attract high-achieving student-athletes. Such "vigorous advertising is a sign of competition, not a lack thereof," because if the Ivy League schools "had no reasonable substitute[s,] … vigorous advertising would be wasted money." *Apple, Inc. v. Psystar Corp.*, 586 F.Supp.2d 1190, 1199 (N.D. Cal. 2008); *see also, e.g.*, *In re German Auto. Mfrs. Antitrust Litig.*, 612 F.Supp.3d 967, 980 (N.D. Cal. 2020) ("German automakers['] attempts to set themselves apart with advertising demonstrate that they *were* competing with non-German luxury brands[.]"), *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021). If other schools and conferences were not reasonably interchangeable with defendants, they would not need to "use[] the 'brand value' of the 'Ivy League' 'in marketing efforts, including efforts to attract students'" (Br.42 (quoting A53)). These allegations undercut plaintiffs' alleged market.

*Finally*, plaintiffs fare no better with the contention (Br.38) that allegations of continued enrollment without athletic scholarships plausibly support an Ivy-only

27

market. Because consumers tend to pay more for a differentiated product in a broader product market, this Court has recognized that even "significant price differences do not always indicate distinct markets." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 228 (2d Cir. 1999) (per curiam); *see also Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962) (finding it "unrealistic to accept" the contention "that medium-priced shoes do not compete with low-priced shoes"); *see also infra* p.40. Moreover, plaintiffs have not actually alleged that the effective prices for student-athletes in the Ivy League are uniquely higher than at peer schools. Instead, they allege only that defendants are "*among* the most expensive undergraduate institutions in the country," A40 (emphasis added). Lastly, athletic scholarships are just one variable affecting the cost of students' education, and plaintiffs concede that the University Defendants provided them with financial aid based on economic need. *E.g.*, A62. Plaintiffs make no allegation—likely because they cannot—that after considering financial aid, the University Defendants are priced higher than other schools.

### 2. Plaintiffs' alternative markets are insufficiently defined and forfeited

The district court also correctly held plaintiffs' alternative markets implausible. Order.25-27. For both the "AAHA Educational Services Market" and the "AAHA Athletic Services Market," the complaint alleged an alternative definition: the eight University Defendants "and a few other schools, including

28

Stanford, Notre Dame, Duke, and Rice." A81; *see* A82. These alternative markets are insufficiently defined and, in any event, forfeited.

Substantively, the district court correctly recognized that plaintiffs have "not actually propose[d] the contours of a relevant market" for either of their proposed alternatives. Order.26. The complaint provides a self-acknowledged non-exhaustive list of four schools but says nothing about how many other schools are in the alternative markets and does not even attempt to explain what characteristics or criteria would cause a school to be included or excluded. *See* A81-82. This failure necessitates dismissal because "[w]ithout an explanation of the [competitors] involved, and their products and services, the court cannot determine the boundaries of the relevant product market." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008); *accord Geneva Pharm. Tech. Corp. v. Barr Labs., Inc.*, 386 F.3d 485, 496 (2d Cir. 2004) ("The goal in defining the relevant market is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output.").

The only merits argument plaintiffs make regarding their alternative markets (Br.47) is that "[t]heir non-conclusory direct and indirect allegations suffice to establish power in a relevant market, even if it includes a small number of other schools," because they (purportedly) allege "control over a very high share of the

29

alternative market." Not so. Antitrust plaintiffs cannot plausibly allege a "very high share," or indeed any share, of a market if the contours of the market are not defined. *FTC v. RAG-Stiftung*, 436 F.Supp.3d 278, 310 (D.D.C. 2020). That is particularly true here. For example, defendants' market share looks very different if the alternative market includes only defendants plus Stanford, Notre Dame, Duke, and Rice rather than also including UVA, UNC, UCLA, Georgetown, Northwestern, the University of Michigan, the University of California, Berkeley, and any number of other schools that offer both elite academic standards and top-level athletic programs. Plaintiffs offer no reason why (or even that) the latter should be excluded from an alternative market.

Even if plaintiffs had adequately pled their alleged alternative markets, they nonetheless forfeited any reliance on these markets by failing to defend them below. Defendants argued in their motion-to-dismiss briefing that these alternative markets were insufficiently pleaded because plaintiffs failed to define the markets' contours and, in turn, could not plausibly allege that the University Defendants have market power in these undefined alternative markets. Dkt.153-1 at 21-23. Rather than address this deficiency, plaintiffs simply reiterated the vague reference in the complaint to "a few other selective universities" and claimed that was sufficient. *See* Dkt.160 at 22. Defendants addressed this failure in their reply, noting that "[p]laintiffs fatally fail[ed] to define the boundaries of their purported

30

alternative markets … or provide a basis for determining market power," did not "argue otherwise [in opposition], and so concede[d] the point." Dkt.164 at 10. In failing to "present the relevant legal arguments" regarding the alternative markets "before the district court," plaintiffs have not "preserve[d] them for appellate review." *Doe v. Trump Corp.*, 6 F.4th 400, 410 (2d Cir. 2021).

Nor do plaintiffs defend their alternative markets before this Court. The only substantive discussion on those markets is in Part II.E of the opening brief, which is titled "Plaintiffs Plead Power in an Alternative Market." Nowhere in that section, however, do plaintiffs challenge the district court's holding that their alternative markets were not adequately pleaded, Order.27, or otherwise defend their alternative market definitions. Rather, plaintiffs use this space (Br.47) to (1) criticize the district court for purportedly treating the alternative market definition "as contradicting their allegations of the Ivy League market," and (2) assert that their allegations "establish power in a relevant market, even if it includes a small number of other schools." Both points are unavailing, *supra* pp.23, 29-30. But regardless, neither argument amounts to a defense of the nebulous market descriptions the district court rejected. It would be "improper" for plaintiffs to "raise[] [this] for the first time in [their] reply brief." *Windward Bora LLC v. Sotomayor*, 113 F.4th 236, 245 n.6 (2d Cir. 2024).

31

### 3. The complaint's generic "all sports" markets are implausible

Both plaintiffs' primary and alternative alleged markets also fail for the independent reason that the complaint does not allege any facts explaining how a *single* market for student-athletes can plausibly consist of *dozens* of different sports, in violation of the rule of interchangeability. *See Skyline Travel, Inc. (NJ) v. Emirates*, 476 F.App'x 480, 481 (2d Cir. 2012) ("Where, as here, the complaint 'limit[s] a product market to a single brand, franchise, institution, or comparable entity that competed with potential substitutes' or fails to provide a 'plausible explanation as to why a market should be limited in a particular way,' the complaint is properly dismissed."). Plaintiffs' use of a single, generic "sports" market disregards obvious differences between individual sports. Most fundamentally, no sports team at any school is a reasonable substitute for a team that plays a different sport. An aspiring collegiate volleyball player does not consider any school's gymnastics team to be a reasonable substitute. But those sport-specific differences are critical, and plaintiffs' failure to address them "with reference to the rule of reasonable interchangeability and cross-elasticity of

32

demand," as is their burden at the pleading stage, *Chapman*, 546 F.3d at 238, is fatal to their claims.[2]

To start, not all the University Defendants offer the same sports. The complaint alleges that Harvard offers 41 different Division I sports, whereas Columbia offers only 33. A45-46; *see also* A44-48 (other University Defendants alleged to offer various different numbers of sports). Plaintiffs specifically acknowledge that Columbia does not offer men's lacrosse and Yale and Dartmouth do not offer wrestling. A96. Incorporated material confirms that not all the University Defendants offer (among others) varsity ice hockey, men's fencing, skiing, or women's rugby. *See* Ivy League, *Home Page*, ivyleague.com, *cited in, e.g.*, A54-55 (each sport's website shows Ivy League standings in that sport, and schools that do not have the relevant team are not included). Ivy League schools (or even non-Ivy League schools) that do not offer a high-achieving student-athlete's sport cannot be reasonable substitutes for those that do. *See Rock v. NCAA*, 928 F.Supp.2d 1010, 1022 (S.D. Ind. 2013) ("[I]t is implausible for Plaintiffs to suggest that a school without a football team is an adequate substitute

---

[2] Although the district court did not rely on this basis in dismissing the complaint, defendants raised it below, Dkt.153-1 at 23-27, and this Court "may affirm on any basis supported by the record, even if the district court did not rely on the relevant ground," *Yerdon v. Poitras*, 120 F.4th 1150, 1153 (2d Cir. 2024) (per curiam).

for a school with a football team, from the perspective of a student-athlete who wants to play football.").

Nor do plaintiffs allege facts suggesting that any specific sports teams at different University Defendants are reasonable substitutes for each other. In fact, plaintiffs' only sport-specific allegations *confirm* that particular sports teams in the Ivy League are *not* all reasonably interchangeable. Plaintiffs allege that "there is little competitive balance within the Ivy League, by sport," A84, and summarize the different degrees of athletic success each school has had in different sports, A95- 98. The "total domination since 2010" of Princeton's women's basketball team, A95, underscores the point. That program, the only one in the Ivy League to ever be ranked in the top 25 nationally, had, at the time the complaint was filed, "16 conference losses, total, since 2009." Dkt.153-4 at 2. (The article from which these figures are drawn may be considered because plaintiffs cite it in their complaint, A85. *Supra* p.14.) Far from pleading facts showing that a high-achieving women's basketball player would consider all the other teams in the Ivy League (and no others) to be reasonably interchangeable with Princeton—as is their burden—plaintiffs' allegations and incorporated material demonstrate precisely the opposite.

Plaintiffs argued below that all Ivy League sports are appropriately considered together in a single "cluster" market. Dkt.160 at 28. But a "cluster

34

market exists only when the 'cluster' is *itself* an object of consumer demand." *Green Country Food Mkt., Inc. v. Bottling Grp., LLC*, 371 F.3d 1275, 1284 (10th Cir. 2004). In other words, "any definition of a cluster market must be responsive to the purpose of the market definition process—identification of an area of competition in which variations in price will affect the demand for alternative products." *Emigra Grp., LLC v. Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F.Supp.2d 330, 353 (S.D.N.Y. 2009). It is therefore "inappropriate to treat the full line of services as a cluster" if consumers (1) do not "prefer to use" that full line of services or (2) "would respond to a price increase by a full line [provider] by shifting all or part of their business to partial line or single [service providers]." *Brooklyn Downtown Hotel LLC v. New York Hotel & Motel Trades Council, AFL-CIO*, 2017 WL 1192179, at *6 (S.D.N.Y. Mar. 29, 2017); *see also Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 768 (9th Cir. 2001) ("A cluster market is recognized 'where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately.'").

Plaintiffs allege no facts to support a cluster market, nor could they. No one attends Harvard to play 41 different varsity sports or Columbia to play 33. And students playing different sports have different competitive options. Thus, a price increase among Ivy League schools might cause a male lacrosse player to attend

35

Johns Hopkins, even though that is its only Division I sport, Big Ten Conference, *Men's Lacrosse Standings*, https://tinyurl.com/33yct8ue, or a basketball player to attend Georgetown, which has a Division I men's basketball program, Big East Conference, *2024-25 Men's Basketball Standings*, https://tinyurl.com/bdzfw2sh. And higher prices at Harvard or Dartmouth—the only two University Defendants that offer Division I skiing—would likely not lead an academically-talented skier to look to any other school in the Ivy League, but they might lead her to attend a selective liberal arts college, like Bates College, Bowdoin College, Colby College, Middlebury College, or Williams College, each of which has a varsity ski team that competes in the same conference as Harvard and Dartmouth. EISA, *Schools*, https://tinyurl.com/2af2bs72. Far from offering any meaningful "analytical convenience," *FTC v. Staples, Inc.*, 190 F.Supp.3d 100, 117 (D.D.C. 2016), plaintiffs' alleged all-sports markets only obscure the meaningful differences in the competitive conditions for each sport and schools' sports program offerings that are plain from the face of the complaint.

For all these reasons, lawsuits challenging collegiate sports rules tend to involve sport-specific markets. In *Alston*, for example, the alleged markets were for "athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her *sport-specific market*." 594 U.S. at 81 (emphasis added). By contrast, failure to allege sport-

36

specific markets that reflect the real-world choices student-athletes face when deciding where to attend college has resulted in dismissal. *See Rock*, 928 F.Supp.2d at 1022. The Court should do the same here.

> ### 4. Plaintiffs' failure to allege a plausible market definition means they cannot indirectly allege anticompetitive effects

Because plaintiffs have not plausibly defined the relevant market, their allegations necessarily fail to allege anticompetitive effects indirectly.

Plaintiffs correctly acknowledge (Br.22) that their indirect allegations require a plausible market definition. As this Court has explained, a plaintiff must plausibly allege facts "showing that the defendant[s] ha[ve] sufficient market power to cause an adverse effect on competition" in order to state an antitrust claim premised on indirect evidence of anticompetitive effects, *NASL*, 883 F.3d at 42. And without a plausible relevant market, "'there is no way to measure'" whether Defendants have sufficient power to harm competition or that competition was harmed. *Concord Assocs., L.P. v. Entertainment Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016).

For the reasons just explained, plaintiffs have not alleged a plausible market, and have therefore failed as a matter of law to plead indirect evidence of anticompetitive effects.

### B.    Plaintiffs Have Not Plausibly Alleged Market-Wide Anticompetitive Effects

Recognizing the implausibility of their alleged product markets, plaintiffs argue (Br.25) that they do not have to allege such a market—the fact of a horizontal agreement, they contend, is enough to state a claim of direct anticompetitive effects.  The law is squarely to the contrary.  To be sure, plaintiffs challenging horizontal restraints do "not need to *precisely* define the relevant market to conclude that these agreements are anticompetitive," *Ohio v. American Express Co.* ("*Amex*"), 585 U.S. 529, 543 n.7 (2018) (emphasis added).  But this Court has expressly held that even plaintiffs alleging horizontal restraints must establish the contours of a plausible market.  *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 n.11 (2d Cir. 2021) (per curiam) (emphasis added).  And as the district court here recognized, "the facts alleged by the plaintiffs are legally insufficient to show an adverse effect on competition as a whole in the relevant market." Order.27-28.

1.    "Without any allegation as to how *market-wide* competition will be affected, the complaint fails to allege a claim on which relief may be granted." *Electronics Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 245 (2d Cir. 1997) (emphasis added).  Antitrust plaintiffs therefore cannot meet their pleading burden under the rule of reason by alleging "output reductions, increased prices, or reduced quality" among just some market participants, but

38

rather must plausibly allege "direct evidence of the effect on the *market as a whole*." *1-800 Contacts*, 1 F.4th at 118 & n.11. For example, allegations of diminished output from one cell phone supplier cannot state an antitrust claim where "[o]ther allegations in the amended complaint, as well as common knowledge, make it clear that other large competitors … compete in the cellular telephone market." *Electronics Commc'ns*, 129 F.3d at 245. Plaintiffs vaguely recognize this point (Br.47-50), but rather than explain how their allegations meet this requirement, they simply assert (Br.49) that their allegations "sufficed to meet the relevant standard." They have not.

This Court's decision in *1-800 Contacts* confirms that mere allegations of a horizontal restraint do not relieve plaintiffs of the market-definition requirement. Like plaintiffs here, the FTC in *1-800 Contacts* argued that "a prima facie case based on direct evidence of harm" obviates the need to define the relevant market. FTC Br.81, *1-800 Contacts v. FTC*, No. 18-3848 (2d Cir. Oct.7, 2019), Dkt.153 (quoting *Amex*, 585 U.S. at 543 n.7). This Court squarely rejected the FTC's argument, explaining that "more" than speculation or unsupported assertions are "needed under [Second Circuit] precedent … to show 'direct' evidence in the *market as a whole*." *1-800 Contacts*, 1 F.4th at 118 n.11.

2. At bottom, plaintiffs' theory (Br.25) is that the Ivy League Agreement results in student-athletes paying higher prices than they otherwise would have.

39

This theory has two fatal shortcomings. First, plaintiffs have not plausibly alleged that when need-based financial aid is factored in, the University Defendants' net tuition costs are higher than at comparable non-Ivy League schools. As this Court has explained, "a conclusory allegation that prices have increased will not suffice to state [an] anticompetitive effect." *Spinelli v. NFL*, 903 F.3d 185, 212 (2d Cir. 2018). Like in *Spinelli*, plaintiffs have provided "no examples, data, or other facts to support their assertion" of higher prices, *id.*

Even if plaintiffs had plausibly alleged that student-athletes enrolled at the University Defendants paid higher prices, they still would not have adequately alleged direct anticompetitive effects because such effects must be alleged as to *the whole market*. *Supra* p.38. Plaintiffs have, at most, attempted to allege only that prices increased at the University Defendants. Indeed, they implicitly acknowledge as much when they admit (Br.27) that "anticompetitive effects occur in a relevant market," but then immediately afterwards posit that "that market comprises the Ivies." That premise is, of course, wrong. As explained, the University Defendants are only a subset of any viable relevant market. *Supra* Part I.A.1. *1-800 Contacts* confirms that higher prices for a mere subset of the market do not amount to market-wide effects.[3]

---

[3] Plaintiffs do not argue on appeal that they adequately alleged direct evidence of anticompetitive effects in their alternative markets. To the extent they

40

In *1-800 Contacts*, the FTC, relying on "empirical evidence," had found that agreements between an online retailer and its competitors over trademark enforcement resulted in the retailer paying less to have their ads displayed when consumers searched for various keywords. 1 F.4th at 110, 118 n.11. This Court explained that such evidence "shows only that [the retailer] paid less for certain keyword advertisements, no more and no less." *Id.* at 118 n.11. However, "showing that a price for certain keywords dropped is not direct evidence of the effect on the *market as a whole*." *Id.* Because the administrative record lacked this market-wide evidence, this Court set aside the FTC's finding of "direct evidence of reduced revenues for search engines." *Id.* The same result is warranted here. Plausible allegations that the Ivy League Agreement results in some student-athletes paying more for education (which plaintiffs have not actually pled, *supra* p.40) would show only that a subset of market participants paid higher prices; such allegations would not show harm in the market for student-athletes as a whole.

Plaintiffs' attempt (Br.48) to distinguish *1-800 Contacts* based on its procedural posture lacks merit. Although *1-800 Contacts* followed an FTC evidentiary hearing, the quality of plaintiffs' evidence (or allegations) goes to

---

have, that claim fails because those markets are undefined and implausible, *supra* Part I.A.2-3.

whether a market has been plausibly defined. That does not speak to the antecedent question, *i.e.*, whether plaintiffs need to plausibly define a market at all. *1-800 Contacts* makes clear that the answer to that question is "yes": even plaintiffs alleging a horizontal restraint must plausibly allege the contours of a relevant market. 1 F.4th at 118 n.11.

In any event, plaintiffs' procedural distinction overlooks that this Court's holding that the FTC lacked evidence regarding price changes went to the price of a different product (contact lenses in the online market for contacts). 1 F.4th at 118. The record contained empirical evidence that the price paid for search terms dropped, but that evidence was simply insufficient to directly show anticompetitive effects across the whole market. *Id.* at 118 n.11. Any effort to extrapolate from Ivy-specific effects to market-wide effects would be no more than bare speculation insufficient to state a claim, *supra* p.40. *See also Giordano v. Saks & Co. LLC*, 2025 WL 799270, at *3 (2d Cir. Mar. 13, 2025) (affirming dismissal of a complaint when plaintiffs only alleged effects on the plaintiffs' employers, and not "the national market for luxury retail employees," which included "numerous" other employers as well); *In re Google Digital Advert. Antitrust Litig.*, 627 F.Supp.3d 346, 377 n.18 (S.D.N.Y. 2022) (collecting cases of district courts in this Circuit "frequently dismiss[ing]" "pleadings alleging rule of reason violations … for failure to adequately allege market harm"); *Cendella v. Metropolitan Museum*

42

*of Art*, 348 F.Supp.3d 346, 362 (S.D.N.Y. 2018) (allegation "that the works of a select few artists have increased in price" did not plausibly allege "an actual adverse effect on competition" without additional "pleadings suggesting that this impacts the entire market," which "includes more than 1,000 galleries, seventy-five museums, and thirty art fairs"); *Wellnx Life Scis. Inc. v. Iovate Health Scis. Rsch. Inc.*, 516 F.Supp.2d 270, 293-294 (S.D.N.Y. 2007) (no "plausible inference of market-wide harm to competition" where "60% of the advertising market is free to compete … by offering better services to advertising consumers.").

*1-800 Contacts* also rebuts plaintiffs' reliance (Br.14, 31) on language and reasoning from the Third Circuit that "[t]o some extent, … a horizontal agreement tends to define the relevant market, for it tends to show that the parties to it are at least potential competitors," such that the agreement's "very existence supports an inference that it would have an effect in the relevant market," *United States v. Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3d Cir. 1986). But a subset of competitors does not make up the entirety of the market, and as *1-800 Contacts* makes clear, the mere fact that a subset of competitors has entered into a horizontal agreement does not necessarily reflect either (1) the entirety of the relevant market; or (2) that the agreement generated adverse market-wide effects. To the extent there is any inconsistency between *1-800 Contacts* and *Sargent*, the former

43

constitutes "binding authority from which [this Court] cannot deviate." *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 100 (2d Cir. 2024).[4]

A comparison between this case and one on which plaintiffs rely (Br.33), *FTC v. Indiana Federation of Dentists*, 476 U.S. 447 (1986), further underscores the distinction between an imprecisely defined market and an implausible one. The FTC had found in *Indiana Federation of Dentists* "that in two localities in the State of Indiana …, Federation dentists constituted heavy majorities of the practicing dentists and that as a result of the efforts of the Federation, insurers in those areas were, over a period of years, actually unable to obtain compliance with their requests for submission of x rays." *Id.* at 460. The Federation argued that the Supreme Court should set aside the Commission's finding of antitrust liability because the FTC did not make "specific findings … concerning the definition of the market in which the Federation allegedly restrained trade." *Id.* The Supreme Court disagreed, finding that the FTC had established two relevant markets with adverse effects. *Id.* at 460-461. According to the Court, the findings of "actual, sustained adverse effects on competition" (*i.e.*, the inability of insurers to obtain x rays when deciding whether to pay dental claims) "in those areas where IFD

---

[4] *Sargent* is further inapposite because it involved a case of *per se* liability, 785 F.2d at 1127. Here, by contrast, plaintiffs acknowledge the rule of reason applies (Br.20), and have not challenged the district court's holding that *per se* liability would be improper in this case, Order.10.

dentists predominated" (*i.e.*, the two localities in Indiana where Federation dentists were heavy majorities of practicing dentists), "suffic[ed] to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis," given "the reality that markets for dental services tend to be relatively localized." *Id.*

Plaintiffs' allegations here fall well short of the showing the FTC assembled in *Indiana Federation of Dentists*. Again, the complaint itself confirms that the Ivy-only markets are implausible. *Supra* Part I.A.1, 3. And unlike the findings related to the market concentration of dentists in the two relevant localities in *Indiana Federation of Dentists*, plaintiffs' complaint does not plausibly allege anything about the share of AAHA students who attend Ivy League schools over non-Ivy League schools, or the share of Ivy League schools relative to non-Ivy League schools that AAHA students consider. The district court correctly applied *1-800 Contacts* and *Indiana Federation of Dentists* when it held plaintiffs needed to do more to state a claim.

3. The district court's reliance on the implausibility of plaintiffs' primary markets in rejecting their allegations of a direct showing of anticompetitive effects also rebuts plaintiffs' assertion (Br.23, 32) that the court "relied on its analysis of Plaintiffs' allegations showing anticompetitive effects *indirectly*" and "did *not* suggest that Plaintiffs' direct allegations … did not plausibly establish

45

anticompetitive effects."  Plaintiffs' core theory of a direct showing of anticompetitive effects is the conclusory assertion that "Ivy League Athletes have paid more for their education and earned less in compensation or reimbursement than they would have in the absence of the Agreement."  A78.  The district court considered that allegation and, having found that plaintiffs failed adequately to allege a plausible market, held that the allegation amounted to, at most, "anticompetitive effects relate[d] to just some market participants, not effects in the market as a whole."  Order.28.  That analysis was correct both substantively and methodologically.

Plaintiffs' suggestion (Br.33) that the decision below "collapse[d]" "the distinction between direct and indirect showings of market power" also misconstrues the district court's analysis.  In actuality, the district court never required plaintiffs to plausibly allege market power in order to plausibly plead a direct showing of anticompetitive effects.  Having not been required to plead market power, plaintiffs' repeated citations (Br.26, 28, 33) to cases explaining that direct evidence of anticompetitive effects obviates a plaintiff's obligation to prove market power are inapposite.

Moreover, plaintiffs cannot escape *Amex*'s admonition that courts "must first define the relevant market" when "assess[ing]" allegations of anticompetitive effects, 585 U.S. at 542.  They describe (Br.29) *Amex* as requiring only "a more

46

searching analysis of the market" because of two supposed distinctions between that case and this one: "(1) the plaintiffs there addressed the wrong price and (2) the defendants were not horizontal competitors." *1-800 Contacts* rejected the second distinction when it held that even plaintiffs alleging a horizontal restraint must allege the contours of a relevant market. 1 F.4th at 118 n.11. And the first fares no better. Plaintiffs correctly assert (Br.30) that the plaintiffs in *Amex* failed to prove anticompetitive effects because they focused on only one side of a two-sided market, *see* 585 U.S. at 547. This narrow focus in *Amex* was problematic, according to plaintiffs (Br.30), because it meant the *Amex* plaintiffs "offered no evidence about the prices for credit-card transactions as a whole," meaning they "addressed the wrong market and the wrong price." The allegations here suffer from the same defect. Because the only markets plaintiffs address are implausible Ivy-only markets, their allegations say nothing about prices in the actual markets, *i.e.*, the markets containing the schools AAHA students actually consider, a universe encompassing schools both inside and outside of the Ivy League. Put differently, plaintiffs' allegations address "the wrong price" (Br.30).

4.     Plaintiffs err in contending (Br.25) that the alleged sustainability of the Ivy League Agreement over decades constitutes direct allegations of anticompetitive effects. To the contrary, rather than defining a unique market, that sustainability reflects the fact that the Ivy League offers student-athletes a

47

differentiated experience within a broader market. *See AD/SAT, Div. of Skylight*, 181 F.3d at 228 (recognizing that "significant price differences do not always indicate distinct markets"). Even if plaintiffs had adequately alleged longstanding higher prices (and they have not, *supra* p.40), that alone is not sufficient to allege market-wide anticompetitive effects. *Supra* pp.40-43.

This point is particularly salient in this case. Although plaintiffs still gesture toward price-fixing (*e.g.*, Br.31), their acknowledgment that the rule of reason applies amounts to a concession, for purposes of this appeal, that the Ivy League Agreement "might plausibly be thought to have a net procompetitive effect," *California Dental Ass'n v. FTC*, 526 U.S. 756, 771 (1999). Thus, it is at least equally plausible that the Ivy League Agreement is sustainable precisely because it *is* procompetitive, helping to differentiate a product within a broader market and expand consumer choice. *See NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 101 (1984). Because plaintiffs have not offered any factual allegations to "nudge[]" their conclusion to the contrary "across the line from conceivable to plausible, their complaint must be dismissed," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## C. Plaintiffs' Bootstrapping Theory Is Unavailing

As a last-ditch effort to justify reversal, plaintiffs claim (Br.46) that their direct and indirect allegations of anticompetitive effects "combine to show that the

48

Ivy League Agreement could and did artificially suppress compensation."
Tellingly, plaintiffs do not cite any authority to support this argument and even if it
were a reasonable approach, plaintiffs do not explain how it could work in the
absence of a plausibly defined market.

## II.    CHOH'S CLAIM IS UNTIMELY

Plaintiff Choh's claim independently fails because, on the face of the
complaint, it is time-barred.  A Sherman Act claim must be brought within four
years "after the cause of action accrued."  15 U.S.C. §15b.  An antitrust claim
accrues when "a defendant commits an act that injures" a plaintiff.  *Zenith Radio
Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971).  Choh alleges he was
injured because Brown did not award him a full athletic scholarship.  A42-43.
This injury accrued when Choh enrolled at Brown in September 2017, knowing
full well Brown would never offer him an athletic scholarship.  *Id.*  September
2017 was more than four years before the complaint's March 2023 filing date.
*Supra* p.7.

In arguing that his claim is nonetheless timely, Choh invokes the continuing
violations doctrine.  That doctrine recognizes that *new* overt acts causing *new*
injuries are subject to their own limitations period.  *US Airways, Inc. v. Sabre
Holdings*, 938 F.3d 43, 67-69 (2d Cir. 2019).  Choh, however, alleged no new
overt acts and no new injuries within the limitations period.  Any injury he may

49

have suffered was inflicted when he first enrolled at Brown in 2017. The fact that

he did not receive an athletic scholarship during later academic years was "merely

a 'manifestation' of Defendants' alleged prior agreement"—not a new overt act

that triggers a new limitations period. *SL-x IP S.a.r.l. v. Merrill Lynch, Pierce,*

*Fenner & Smith Inc.*, 2023 WL 2620041, at *3 (2d Cir. Mar. 24, 2023).

## A.    Choh Has Not Alleged Any New, Independent Overt Act

The district court followed this Court's precedent in holding that the

continuing violations doctrine is inapplicable because Brown's "failure … to

award [Choh] an athletic scholarship or compensation for athletic services during

the remainder of his time at Brown was simply a manifestation of the overt act,

namely Brown's decision to enter into the most recent version of the Ivy League

Agreement." Order.35.

"[A]n overt act that restarts the statute of limitations … must be a new and

independent act that is not merely a reaffirmation of a previous act." *US Airways*,

938 F.3d at 68. In *US Airways*, for example, the defendant allegedly charged the

plaintiff elevated prices pursuant to an anticompetitive provision in a contract

executed more than four years before the plaintiff brought suit. *Id*. at 69. This

Court rejected the plaintiff's appeal to the continuing violations doctrine, holding

that "each supracompetitive price charged … pursuant to the 2006 contract was not

an overt act of its own, but a manifestation of the prior overt act of entering into

50

the 2006 contract.  That act, which began the running of the statute of limitations, was performed more than four years prior to the filing of this action."  *Id.*

The rule in *US Airways* that only new, independent acts inflicting new injuries restart the limitations period is consistent with how other circuits apply the continuing violations doctrine.  In *Tam Travel, Inc. v. Delta Airlines, Inc.*, 583 F.3d 896 (6th Cir. 2009), for instance, the Sixth Circuit rejected an attempt to invoke the continuing violations doctrine where the defendant, after emerging from bankruptcy, continued to apply a commission policy that was allegedly the product of a long-running antitrust conspiracy.  The court held that the maintenance of an existing policy is not an overt act sufficient to extend the statute of limitations, reasoning that otherwise "the applicable limitations period for a § 1 claim would be infinite."  *Id.* at 902.  Similarly, the Fourth Circuit held in *CSX Transportation, Inc. v. Norfolk Southern Railway Co.*, that "mere silence or inaction from a defendant— even though the alleged unlawful conspiracy to exclude a plaintiff remains in effect—isn't enough to restart the limitations period" because "an *affirmative* act— like a promise to act in the future—is required."  114 F.4th 280, 289 (4th Cir. 2024), *petition for cert. filed*, No. 24-591 (U.S. Nov. 26, 2024).

District courts within this Circuit have repeatedly found that allegedly new overt acts do not toll the statute of limitations when they simply manifest preexisting policies.  In *Giordano v. Saks Inc.*, 654 F.Supp.3d 174 (E.D.N.Y.

2023), *aff'd*, 2025 WL 799270 (2d Cir. Mar. 13, 2025), for example, the plaintiffs
alleged that "Saks and [other] [d]efendants … agreed not to compete for
employees in the luxury retail industry by not hiring" Saks' employees unless
certain terms were met, thus "resulting in depressed compensation," among other
harms, *id.* at 184. The court found no continuing violation because "[a]ctions
taken by Defendants in performance of the no-hire agreement … [were]
'manifestation[s] of the 'overt act.'" *Id.* at 192. Similar reasoning was applied in
*In re Google Digital Advertising Antitrust Litigation*, 721 F.Supp.3d 230 (S.D.N.Y.
2024), which held that "repeated manifestation[s] of the same overt act—
enforcement on a limit on the number of line items permitted in header bidding"
were "not new and independent acts," *id.* at 272-273. At bottom, "[u]nder any
meaningful definition of 'reaffirmation' … a 'renewal' of policies in existence"
before the limitations period are just that—reaffirmations—not new overt acts.
*Madison Square Garden, L.P. v. NHL*, 2008 WL 4547518, at *10 (S.D.N.Y. Oct.
10, 2008).

  This case fits squarely within the above case law. The complaint alleges that
defendants, through "[t]he original Ivy League Agreement" in 1954, decided not to
award athletic scholarships, instead deciding that "[a]thletes shall be admitted as
students and shall be awarded financial aid only on the basis of economic need."
A62. Defendants (including Brown) allegedly "reaffirmed" that original decision

in 1977, 1979, and 2017, all well outside the limitations period.  *Id.*  And that agreement has allegedly been "enforced for decades, to the present."  *Id.*  Thus, on Choh's own allegations, the Ivy League Agreement meant there was never any possibility that Brown would ever award him an athletic scholarship, or any other compensation for his membership on Brown's men's basketball team.  On the face of the complaint, that continued reality was "only a manifestation" of the Ivy League Agreement, meaning the absence of any later athletic scholarships or compensation did not "constitute a 'new and independent act,' as required to restart the statute of limitations."  *US Airways*, 938 F.3d at 68.  Because Choh's "complaint's untimeliness is apparent on its face," Choh's invocation (Br.50) of the general rule that plaintiffs do not have the burden of pleading the inapplicability of an affirmative defense is irrelevant and "a statute of limitations dismissal at the motion to dismiss stage is appropriate."  *Griffin v. Carnes*, 72 F.4th 16, 21 (2d Cir. 2023) (per curiam).

To be sure, Choh received updated need-based financial aid awards each year that factored in any changes in his or his family's financial circumstances. But the fact that his *need-based* aid was recalculated each year is irrelevant. Choh's allegations stem from the Ivy League Agreement itself, Choh was (allegedly) injured by the Ivy League Agreement in 2017, and plaintiffs'

allegations confirm that the agreement at issue did not change during his tenure at Brown.

As the district court recognized, "Choh first felt the adverse impact of the Ivy League Agreement no later than when he enrolled at Brown University in September 2017. His claim accrued by then and the statute of limitations began running." Order.34-35. Choh's claim is therefore time-barred based on allegations apparent from the face of the complaint.

**B.     Choh's Counterarguments Are Unavailing**

Choh's arguments to the contrary do not move the needle.

1.     Choh relies heavily (Br.51-53) on *Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997), in attempting to save his untimely claim. But *Klehr* stands for no more than the unremarkable proposition that the continuing violations doctrine makes certain claims timely that arguably originate outside the limitations period. The crux of this dispute is whether the continuing violations doctrine applies on the facts Choh alleged, and *Klehr* does not speak to that question.

*Klehr* is also distinguishable in several respects. For one, Sherman Act claims were not at issue in *Klehr*. 521 U.S. at 182. Unsurprisingly then, "the Supreme Court did not specifically analyze the antitrust laws," and "the specific

facts" in that case were not "relevant to a Section 1" Sherman Act claim. *Giordano*, 654 F.Supp.3d at 193.[5]

*Klehr* also presents a starkly different factual scenario. There, the plaintiffs alleged that defendants engaged in fraud when selling silos to store cattle feed. 521 U.S. at 183-184. Unlike those plaintiffs, who were allegedly unaware of the illegality surrounding the transaction they entered into, Choh was a student-athlete who made a single decision—to enroll and play basketball at Brown knowing it would not award him an athletic scholarship—that he now alleges was controlled by an agreement that has been public knowledge for decades. Tellingly, *Klehr* observed that reliance on a supposed "series" of acts can "lengthen[] the limitations period dramatically" and "thereby conflicts with a basic objective—repose—that underlies limitations periods." *Id.* at 187. Thus, to the extent *Klehr* is relevant, it supports applying the statute of limitations here to prevent Choh from "sleeping on [his] rights." *Id.*

---

[5] Neither of the two out-of-circuit cases Choh cites (Br.52) as applying *Klehr* to antitrust claims holds much weight. One, which held that payment of "depressed wage[s]" is analogous to "additional sale[s]" in a price-fixing conspiracy, *Turner v. McDonald's USA, LLC*, 2020 WL 3044086, at *4 (N.D. Ill. Apr. 24, 2020), failed to engage with the requirement that a defendant commit an alleged *new* overt act for the continuing violations doctrine to apply. The other specifically relied on a new overt act within the limitations period. *West Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 106 (3d Cir. 2010).

2.      Choh's effort (Br.54-59) to distinguish *US Airways, Inc. v. Sabre Holdings, Corp.*, the principal authority on which the district court relied, Order.33-35, is likewise unpersuasive.  He first asserts (Br.54) that *US Airways* "articulated" "an exception to the continuing violation doctrine."  Not so.  *US Airways* merely addressed when the doctrine applied; it did not carve out certain, otherwise-applicable scenarios from the doctrine.  *See* 938 F.3d at 69.

Choh is also wrong in claiming (Br.54) that *US Airways* is distinguishable on the ground that, unlike this case, "the contract at issue [in *US Airways*] was between plaintiff and the defendant."  This Court's reasoning underscores that this is a distinction without a difference.  The holding in *US Airways* aligned with those of other circuits, including the rule adopted by the Sixth Circuit in *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462 (6th Cir. 1996).  *See US Airways*, 938 F.3d at 68.  *DXS* did not concern a bilateral contract between the plaintiff and defendant.  It instead considered "a series of policies regarding [defendant's] maintenance services" that the defendant adopted on its own, rather than through negotiation with the plaintiff.  100 F.3d at 465.  And the court expressly acknowledged that had the defendant "implemented its new policies" on the date it provided notification to the plaintiff, that could demonstrate that later actions "were merely effects … that caused no new injury" to the plaintiff.  *Id.* at 468.  The

56

fact that the parties had not entered a bilateral contract with each other did not factor into the analysis at all.[6]

In addition, numerous cases have found that, even when a horizontal conspiracy is alleged, a plaintiff must still allege a new overt act that causes a new injury to trigger application of the continuing violations doctrine. *Supra* pp.51-52. And plaintiffs' argument to the contrary (Br.55-56) notwithstanding, *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979), does not suggest otherwise. In *Berkey*, this Court explained that a plaintiff is injured when he or she "'feels the adverse impact' of the [alleged] violation" by, for example, paying "price[s]" "boost[ed] … to excessive levels." *Id.* at 295. Here, Choh felt any "adverse impact" when he matriculated at Brown in 2017, with full knowledge of the Ivy League's decades-old policy, and incurred the effects of Brown's final decision not to award him an athletic scholarship. The fact that Brown did not change course and grant Choh an athletic scholarship during the ensuing years was merely a reaffirmation of that decision.

---

[6] The Sixth Circuit in *DXS* ultimately reversed the district court's grant of summary judgment to the defendant, 100 F.3d at 476, but it did so because of factual disputes over whether actions the defendant took during the limitations period were reaffirmations or new overt acts implementing a new policy, *id.* at 467-468. Here, there is no dispute that the Ivy League Agreement was implemented well before the limitations period.

## CONCLUSION

The decision below should be affirmed.

April 2, 2025

Respectfully submitted,

*/s/ Seth P. Waxman*

NOAH J. KAUFMAN
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
(617) 341-7590
noah.kaufman@morganlewis.com

JON R. ROELLKE
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5754
jon.roellke@morganlewis.com

*Attorneys for Defendant-Appellee
Brown University*

KAREN HOFFMAN LENT
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
Room 40-216
New York, NY 10001-8602
(212) 735-3276
karen.lent@skadden.com

AMY VAN GELDER
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
320 South Canal Street
Chicago, IL 60606-5707
(312) 407-0903

SETH P. WAXMAN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington DC 20037
(202) 663-6000
seth.waxman@wilmerhale.com

DAVID GRINGER
ALAN SCHOENFELD
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
alan.schoenfeld@wilmerhale.com
david.gringer@wilmerhale.com

*Attorneys for Defendant-Appellee The
Trustees of the University of
Pennsylvania*

DIANE L. MCGIMSEY
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA 90067
(310) 712-6600
mcgimseyd@sullcrom.com

*Attorney for Defendant-Appellee
Harvard University*

58

amy.vangelder@skadden.com

*Attorneys for Defendant-Appellee Trustees of Columbia University in the City of New York*

NORMAN ARMSTRONG, JR.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 389-5000
norman.armstrong@kirkland.com

EMILY T. CHEN
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
emily.chen@kirkland.com

*Attorneys for Defendant-Appellee Cornell University*

ISHAN K. BHABHA
DOUGLAS E. LITVACK
JENNER & BLOCK LLP
1099 New York Avenue NW, Suite 900
Washington, DC 20001-4412
(202) 637-6327
ibhabha@jenner.com
dlitvack@jenner.com

*Attorneys for Defendant-Appellee Trustees of Dartmouth College*

JUAN A. ARTEAGA
ROSA MORALES
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Avenue
New York, NY 10001
(212) 803-4000
jarteaga@crowell.com
rmorales@crowell.com

JORDAN LUDWIG
CROWELL & MORING LLP
515 South Flower Street, 40th Floor
Los Angeles, CA 90071
(213) 443-5524
jludwig@crowell.com

*Attorneys for Defendant-Appellee Princeton University*

CHARLES A. LOUGHLIN
BENJAMIN F. HOLT
CHRISTOPHER M. FITZPATRICK
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600
chuck.loughlin@hoganlovells.com
benjamin.holt@hoganlovells.com
chris.fitzpatrick@hoganlovells.com

*Attorneys for Defendant-Appellee Yale University*

DEREK LUDWIN
MEAGHAN RYAN
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, D.C. 20001

59

(202) 662-5429
dludwin@cov.com
mryan@cov.com

*Attorney for Defendant-Appellee*
*Council of Ivy Group Presidents*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Local Rule 32.1(a)(4)(A).

1.      Exclusive of the exempted portions of this brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,784 words.

2.      This brief complies with the typeface and style requirements of Fed. R. App. 32(a)(5)-(6), because this brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font. As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

*/s/ Seth P. Waxman*
SETH P. WAXMAN

April 2, 2025